# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| EDIBLE GIFTS PLUS, LLC and MELANIE OLLIVETT DIZDAREVIC,<br><br>         Plaintiffs,<br><br>v.<br><br>MARGO RAPPEL and XYZ COMPANY,<br><br>            Defendants/Third Party Plaintiffs.<br><br>v.<br><br>MELANIE DIZDAREVIC, DINO DIZDAREVIC & DARREN J. KADY,<br><br>         Third Party Defendants. | CIVIL ACTION NO. 3-15-CV-07904-AET-DEA<br><br><br>**Affidavit of Plaintiff Melanie Ollivett Dizdarevic in Support of Motion for Summary Judgment**<br><br><br>(Electronically Filed) |

MELANIE OLLIVETT DIZDAREVIC, being duly sworn, deposes and says:

1)    I am the Plaintiff in the above-captioned matter and make this Affidavit in support of the within motion for summary judgment.

## The Edible Gifts Plus Business (the "Business")

2)      On or about January 11, 2014, I entered into an Asset Purchase Agreement with Defendant Margo Rappel to purchase Ms. Rappel's Edible Gifts Plus business.

3)      Edible Gifts Plus (the "Business") is primarily a seller of edible treats and gifts such as cookies, candies, gourmet chocolates, dipped fruits, pretzels, popcorn, and other similar items (collectively, the "Business Goods").

4)       Both before and after the Closing Date, the Business has specialized in offering and selling Business Goods for special occasions, holidays, gifts, and promotions, and customizing such Business Goods and their packaging for corporate clients, individuals, parties, and special events.

## The Agreement for the Sale of the Business

5)      In connection with her sale of the Business, Ms. Rappel was represented by Lauri O. Bini, Esq. of the New Jersey law firm of Byrnes O'Hearn & Heugle, LLC.

6)      In connection with my purchase of the Business, I was not represented by, and did not consult with, an attorney.

7)      A true and complete copy of the January 11, 2014 Asset Purchase Agreement, including all Schedules thereto (collectively, the "Agreement"), is annexed hereto as **Exhibit A**.

2

8)     A true and complete copy of the February 5, 2014 Bill of Sale, including all Schedules thereto (collectively, the "Bill of Sale"), is annexed hereto as **Exhibit B**, and includes the same Schedule A (Assets and Property Being Sold and Liabilities Being Assumed) and Schedule C (Purchase Price Allocation) that were annexed to the Agreement, and a Seller's Affidavit.

9)     On behalf of Ms. Rappel, Ms. Bini drafted the Agreement and the Bill of Sale.

10)     Although the Agreement in its entirety was drafted by Ms. Bini, I did request the inclusion of a non-compete clause (the "Non-Compete Clause") to protect the goodwill that I was acquiring under the Agreement and to ensure, among other things, that Ms. Rappel did not, after the Closing, continue to use her valuable network of vendors and customers (which I was buying) to sell Business Goods to the customers of the Business.

11)     The Non-Compete Clause, which was also drafted by Ms. Bini, appears in the final Agreement at page 5, Paragraph 15.

12)     The transaction for the sale of Edible Gifts Plus closed on or about February 5, 2014 (the "Closing" or "Closing Date").

**Whether Seller's Post-Closing Transactions Violate the Non-Compete Clause**

13)     Prior to the Closing Date, the following companies were regular customers of the Business (hereinafter collectively referred to as "Business

Customers"), and were included in the customer database that I acquired under the Agreement:

      (a) Springpoint Senior Living in Wall Township, NJ;

      (b) CR Wealth Management Group in New York, NY ("CR Wealth");

      (c) Micro Strategies in Rockaway and Parsippany, NJ; and

      (d) Project Ezrah in Englewood, NJ.

14)    Prior to Closing, Ms. Rappel did not tell me that her contacts for certain corporate customers, including Gary Puma at Springpoint Senior Living, were members of her family.

15)    Prior to Closing, Ms. Rappel did not tell me that her contact at Micro Strategies, Letty Dempsey, was Ms. Rappel's good friend.

16)    Based on sales records that I had access to after purchasing the Business, based on overall sales:

      (a) Project Ezrah was the single largest customer of the Business prior to Closing, with overall sales of $125,593.43 from 2009 through their last order on January 30, 2014 (six days prior to Closing); and

      (b) Micro Strategies was the second largest customer of the Business prior to Closing, with overall sales of $86,703.04 from 2009 through their last order on January 15, 2014 (21 days prior to Closing).

17)    Prior to the Closing Date, the following vendors were regular vendors of the Business (hereinafter collectively referred to as "Business Vendors"):

(a) Lady Fortunes;

(b) Veronica's Treats; and

(c) Sugar Plum.

These Business Vendors appeared on a list of vendors that Ms. Rappel provided to me when I purchased the Business, which was marked as Exhibit MD-4 at my deposition and is annexed hereto as **Exhibit C**.

18)    Prior to the Closing, Ms. Rappel did not tell me that her contacts for these three Business Vendors (Lady Fortunes, Sugar Plum, Veronica's Treats) were also personal friends.

19)    All three of these Business Vendors are also online edible gift businesses in their own right, and in addition to selling their gift products at a discounted price to resellers like Edible Gifts Plus, they also sell directly to the public. True and complete copies of the home pages for the respective websites of all three Business Vendors are annexed hereto as **Exhibit J.**

20)    I have reviewed the table of Seller's Post-Closing Transactions set forth in ¶ 27 of Plaintiff's Statement of Material Facts Not In Dispute submitted in support of this motion, and understand it to accurately reflect the documents and testimony obtained in this case to date (which I have also reviewed) reflecting

post-Closing transactions by which Ms. Rappel used the above Business Vendors to sell products to the above Business Customers. These post-Closing transactions are hereinafter collectively referred to as the "Seller's Post-Closing Transactions."

21)   With respect to all of the Seller's Post-Closing Transactions:

   (a) They all involve orders for Business Goods that could have been fulfilled by the Business after the Closing;

   (b) Ms. Rappel did not contact me at any time about any of the Seller's Post-Closing Transactions, and denied that any such transactions were taking place until they were disclosed through discovery taken in this litigation.

22)   CR Wealth currently remains a client of the Business.

23)   Annexed hereto as **Exhibit D** are true copies of two e-mails dated August and November 2016 detailing two recent orders that CR Wealth placed with me.

24)   Had Ms. Rappel or the Business Customers contacted me about the Seller's Post-Closing Transactions before they were handled by Ms. Rappel, I would have and could have fulfilled all of these orders.

25)   With respect to Seller's Post-Closing Transaction #9, while Ms. Rappel testified that I would not be able to fulfill the "holiday tray" portion of this

order because the customer specifically requested that Sugar Plum fill this order, I respond as follows:

(a) There are many other excellent resellers of goods of this type, and I am certain that I could have obtained comparable goods that would have met or exceeded the customer's expectations – holiday trays are fairly standard items that are offered by a wide variety of vendors;

(b) Although Sugar Plum told me just two months after the Closing that our orders were "too small" to continue doing business with us, had a client expressly requested this specific vendor, I would have tried to honor the request;

(c) Apparently this particular order was not too small for Sugar Plum to fulfill it for Ms. Rappel, so I believe they would have done the same if I had placed the order; and

(d) Because Ms. Rappel kept the customer (Micro Strategies) to herself, I was never given the chance to offer my services to this large and valuable client.

26) I still own the Business that I acquired from Ms. Rappel under the Agreement, and have never sold, transferred, or otherwise assigned my interest therein.

## <u>Whether All Website Images Were Part of the Agreement</u>

27)     Prior to Closing, my husband and I travelled from our home in South Carolina to Ms. Rappel's home office in New Jersey to review the financial records of the Business.

28)     During our visit, we spent approximately 6 or 7 hours in Ms. Rappel's home office.

29)     During our visit, we barely spoke with Ms. Rappel, who was busy on the phone and on her computer.

30)     Instead, Ms. Rappel referred us to an employee named Vicky to review the financials with us and answer any questions we had about them.

31)     We spent about 95% of our time on this visit reviewing the financials with Vicky.

32)     Other than showing us, through a couple of examples, how new orders were processed as they came in, Ms. Rappel did not show us anything else about the Business during our visit.

33)     At no time prior to Closing did Ms. Rappel, or any employee of the Business: (a) show me where any of the product images used on the Business website came from; (b) advise me that Ms. Rappel did not own the product images that appeared on the Business website; or (c) advise me that any of the product

images that appeared on the Business website were owned by other parties such as vendors of the Business.

34)     Annexed hereto as **Exhibit E** is a true and complete copy of Ms. Rappel's January 3, 2013 answers to several questions I presented with my conditional offer to buy the Business, which was marked as Exhibit MD-2 at my deposition, and Exhibit P-4 at Ms. Rappel's deposition (highlighting for emphasis added).

35)     As shown in **Exhibit E**, I specifically asked Ms. Rappel several questions about who owns the Business website, who maintains it, who makes changes and adds new products to it, and how much it costs to make those changes, including the addition of new products. <u>See</u> **Exhibit E**, highlighted questions and answers on page 2.

36)     Ms. Rappel's responses to my questions led me to believe that, although Ms. Rappel had hired outside web developers/consultants in the past to do this work, at the time of the Closing Ms. Rappel was making most changes to the Business website, including the addition of new products, by herself.

37)     At the time of the Closing, there were approximately 3,000 product images on the Business website.

38)     As such, there was little need for me to do much in terms of adding new products and images immediately and for some time after the Closing.

9

39)   Consistent with Ms. Rappel's reported own practice, however, since taking over the Business I have handled most changes to the Business website myself, including the addition of new products and images.

40)   This includes staging and photographing new products for inclusion on the Business website, all of which I do myself.

41)   Attached as **Exhibit F** is a sampling of images from among the dozens of photo shoots I have done since the Closing to add additional products and images to the Business website.

42)   On or about May 26, 2015, we received an e-mail from Lady Fortunes, one of the Business Vendors, advising that we were in breach of a prior "Reseller Agreement" between Lady Fortunes and Ms. Rappel by which Ms. Rappel was permitted to use Lady Fortune's "intellectual property (our images, descriptions, product designs, etc)" on the Business website. A true and complete copy of Lady Fortune's May 26, 2015 e-mail (hereinafter "Lady Fortunes Demand"), which was marked as Exhibit MD-19 at my deposition, is annexed hereto as **Exhibit G** (highlighting for emphasis added).

43)   The Lady Fortunes Demand required the Business to sign a new "Reseller Agreement which effectively makes you agree to exclusivity to Lady Fortunes Inc for the products you currently offer already on your site." See **Exhibit G**.

10

44) A true and complete copy of Lady Fortune's proposed Reseller Agreement ("Proposed Reseller Agreement") is annexed hereto as **Exhibit H**.

45) The Lady Fortunes Demand was the first time I had ever heard of a contract between the Business and one of its vendors.

46) With the exception of software licenses, such as the license for Volusion, which is the e-commerce software used to manage the back-end of the Business website, and a contract with "Worldpay," which is the company that processes credit card payments for the Business, there were no other licenses or contracts transferred under the Agreement.

47) From my very first discussions with Ms. Rappel about her Business, through and after the Closing, Ms. Rappel never identified, mentioned, produced, or transferred to me any licenses or contracts between the Business and any of its vendors.

48) Since taking over the Business after Closing, I have reviewed all of the documents that Ms. Rappel transferred to me under the Agreement, and have never found any licenses or contracts between the Business and any of its vendors.

49) The Lady Fortunes Demand was the first time I had ever heard of a Business vendor claiming an ownership interest in any of the "intellectual property," including product images, used on the Business website I had purchased under the Agreement.

50)   Contrary to what Lady Fortunes stated in the Lady Fortunes Demand, I believed that I owned all "intellectual property," including product images, which existed on the Business website at the time of the Closing, having purchased it from Ms. Rappel under the Agreement.

51)   This belief was based on:

(a) The Agreement and the Bill of Sale, which I understood to include the Business website, images, and intellectual property in their entirety and without any exclusions;

(b) The Seller's representations in the Agreement and the Bill of Sale that she owned good and marketable title to all assets being transferred, without restriction;

(c) The Seller's answers to my questions prior to Closing, by which she told me in writing that she handled most changes to the Business website herself, including the addition of new products; and

(d) A review of the Business website prior to Closing, which displayed thousands of product images without any indication that any of the images were owned by someone other than Ms. Rappel.

52)    Both before and after the Closing, the product images used on the Business website did not identify to end-users the vendor who manufactured the goods.

53)    Both before and after the Closing, the Business website did not identify the source of the product images shown on the Business website.

54)    The reason that the sources of the products and product images are not visible on the Business website is obvious: providing end-users with such information might prompt them to leave the Business website and try to buy the Business goods directly from the vendors/manufacturers.

55)    Even today, this is consistent with the practice of other resellers of similar products, such as 1-800-Bakery, Chocolate.org, All About Gifts & Baskets, Cookies.com, My Baby Shower Favors, and Good Fortunes.

56)    For example, annexed hereto as **Exhibit I** are true copies of product page screenshots for each of the above-referenced resellers, all of which depict product images without identifying the source of either the images or the products.

57)    Although I requested from Lady Fortunes a copy of the "Reseller Agreement" that it claimed to have with Ms. Rappel, Lady Fortunes never provided me with a copy of any such agreement.

58)     Despite searching all of the Business records that I acquired from Ms. Rappel under the Agreement, I have never found a copy of any agreement between Ms. Rappel and Lady Fortunes, or any other vendor of the Business.

59)     I declined to execute the Proposed Reseller Agreement because it required that the Business use Lady Fortunes exclusively for many products that I could purchase from other vendors, and it did not make sense for my East-coast based business with many East-coast based clients to have to rely exclusively on a West-coast based vendor for most of its order fulfillment.

60)     Once I declined to execute the Proposed Reseller Agreement, Lady Fortunes demanded that I immediately remove all of its intellectual property, including product images, from my website.

61)     Believing that the product images were all mine, having purchased all websites, images, and intellectual property from Ms. Rappel under the Agreement, I initially refused to remove any images from the Business website.

62)     Lady Fortunes ultimately retained an attorney who sent me a formal demand, under penalty of litigation, to remove all of Lady Fortunes' images from the Business website.

63)     I retained my own attorney to advise me with respect to the Lady Fortunes dispute.

64)     In working with my attorney to resolve the Lady Fortunes dispute, I learned, for the first time, that Lady Fortunes did, in fact, own more than 1,800 of the approximately 3,000 images that I had been using on the Business website.

65)     On the advice of my attorney, and to avoid litigation with Lady Fortunes, I spent several months removing all of Lady Fortunes' images from the Business website.

66)     Deleting more than half of the product images from my Business website has had a significant negative impact on my Business.

67)     As demonstrated above in Paragraphs 55 and 56, and shown in **Exhibit I**, consumers have several other choices when deciding where to buy the edible gift products that I sell, and the removal of more than half of the product images from my Business website put me at a severe competitive disadvantage.

68)     In addition to the lost revenue caused by the deletion of more than half of the images from my Business website, I have spent significant time and expense rebuilding the Business website with new products and images to replace those that were owned by Lady Fortunes.

69)     Replacing more than half of the product images that were previously displayed on my Business website is a time-consuming process, which even now, about a year and a half after the Lady Fortunes Demand, is not complete.

70)     To date, I have replaced about half of the 1,800 product images that Lady Fortunes required me to delete from the Business website.

71)     In deciding to purchase the Business from Ms. Rappel, I relied on the language of the Agreement and the Bill of Sale, and Mr. Rappel's representations thereunder, to conclude that I was buying the Business website and everything on it, including all "intellectual property" and images.

72)     Had I known that more than half of the images on my Business website were owned by Lady Fortunes, who could demand that they be taken down at any time, I would have been alerted to how little bargaining power I had against the single largest vendor of the Business, and I never would have purchased the Business from the Seller.

73)     At the very least, I would never have agreed to a purchase price of $120,000, which, as reflected in the Schedule C Purchase Price Allocation that was drafted by Ms. Rappel's attorney, included $22,500 for URL's and Websites, and another $20,000 for Intellectual Property. *See* **Exhibit A** at 9 (Schedule C Purchase Price Allocation).

74)     At the time of the Closing, I believed that I was buying a valuable e-commerce site as an ongoing business concern that did between $251,000 and $461,000 in gross annual sales prior to Closing.

75)     That value derived, in large part, from:

a) The personal and business good will that the Seller had developed over the years through her relationships with the vendors and customers of the Business, which I was buying and sought to protect via the non-compete clause contained in the Agreement; and

b) A valuable e-commerce site that was powered, in large part, by images of the products sold by the Business; without those images, the website I bought is really just an empty template, as the images are essential to converting site visits to sales.

76)     The vendor and customer lists, the good will associated therewith, and the website, including all images and intellectual property related thereto, were the most important and valuable assets that I purchased under the Agreement; without them, there is little to no value to the Business.

17

I swear under penalty of perjury that the above statements are true and correct to the best of my knowledge, information, and belief.


Dated: March _10_, 2017

Subscribed and sworn to on this
_10th_ day of March, 2017.

Notary Public

18

EXHIBIT "A"

## CONTRACT FOR SALE OF ASSETS

AGREEMENT made this 11th day of January, 2014, by and between

### EDIBLE GIFTS PLUS, LLC
(hereinafter referred to as "Seller")

And

### MELANIE OLLIVETT
(hereinafter referred to as "Buyer")

Seller presently owns and operates a business known as Edible Gifts Plus, LLC trading as Edible Gifts Plus, Candy Wraps Plus, and Cookie HQ.  Seller is desirous of selling said business.

Buyer desires to purchase the business as a going concern, exclusive of cash and accounts receivable and free of any obligation for accounts payable or other liabilities of the Seller.

For the reasons set forth above and in consideration of the mutual covenants and promises of the parties to the agreement. Seller and Buyer covenant and agree as follows:

1.   **Sale of business.**  Seller agrees to sell and Buyer agrees to purchase. free from all liabilities and encumbrances except as otherwise specifically set forth herein. the assets now owned by Seller operating at 119 Borden Road, Middletown, New Jersey 07748. including all of Seller's rights under its contracts, licenses, and agreements, including inventory and property owned and used by Seller in such business as specified in Schedule A, which includes the websites, email addresses, phone numbers, customer lists, vendor lists and the good will of the business as a going concern other than property specifically excluded herein.  Seller agrees to cooperate in shipping the inventory to Buyer at Buyer's request on or after the Closing. Buyer shall determine the shipping method and agrees to pay all costs associated with shipping said inventory and insuring the inventory during shipment. Seller agrees to answer questions and provide assistance to Buyer for a period of ninety (90) days after Closing.  This sale does not include the cash on hand or in banks at the date of closing. accounts receivable, the vehicles currently used by Seller. the office furniture, computers, printers, phones and equipment housed in the offices of Seller located at 119 Borden Road, Middletown, New Jersey, or such other property as may be listed in Schedule B, as agreed to by the parties prior to Closing.  The parties acknowledge and agree that all orders placed prior to Closing shall be the responsibility of Seller and Seller is entitled to all profits from such orders.

2.   **Purchase price.**  As full payment for the transfer of the assets by Seller, Buyer shall pay to Seller the sum of ONE HUNDRED TWENTY THOUSAND



EXHIBIT D

P-2

8/30/16 S

EDIBLEGIFTS000728

MD-5

($120,000) DOLLARS. The Buyer has paid a deposit of FIVE THOUSAND DOLLARS ($5000) upon the signing of the Letter of Intent and will pay an additional FIVE THOUSAND DOLLARS ($5000) upon the signing of this Asset Purchase Agreement. The deposit monies will be held in escrow by Seller's attorney (collectively referred to as the "Deposit"). The purchase price shall be allocated among the assets as further agreed to by the parties and as attached as Exhibit C.

3.      **Terms of payment.**  The Buyer shall pay NINETY THOUSAND DOLLARS ($90,000) to Seller at Closing by certified, cashier's check, wire transfer or attorney trust account check. The Buyer shall pay to Seller the balance of the purchase price, or TWENTY THOUSAND DOLLARS ($20,000) as follows: Monthly payments of EIGHT HUNDRED THIRTY THREE DOLLARS AND THIRTY THREE CENTS ($833.33) due on the first of each month beginning with the first payment starting May 1. 2014 and ending with the last payment due April 1, 2016 (referred to as "Seller Financing"). In the event that a payment due is not made within ten (10) days of the time set forth in the Promissory Note, the Borrower shall pay an additional late fee in the amount of six percent (6%) of said payment.  Buyer, as well as Buyer's husband and father, agree to execute Personal Guarantees for said $20,000 Seller Financing.

4.      **Adjustments at closing.**  Adjustments shall be made at the time of closing for all operating expenses including. but not limited to website hosting expenses, pre-paid advertising expenses and any other applicable expenses agreed to by the parties.

5.      **Time of closing.**  The closing shall take place remotely at a time agreed upon by the parties on January 31, 2014.  Upon payment of the portion of the purchase price then due to Seller, Seller shall deliver to Buyer such instruments of transfer as are necessary to transfer to Buyer the business and property referred to in Section 1.  Such instruments of transfer shall effectively transfer to Buyer full title to the business and property referred to in Section 1, free of all liens and encumbrances, except as otherwise specifically set forth herein.

6.      **Default/Remedies.**  If either party fails to close, the non-defaulting party may pursue all remedies and damages in law and/or equity, flowing from the breach. Notwithstanding the above, the Buyer agrees that if the closing of this transaction does not occur through no fault of the Seller after the completion of due diligence by Buyer and the signing of this Asset Purchase Agreement, Buyer will forfeit the Deposit as liquidated damages. BUYER AND SELLER HAVE NEGOTIATED AND AGREED THAT SUCH LIQUIDATED DAMAGES ARE A GENUINE ESTIMATE OF THE FORESEEABLE DAMAGES TO SELLER IN THE EVENT OF BUYER'S BREACH AND SHALL BE THE SOLE RECOURSE BY SELLER FOR SUCH BREACH.

7.      **Representations of Seller.**  Seller represents to the best of Seller's knowledge that:

2

a)      Seller is duly qualified under the laws of New Jersey to carry on the business as now owned and conducted at the location of 119 Borden Road, Middletown, New Jersey.

b)      Seller is the owner of and has good and marketable title to the property referred to in Section 1, free of all restrictions on transfer or assignment and of all encumbrances.

c)      To the best of its knowledge, Seller has complied with all applicable laws (including rules, regulations, codes, plans, injunctions, judgments, orders, decrees, rulings, and charges there under) of federal, state, local, and foreign governments. To the best of its knowledge, Seller has fully complied with all laws, ordinances, rulings and regulations of all constituted governmental authorities having jurisdiction in respect to the business or its conduct thereof, and that no consents of any governmental authority are necessary to conclude this transaction.

d)      No proceedings, judgments, or liens are now pending or threatened against Seller or against the business. Seller shall remain responsible for any claim or action brought against the business for any work or services performed by Seller prior and up to date of closing and transfer of the business to Buyer.

e)      Seller will, up to the date of closing, operate the business in the usual and ordinary manner and will not enter into any contract except as may be required in the regular course of business.

f)      Seller will duly comply with any applicable provisions of Chapter 6 of the New Jersey Uniform Commercial Code dealing with bulk transfers.

g)      Seller states that all due diligence materials provided to Buyer are documents and records kept in the ordinary course of business and further states that to the best of Seller's knowledge all due diligence materials, including but not limited to facts, sales, expenses and accounting, are true and accurate. As part of due diligence, Buyer has the right to conduct an audit of any of Seller's business records. Buyer will pay all costs associated with the audit. Seller will reimburse Buyer for the costs of said audit in the event that audit determines discrepancies greater than two percent (2%).

8.     **Covenants.**

a)      At closing, the Buyer will assume all business costs and expenses.

b)      The Buyer will assume none of the liabilities of the former Edible Gifts Plus, LLC including accounts payable, and the net operating losses of the Seller will remain on the books of Edible Gifts Plus, LLC. The Buyer will be entitled to none of the accounts receivable of Seller.

3

9.      **Warranties or Guarantees.**  Other than as may be specifically set forth in this contract, Seller makes no representations and gives no warranties or guarantees whatsoever concerning the business, its volume, income, number of customers, web traffic or its gross or net receipts. Buyer is afforded ample opportunity to investigate and examine the business and all aspects concerning its operation, customer volume, income and/or receipts. All inventory included in the sale is sold strictly in its "as is" condition without any warranty or guarantee of Seller.

10.     **Tax Clearance Letter.**  Buyer will request a tax clearance letter from the State of New Jersey and Seller agrees to an escrow for any sum recommended by the State to be held pending a full tax clearance by the State.

11.     **Risk of Loss by Fire.**  Seller assumes all risk of destruction, loss, or damages by fire prior to the closing of this transaction. If any such destruction, loss, or damage amounts to more than Ten Thousand ($10,000.00) Dollars, Buyer may at her option terminate the agreement. In such event, the escrow agent shall immediately pay to Buyer the purchase money held by him, and the escrow agent shall be discharged from all liability therefore.

12.     **Representation by Buyer.**  Buyer represents that she has sufficient monies and assets available to complete this transaction without the need to obtain financing from any outside source other than the Seller Financing referred to herein.

13.     **Brokers and Brokers Commissions.**  Each party represents that no broker or finder or other person has any valid claim for brokerage commissions or finders' fees in connection with this agreement or the transactions contemplated under this agreement. Each party shall indemnify the other against any claim or loss suffered as a result of any other broker's commission or finder's fee payable, or alleged to be payable, on the basis of any agreement made by or on behalf of the indemnifying party.

14.     **Indemnification.**  After the Closing Date, Seller shall indemnify and hold harmless Buyer and her successors and assigns, against and in respect of any loss, liability or expense (including, without limitation, reasonable attorneys' fees and expenses) resulting from (a) any breach of any representation, warranty, covenant or agreement of Seller hereunder; (b) any third party claim, litigation, cause of action, judgment or damages with respect to liabilities or obligations of Seller relating to the conduct of the Business, the Assets or the Equipment prior to Closing Date.

Buyer shall indemnify and hold harmless Seller, and its successors and assigns, from any and all claims for sums due by third parties arising after the date of Closing, and in respect to any loss, liability, expense, third party claim, litigation, cause of action, judgment or damages with respect to obligations of Buyer after Closing, including court costs and reasonable attorneys fees, which indemnification shall survive Closing of title.

4

15.     **Non-Compete.** Seller agrees that (1) for a period of ten (10) years following the Closing of this transaction or (2) for as long as Buyer owns the business, whichever period is lesser, that Seller will not compete with, either directly or indirectly, an online edible gift business or other on-line gift business that markets and sells gifts for special occasions, holidays, celebrations, corporate/business events, gratuities and/or similar functions (hereinafter referred to as a "Gift Business"). For the purpose herein, the term "compete" means to design, manufacture, market or sell products that utilize the edible gifts concept and applies equally to refraining from teaching any other party (except for the Buyer) how to operate a Gift Business, consult, assist, direct, own or work for a Gift business. For the purposes herein, the term "compete" does NOT include any conduct or actions by Seller in working in any capacity for a business other than a Gift Business. Subsequent to the Closing, the Seller agrees not to transact business with Seller's current vendors for the purpose of competing with Buyer. Furthermore, subsequent to the Closing, Seller agrees that it will not solicit or contact individuals or entities on the customer list being sold to Buyer for the purpose of competing with the Buyer. The parties acknowledge and agree that Seller may make contact with said individuals and entities when there is a specific request to do so from the Buyer or for other personal or business matters which are in no way related to the Gift Business. The provisions of this paragraph shall survive the Closing of this transaction.

16.     **Customer List.** All records, customer lists, vendor lists and advertising materials relating to the business are included in this sale.

17.     **Business Name.** The names of Edible Gifts Plus, Candy Wraps Plus, and Cookie HQ which the Seller has been conducting business, as well as the right to use all phone numbers, web sites or other marketing names or devices are made a part of this sale and Buyer shall be authorized to use said names. From date of closing, Seller shall make no claim to said names or their use.

18.     **Due Diligence.**     Buyer has the right to conduct due diligence and may cancel this contract and obtain a full refund of all deposit monies if the due diligence materials do not meet Buyer's satisfaction. Buyer agrees to execute a confidentiality agreement prior to conducting any due diligence and hereby agrees that should the transaction not close, Buyer will not use any of Seller's proprietary information including its vendor and customer lists or operate a competing business or associate directly or indirectly with a competing online Gift Business.

19.     **Choice of Law.**     This Agreement as well as all other agreements and amendments thereto entered into by the parties shall be governed by and construed under the laws of the State of New Jersey and the federal and state courts located in the State of New Jersey shall have exclusive jurisdiction to hear and determine any claims or disputes pertaining directly or indirectly to this Agreement and to any matter arising there from.

20.     **Entire Agreement/Amendments.**     This Agreement represents the entire agreement of the parties and supersedes all prior agreements. Furthermore, this Agreement may not be modified, amended or terminated orally but only in writing signed by the parties.

5

EDIBLEGIFTS000732

Signed, sealed and delivered by the parties hereto on the date first above written.

Edible Gifts Plus, LLC, Seller

BY: *Margo Rappel*
Margo Rappel

BY: *Melanie Ollivett*

Melanie Ollivett, Buyer

Buyer acknowledges that she has completed due diligence as of this __14th__ day of January, 2014, that she has approved of the terms of this Asset Purchase Agreement, and that she has forwarded all deposit monies to Seller's Attorney to be held in escrow pending Closing.

Date: __1-14-14__          BY: *Melanie Ollivett*
                                Melanie Ollivett, Buyer

EDIBLEGIFTS000733

**SCHEDULE "A"**

ASSETS AND PROPERTY BEING SOLD AND LIABILITIES BEING ASSUMED

Inventory – to be shipped to Buyer at Buyer's sole cost and expense
Use of Names Edible Gifts Plus, Candy Wraps Plus and Cookie HQ
Exclusive use, rights and management of URLs currently under license to Seller
Customer Lists and Purchase History
Vendor Contacts and Purchase History
Goodwill
Trademarks
Images and Advertising Files
Telephone numbers
Email addresses
Assignable contracts of Seller
Non-Compete Agreement

No liabilities are to be assumed

ADDITIONAL ITEMS

**ALL INVENTORY IS SOLD STRICTLY IN ITS PRESENT "AS IS" CONDITION.**

7

EDIBLEGIFTS000734

## SCHEDULE "B"

### ASSETS AND PROPERTY NOT INCLUDED IN THE SALE

Cash on hand and in banks
Accounts Receivable (including credit card transactions pending at time of Closing)
Office furniture located at offices of Seller
Computers, printers, fax machines, telephones and similar equipment located at the offices of
    Seller
Seller's Vehicles

8

EDIBLEGIFTS000735

## SCHEDULE "C"

### PURCHASE PRICE ALLOCATION

INVENTORY          $6500

URL'S AND WEBSITES          $22,500

BUSINESS GOODWILL          $20,000

PERSONAL GOODWILL          $20,000

INTELLECTUAL PROPERTY          $20,000

CUSTOMER LISTS/VENDOR LISTS/DATA          $20,000

COVENANT NOT TO COMPETE          $1000

ASSISTANCE AND TRAINING          $10,000

EDIBLEGIFTS000736

EXHIBIT "B"

## BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS:  That Edible Gifts Plus, LLC located at 119 Borden Road, Middletown, New Jersey (herein referred to as "Seller"), for and in consideration of the sum of One Hundred Twenty Thousand Dollars ($120,000), to be paid to Seller, receipt of which Ninety Thousand Dollars ($90,000) is hereby acknowledged and the remaining twenty thousand dollars ($20,000) will be paid over time pursuant to the terms of a Promissory Note and Personal Guarantee by Buyer, Melanie Ollivett, located at 283 Ceasar Place, Hilton Head Island, South Carolina (herein referred to as "Buyer"), does hereby sell, transfer, set over and assign unto Buyer, all of its right, title and interest in and to the property set forth in Schedule "A" hereof.

TO HAVE AND TO HOLD, the same unto Buyer forever, subject to the following:

Seller covenants and agrees, to and with Buyer, to warrant and defend the sale of said property hereby sold, unto Buyer against all and every person or persons, except as otherwise herein stated.

All the terms, covenants and conditions herein contained shall be for and shall inure to the benefit of and shall bind the respective parties hereto, and their legal representatives, successors and assigns, respectively, except as otherwise herein stated.

In all references herein to any parties, persons, entities or corporations, the use of any particular gender or the plural or singular number is intended to include the appropriate gender or number as the text of the within instrument may require.

IN WITNESS WHEREOF, the Seller has hereunto set its hand and seal or caused this Agreement to be signed and to be deemed effective and binding as of the 5th day of February, 2014.

Attest:

Lauri O. Bini Esq.

By: _____
Margo Rappel

Sworn and subscribed to
Before me this 5th day of February, 2014.

Lauri O. Bini, Esq.
Attorney-at-Law of the State of New Jersey



## SCHEDULE "A"

### ASSETS AND PROPERTY BEING SOLD AND LIABILITIES BEING ASSUMED

Inventory
Use of Names Edible Gifts Plus, Candy Wraps Plus and Cookie HQ
Exclusive use, rights and management of URLs under license to Seller
Customer Lists and Purchase History
Vendor Contacts and Purchase History
Goodwill
Trademarks
Images and Advertising Files
Telephone numbers
Email addresses
Assignable contracts of Seller
Non-Compete Agreement

No liabilities are to be assumed.

### ADDITIONAL ITEMS

**ALL INVENTORY IS SOLD STRICTLY IN ITS PRESENT "AS IS" CONDITION.**

## SCHEDULE "C"

### PURCHASE PRICE ALLOCATION

INVENTORY          $6500

URL'S AND WEBSITES          $22,500

BUSINESS GOODWILL          $20,000

PERSONAL GOODWILL          $20,000

INTELLECTUAL PROPERTY          $20,000

CUSTOMER LISTS/VENDOR LISTS/DATA          $20,000

COVENANT NOT TO COMPETE          $1000

ASSISTANCE AND TRAINING          $10,000

STATE OF NEW JERSEY        :
                           : SS
COUNTY OF MONMOUTH         :

       **Margo Rappel,** being duly sworn, says:

1.     I am not a minor.   I am of full age and have full authority to execute this
       Bill of Sale as owner of Edible Gifts Plus, LLC ("Seller").

2.     Seller is the owner of and in actual possession of the property mentioned in
       This Bill of Sale.

3.     Seller has the absolute right and authority to sell same under the conditions and terms
       Contained in the Bill of Sale.

4.     There are no liens, mortgages, security interests, judgments, levies, Municipal,
       State, Federal, Unemployment compensation or social security taxes unpaid,
       Nor any persons or corporations who have any claim of any nature whatsoever
       Against the said property and that the same are free and clear, except:   None.

5.     This Affidavit is made to induce Buyer to purchase said property knowing that
       Buyer relies upon the truth of the statements herein contained.

                                         _Margo Rappel_
                                           Margo Rappel

Sworn and subscribed before
Me this 5ᵗʰ day of Feb , 2014.

_Lauri O. Bini_

Lauri O. Bini, Esq.

EXHIBIT "C"

**CONFIDENTIAL**

| VENDOR NAME | ZIP CODE | PHONE # | CONTACTS | ADDITIONAL INFO |
|---|---|---|---|---|
| David's Cookies | 07004 | 800-217-2938 | Lisa | email to Lisa@Davidscookies.com |
| | | | | 10 am cut-off |
| Gift Basket Drop Shippnig | 63755 | 573-204-8111 | | internet sales at Filing.com |
| | | | | Password: rjnjs5 |
| | | | | Enter orders on their site |
| Veronica's Treats | 02346 | 508-946-4438 | Hillary | Enter orders on their site |
| | | | Or Brittany | mlrappel@aol.com |
| | | | | Password. rjnjs5 |
| Bouquet of Fruits | 93727 | 559-259-6752 | Steve | Business gift network-corp catalog |
| | | | | info@EdibleGiftsPlus.com |
| | | | | Password: egp |
| Lollipop Creations | 28217 | 877-360-2337 704-535-9500 | Lori | Email orders to sales@lollypop.com |
| | | | | And lori@lorpop.com |
| Fairytale Brownies | 85040 | 800-324-7982 | | Email to wholesale@brownies.com |
| Lady Fortunes | 91304 | 818-993-1277 Ext 2 | Daria Heeda/Emma | mlrappel@aol.com Password: cookie1234 |
| Hampton Popcorn | New York | 212-570-9555 | Robin | email orders to: orders@hamptonpopcorn.com, robingould@hamptonpopcorn.com |
| South Bend Chocolate | 46619 | 574-233-2577 | Sheree | email orders to corp@sbchocolate.com |

AD-4

CONFIDENTIAL

Sugar Plum          18704          800-447-8427     Frann/Neil    email orders to

                                   570-288-0559                   customerservice@sugar-plum.com

                                                                  frann@sugar-plum.com

                                                                  Password: basket1


Gift Marketing Alliance                800-256-0069     Emmitt; Emma    Giftmarketingalliance.com


Cherubs n Chocolates                   888-284-0998

(candy bar wrappers)                   X107 (sales)


Carousel Cakes                         845-627-2323     Chelsea    email orders to

                                                                   info@carouselcakes.com


Resource Revival

*need to update*

CONFIDENTIAL

| Name | Zip Code | Phone Number | Contacts | Addtl. Info. |
|---|---|---|---|---|
| Corso's Cookies | 13209 | 800-465-7775; 315-487-2111; FAX – 315-487-4208 | Karen or Judy | password: open1234 noon cutoff |
| David's Cookies – CLOSED FOR PASSOVER | 07004 | 800-217-2938; Fax – 973-882-6998 | Lisa and Michele | e-mail and orders@Davidscookies.com 10 a.m. cutoff |
| Fruit Company | 97031 | 800-387-3100 | Julie or Becky | using spreadsheet 2:00 p.m. cutoff |
| Gift Basket Dropshipping | 63755 | 573-204-8111 | | password: rjnjs5 enter orders on their site Fruit ships from Maryland $1.50 – S/H to use our own account |
| Sweets in Bloom | 45236 | 513-961-6625 x134 | Joanne | e-mail to |
| Veronica's Treats | 02346 | 508-946-4438 (Home # – 508-337-5992) | Hillary or Brittany | Enter orders on their site rjnjs5 |
| Bouquet of Fruits | 93727 | 559-346-0210 or 0208; Fax – 559-346-0211; Steve – cell – 559-259-6752 | Nuvia or Nora (other #s – 800-243-7848) | Bouquetoffruit.com – now use DropShipGiftNetwork.com Business gift network – corp. catalog egp |
| Lollipop Creations | 28217 | 704-927-0590; 704-309-8041 | Lori | e-mail to and |
| All Wrapped Up | 33311 | 954-587-2111 | | e-mail to |
| Funky Chunky | 55439 | 888-473-8659 | Tori | Noon cutoff e-mail to |
| Supercookie | 60076 | 800-514-2207; cell – 847-894-2233; 847-251-1955 (café) | Philip or Mike | e-mail to |
| Fairytale | 85040 | 800-324-7982 | Ellie | e-mail to |

RAP_000080

CONFIDENTIAL

| | | | | |
|---|---|---|---|---|
| Brownies | | | Eileen - owner | |
| Exceptional Brownies | | 212-439-0766 | Claire | e-mail to claire@exceptionalbrownie.com |
| Lady Fortunes | 91304 | 818-993-1277 x2 | Daria Heeda Emma | cookie123 |
| Hampton Popcorn | New York | 212-570-9555 | Robin | e-mail orders to: robin@hamptonpopcorn.com, robingould@hamptonpopcorn.com |
| South Bend Chocolate | 46619 | 574-233-2577 | Sheree *caren nancy* | e-mail orders to |
| Sugar Plum | 18704 | 800-447-8427 | Frann; Neil | e-mail orders to customer *@* *m.com* Frann@sugar-plum.com *714-906.9* Our password: basket1 |
| Gift Marketing Alliance | | 800-256-0069 *570-* | Emmitt; Emma | Giftmarketingalliance.com |
| Cherubs n' Chocolates | | 888-284-0998 x107 (sales) | | |
| Carousel Cakes | | 845-627-2323 | Chelsea | e-mail orders to |
| Wabash Farms | | 877-888-7077 | Tom | e-mail orders to |
| Resource Revival | 97040 | 800-866-8823 | | |
| Smithfield Collection | | 888-741-2221 | Bonnie Howell | |
| Kosher Care Packages | | 718-776-0807 | Karen | |

*sweet*
*Sally's    Hawthrin, 917-656-3114*
*NJ*

*ay Design*
*info@ will designby tus.com*
*[illegible]*

CONFIDENTIAL

| Name | Zip Code | Phone Number | Contacts | Addtl. Info. |
|---|---|---|---|---|
| Corso's Cookies | 13209 | 800-465-7775 | Karen or Judy | @EdibleGiftsPlus.com pa open123 noon cutoff |
| David's Cookies | 07004 | 800-217-2938 | Lisa | e-mail to lisa@davidscookies.com 10 a.m. cutoff |
| Fruit Company | 97031 | 800-387-3100 | Julie or Becky | dropship@thefruitcompany.com using spreadsheet 2:00 p.m. cutoff |
| Gift Basket Dropshipping | 63755 | 573-204-8111 | | info@EdibleGiftsPlus.com password: rjnjs5 enter orders on their site |
| Sweets in Bloom | 45236 | 513-961-6625 x134 | Joanne | e-mail to sweetsnbloom@jonesthefoflorist.com |
| Veronica's Treats | 02346 | 508-946-4438 | Hillary or Brittany | Enter orders on their site mlrappel@aol.com rjnjs5 |
| Bouquet of Fruits | 93727 | 559-251-5262 | Nuvia or Nora | Bouquetoffruit.com Business gift network – corp catalog info@EdibleGiftsPlus.com egp |
| Lollipop Creations | 28217 | 704-525-9500 | JB or Stephanie | e-mail to Orders@lollipopcreations.com |
| All Wrapped Up | 33311 | 954-587-2111 | | e-mail to info@allwrappedup-gifts.com |
| Funky Chunky | 55439 | | Teri | |
| Supercookie | 60076 | 800-514-2207 | Philip or Mike | e-mail to philip@supercookie.com |
| Fairytale Brownies | 85040 | 800-324-7982 | Ellie | e-mail to wholesale@brownies.com |
| Exceptional Brownies | | 212-439-0766 | Claire | e-mail to claire@exceptionalbrownie.com |

*(handwritten notes throughout the document, partially legible)*

Hampton New York Popcorn  516-439-4723   Robyn   customerservice@ hamptonpopcorn.com online.hamptonpopcorn.com

sts. chocolate info.

Plum 18704   800-447-8423

XIO/ sales

CONFIDENTIAL

| Name | Zip Code | Phone Number | Contacts | Addtl. Info. |
|---|---|---|---|---|
| Corso's Cookies | 13209 | 800-465-7775 | Karen or Judy | info@EdibleGiftsPlus.com password: open123 noon cutoff |
| David's Cookies | 07004 | 800-217-2938 | Lisa | e-mail to Lisa@Davidscookies.com 10 a.m. cutoff |
| Fruit Company | 97031 | 800-387-3100 | Julie or Becky | drop.ship@thefruitcompany.com using spreadsheet 2:00 p.m. cutoff |
| Gift Basket Dropshipping | 63755 | 573-204-8111 | | info@EdibleGiftsPlus.com password: rjnjs5 enter orders on their site |
| Sweets in Bloom | 45236 | 513-961-6625 x134 | Joanne | e-mail to sweetsinbloom@onestheflorist.com |
| Veronica's Treats | 02346 | 508-946-4438 | Hillary or Brittany | Enter orders on their site mlrappel@aol.com rjnjs5 |
| Bouquet of Fruits | 93727 | 559-294-2070 | Nuvia or Nora | Bouquetoffruit.com Business gift network -- corp. catalog info@EdibleGiftsPlus.com egp |
| Lollipop Creations | 28217 | 704-525-9500 | JB or Stephanie | e-mail to Orders@lollipopcreations.com |
| All Wrapped Up | 33311 | 954-587-2111 | | e-mail to info@allwrappedup-gifts.com |
| Funky Chunky | 55439 | | Tori | |
| Supercookie | 60076 | 800-514-2207 | Philip or Mike | e-mail to philip@supercookie.com |
| Fairytale Brownies | 85040 | 800-324-7982 | Ellie | e-mail to wholesale@brownies.com |
| Exceptional Brownies | | 212-439-0766 | Claire | e-mail to claire@exceptionalbrownie.com |

Add:
Lady Fortune

**CONFIDENTIAL**

| VENDOR NAME | ZIP CODE | PHONE # | CONTACTS | ADDITIONAL INFO |
|---|---|---|---|---|
| David's Cookies and pat@davidscookies.com | 07004 | 800-217-2938 | Lisa | email to lisa@Davidscookies.com |
| | | | | 10 am cut-off |
| Gift Basket Drop Shippnig | 63755 | 573-204-8111 | | info@edibleraising.com |
| | | | | Password: rjnjs5 |
| | | | | Enter orders on their site |
| Veronica's Treats | 02346 | 508-946-4438 | Hillary Or Shari | Enter orders on their site |
| | | | | mkappel@aol.com |
| | | | | Password: rjnjs5 |
| Bouquet of Fruits | 93727 | 559-259-6752 | Steve | http://dropshipgiftnetwork.com/ |
| | | | | info@EdibleGiftsPlus.com |
| | | | | Password: egp |
| Lollipop Creations | 28217 | 704-525-9500 | Lori | Email orders to sales@daprano.com |
| | | | | And lori@daprano.com |
| Fairytale Brownies | 85040 | 800-324-7982 | | Email to wholesale@brownie.com |
| Lady Fortunes art@ediblegiftsplus.com | 91304 | 818-993-1277 | Daria | Info@ediblegiftsplus.com and |
| | | Ext 2 | Heeda/Emma | Password: cookie1234 and art |
| Hampton Popcorn | New York | 212-570-9555 | Robin | email orders to: |

customerservice@hamptonpopcorn.com, orders@hamptonpopcorn.com, jessica@hamptonpopcorn.com

**CONFIDENTIAL**

South Bend Chocolate    46619    574-233-2577    Brandy    email orders to brandy@sbchoco.com

Sugar Plum    18704    570-714-9069    Frann/Neil    email orders to

customerservice@sugar-plum.com;

frann@sugar-plum.com and

ParliosOcurs@sbcs.com

Pricing –

Truffles – 30%

Chocolate Molds – 40%

Chocolate Trays – 35%

Pizzas – 40%

Pizzas with Ribbons – 35%

Popcorn, Pretzels, Chips and Nuts – 40%

Double Decadence Basket and Holiday Hamper – 30%


User Name – info@ediblegiftsplus.com **Password: basket1**

Gift Marketing Alliance    800-256-0069    Alex and Debbie    Giftmarketingalliance.com and
gm4gifts.com – user name – mlrappel – password – rjnjs5


Cherubs  n Chocolates    888-284-0998

(candy bar wrappers)    X107 (sales)


Carousel Cakes    845-627-2323    Chelsea    email orders to

info@carouselcakes.com


Resource Revival


Sweet Sally's

**CONFIDENTIAL**

Heritage Shortbread – email orders to [illegible]

Funky Chunky – email orders to [illegible] and [illegible]

RAP_000086

EXHIBIT "D"

Edible Gifts Plus Mail - Order # 25848/25849

# Gmail

Melanie Dizdarevic <info@ediblegiftsplus.com>

## Order # 25848/25849
1 message

**Warren, Greg** <Greg.Warren@morganstanley.com>
To: Edible Gifts Plus <info@ediblegiftsplus.com>

Tue, Aug 30, 2016 at 6:47 AM

Good afternoon Melanie,

I just received the notifications that both packages have been delivered. Thank you so much for getting them out promptly, it's greatly appreciated. If there are any issues I'll let you know but so far we've received great feedback on the cookies! We look forward to doing business in the future.

Thank you,

Greg-

**The CR Wealth Management Group at Morgan Stanley**

**Greg Warren**

*Client Service Associate*

## Morgan Stanley

1290 Avenue of Americas, 13th Floor / New York, NY 10104

T: 212-492-6996 | T: 800-321-7390 | F: 212-492-6340
Email:  Greg.Warren@morganstanley.com

It is important that you do not use e-mail to request, authorize or effect the purchase or sale of any security or commodity, to send fund transfer instructions, or to effect any other transactions. Any such request, orders, or instructions that you send will not be accepted and will not be processed by Morgan Stanley Smith Barney.  Not for Appraisal or Valuation. Historical Data - Informational Purposes Only. Not an offer to buy or sell. No Guarantee. Not a Solicitation.

This report is not an official account statement and while it may contain data regarding income, liabilities, capital gains and losses, it is not an official tax statement. There are no guarantees of accuracy or completeness. Please refer to the original statement for current account information and any Form 1099's and related materials for tax or other purposes. In the case of conflict between this document and your statement, the statement controls. Up-to-date portfolio information can be found at www.mssb.com.

Not Tax or Legal Advice – Consult with Your Tax or Legal Advisor. No Added Duties Because of Additional Information.

EGP-000105

Edible Gifts Plus Mail – Moved Firms but Still Want Your White Chocolate Oreo Cookies



Melanie Dizdarevic <info@ediblegiftsplus.com>

## Moved Firms but Still Want Your White Chocolate Oreo Cookies

2 messages

**McKinnis, Alexander** <alexander.mckinnis@stifel.com>                    Thu, Nov 17, 2016 at 5:40 PM
To: "info@ediblegiftsplus.com" <info@ediblegiftsplus.com>
Cc: "Connelly, Tyler (New York 3 Bryant)" <tyler.connelly@stifel.com>, "Segal, Jason (New York 3 Bryant)"
<jason.segal@stifel.com>, "Lariviere, Paul (New York 3 Bryant)" <paul.lariviere@stifel.com>, "Stewart, Scott (New York 3
Bryant)" <stewartsc@stifel.com>, "Hasanaj, Selman (New York 3 Bryant)" <hasanajs@stifel.com>

Hello All,


We moved from Morgan Stanley to Stifel but we want to send our clients your tins with the white chocolate oreo
cookies.  Can you provide the pricing for the tins.


Thank you,


Alex-


Alexander Harris McKinnis
Registered Client Relationship Manager, Vice President Client Service


STIFEL | The GR Wealth Management Group

Investment Services Since 1890


This message, and any of its attachments, is for the intended recipient(s) only, and it may contain information that is
privileged, confidential, and/or proprietary and subject to important terms and conditions available at
http://www.stifel.com/disclosures/emaildisclaimers/. If you are not the intended recipient, please delete this message
and immediately notify the sender. No confidentiality, privilege, or property rights are waived or lost by any errors in
transmission.


**Edible Gifts Plus** <info@ediblegiftsplus.com>                    Thu, Nov 17, 2016 at 8:35 PM
To: "McKinnis, Alexander" <alexander.mckinnis@stifel.com>, "Connelly, Tyler (New York 3 Bryant)"
<tyler.connelly@stifel.com>, "Segal, Jason (New York 3 Bryant)" <jason.segal@stifel.com>, "Lariviere, Paul (New York 3
Bryant)" <paul.lariviere@stifel.com>, "Stewart, Scott (New York 3 Bryant)" <stewartsc@stifel.com>, "Hasanaj, Selman (New
York 3 Bryant)" <hasanajs@stifel.com>

Hi Alex,

It's so nice to hear from you, I'd be happy to help you and your new firm!  Are we going to do the same 25pc tins as last
year with the red and snowflake sprinkles?

EGP-000106

EXHIBIT "E"

12/20/2015                                    Re: Fwd: Offer and Questions

**CONFIDENTIAL**

**From:** Melanie Dizdarevic <melanie.dizdarevic@yahoo.com>

**To:** Margo <mlrappel@aol.com>

**Subject:** Re: Fwd: Offer and Questions

**Date:** Fri, Jan 3, 2014 5:09 pm

**Attachments:** Edible Gifts Plus - 2.pdf (41K), Edible Gifts Plus - 2_1.pdf (225K), Edible Gifts Plus - 2_2.pdf (205K)

Thank you for this Margo! Just so you know, I just sent back the signed agreement to Lauri and I have attached it to you as well. I have just asked that she has you sign the original LOI and this LOI Addendum as well and as soon as I receive these back I will be mailing out the agreement and deposit.
I look forward to working with you!

Melanie Ollivett

On Friday, January 3, 2014 3:53 PM, Margo <mlrappel@aol.com> wrote:
Here you go ....

——Original Message——
**From:** Melanie Dizdarevic <melanie.dizdarevic@yahoo.com>
**To:** mlrappel <mlrappel@aol.com>
**Sent:** Mon, Dec 30, 2013 3:42 pm
**Subject:** Offer and Questions

Hi Margo,

It was nice to talk with you again this morning. As we discussed on the phone, I would like to make a final offer to you after discussing yours and my fathers concerns regarding the business and its income.

We would like to offer you 120K for your entire business which would include but not be limited to all inventory, Websites and customer lists. $100,000 is a cash payment and 20K of this offer being contingent on your 2013 tax returns showing a net profit of 60K. This 20K would be financed over 24 months by seller at no (0) interest rate with your first payment being paid on May 1st, 2013 after taxes have been finalized. The $20,000 will be prorated based on the net difference of $10,000 between a net profit of $50,000 to $60,000.

Please find below a list of questions I would need to have answers to in order to have a better understanding about your business. We are pre-paired to enter into a contract for a quick closing.
However, I would need thorough and satisfactory answers to these questions in order to make sure this business works for us.
I look forward to speaking with you this evening.

Thank you.
Sincerely,

Melanie Ollivett

EXHIBIT ___
P-4
8/30/16
PENGAD 800-631-6989

How many vendors do you work with? We work with about a dozen or so vendors

How does ground delivery affect the shelf life of the food being shipped? Many of our products have a shelf life of several weeks to several months. There are some products that are perishable (ie. dipped fruit) with a fixed shipping rate to take that into account (ie. strawberries - overnight shipping) We have made it a practice to take the time to call and/or e-mail our customers in the event that they have selected an inappropriate shipping method.

How do you handle summertime deliveries? (i.e. chocolate in hot summer) We do have a warm weather shipping

MD-2

12/20/2015                                Re: Fwd: Offer and Questions

CONFIDENTIAL

policy posted on our website. But again, we have made it a practice to take the time to call and/or e-mail our customers in the event that they have selected an inappropriate shipping method.

Who handles any liability from food related issues? (Such as food poisoning, spoiling, etc?) My dad established an LLC to protect me from any liability issues and felt that it was not necessary to have additional insurance.

How is your product quality control managed? We have been working with many of the same vendors/suppliers for several years - sampling of products at times and best practices with these suppliers

Who covers the cost of damaged or undelivered goods? Case by case basis - depending upon the shipping method used - UPS and/or FEDEX. Claims will be filed with carrier. In the event of an incorrect product being shipped, our suppliers are terrific about correcting those rare occurrences.

Please walk me through step by step, the entire process from when the customer orders on your website, everything you do on your end, until the shipment arrives to customer. (for EdibleGiftsPlus.com and Candywraps.com) Order placed - submitted to supplier either via e-mail or on their sites - order shipped - tracking information forwarded to customer and payment is captured

How do you handle back orders? We will either e-mail or call customer / recommend substitutions

Are there any exceptions to that process? (Is the process the same for every order or can it vary with different products/vendors/customers) If there is a different process for each, please explain any other process. There may be a slightly different process depending upon the vendors/suppliers

What is your target audience? (i.e. age, sex, income status) Everyone

How many customer contact information, do you currently have? (Email, Phone and addresses) We currently have over 17,500 customers on Edible Gifts Plus and about the same on CookieHQ (which is in a hibernating state should you want to resurrect this site)

How many unique daily visitors does your website get? Google Analytics Sent

What percentage of your customer are repeat customers? Spreadsheets sent

How many new customers do you get per month on average? Spreadsheets sent

Do you have the breakdown or reports of how many customers the marketing campaigns you did brought in? No

Who owns the web domain and actual website for EdibleGiftsPlus.com and CandyWraps.com? Is it yourself or the web developer? Domains e-mailed to you - I own these domains

What are the hosting fees for these websites? Website hosting for Edible Gifts Plus was about $2,440 for 2012 and we are paying a nominal fee (around $20 or so I think) to continue to maintain CookieHQ in its slumbered state

Who provides the design and maintenance of your website and who adds the new products? I add many of the products myself - I have had work done by my Website company in the past in addition to a few outside consultants on as needed basis

How much do they charge or what are their rates? Rates vary - can be $35 and up depending upon who is doing the work

How many times a month does your website go down? Hardly ever - we may have problems a few times a year

What are your costs for making changes to the website? (i.e. what would the company charge to add or remove an additional product to your website?) We do much of that ourselves

Can you change web developers if you wanted to or are you committed to this company? You can make any changes you would like

You mentioned someone named Vicky who helped with some things, what tasks did she help with and what

https://mail.aol.com/webmail-std/en/PrintMessage                                RW1P-000033

2/3

12/20/2015                                        Re: Fwd: Offer and Questions
CONFIDENTIAL

extent? **Vicky takes care of the bookkeeping/financial end of the business and assists with day to day activities**

On the P&L you sent, there are names listed to the right of the figures.  Who are these peoples and what part of the business are they associated with? **Susan and an assortment of others including Lisa, Pam and Barbara have assisted me with the business in some fashion over the years.**

What is the name of your Merchant Service Company and what is the costs associate with them? **WorldPay/Authorize.net - Vicky can review this with you**

Can we see a P&L for each month of 2011 and 2012 to get a better idea of sales pattern and how the season runs for this business? **- Charts e-mailed**

What was your Father's job in the company? What did he do and how many hours a week did he work? **My dad served as an advisor to me in setting up and running the business and helped with some of the legal matters - he did not work in any major capacity**

**CONFIDENTIAL**

From: Margo <mlrappel@aol.com>
To: melanie.dizdarevic <melanie.dizdarevic@yahoo.com>
Subject: Domain Names
Date: Tue, Dec 31, 2013 11:40 am

Here you go ...

largefortunecookie.com
largefortunecookies.com
browniehq.com
cookieheadquarters.com
cookiehq.net
cookiehqs.com
cookiehq.com
ediblegiftsplus.com
candywrapsplus.com
funbagsplus.com

Margo
Edible Gifts Plus
Candy Wraps Plus
732-671-6318 - office
732-687-3002 - cell
www.EdibleGiftsPlus.com
www.CandyWrapsPlus.com

12/18/2015

**CONFIDENTIAL**  All emails

From: Melanie Dizdarevic <melanie.dizdarevic@yahoo.com>

To: mlrappel <mlrappel@aol.com>

Subject: All emails

Date: Tue, Dec 31, 2013 2:00 pm

Hey Margo,

I got all of the emails, thank you for sending those so fast.  I will be going over all of them with my dad in a few when he gets here.  I will get that LOI over to you asap.
Have a great day and I forgot, Happy New Year!!

Melanie

RAP_000036

EXHIBIT "F"



















EXHIBIT "G"

| From: | Alex Emeira |
|---|---|
| To: | Dino Dizdarevic |
| Cc: | Edible Gifts Plus |
| Subject: | RE: Edible Gifts Plus Wholesale Account |
| Date: | Tuesday, May 26, 2015 5:58:09 PM |
| Attachments: | image.png |
| | image.png |
| | image.png |
| | image.png |
| | image.png |
| | RESELLER_AGREEMENT2015_reduced_size.pdf |

Hello Dino,

We have a Reseller Agreement between Lady Fortunes Inc and Edible Gifts Plus from 2008 which was signed by the previous owner. Somehow, we overlooked receipt of an updated Reseller Agreement when you took over the business last year.

In order to continue having Edible Gifts Plus as a Wholesale Reseller , we must have this document signed, dated and mailed back to us this week.

It has come to our attention that you are using our intellectual property (our images, descriptions, product designs, etc) while diverting orders to other vendors. Let me be clear that we do not have an issue with you carrying other products on your website. The issue we have as that per our original agreement with the original owner of Edible Gifts Plus, it is our products you are showing on your website- yet orders are being send to other vendors for products shown on Edible Gifts Plus via images owned by Lady Fortunes Inc.

We offer a superior line- and service. We have been in this business for over 10 years while other companies have come and gone. We are confident that you see the value in that.

We will protect our interests, and for that reason, need you to show us good faith by agreeing to our Reseller Agreement which effectively makes you agree to exclusivity to Lady Fortunes Inc for the products you currently offer already on your site.

If you intend to carry other vendors products in lieu of Lady Fortunes' that is your prerogative. But if you agree to the exclusivity agreement as set forth in our Reseller Agreement, there will be serious legal repercussions if you break that agreement.

Thank you Dino. We need to get the signed document back this week in order to continue your Wholesale account. If we do not hear back from you by Friday this week (June 1st), we will initiate termination process of your wholesale account.

Have a great day.


On 5/22/15 12:05 PM, "Dino Dizdarevic" <dino@ediblegiftsplus.com> wrote:

Alex,

What number can I reach you at since you're out of the office?

Sincerely,

**Dino Dizdarevic**
Edible Gifts Plus
1-866-671-7775
843-802-4711
<http://www.ediblegiftsplus.com/>

MD- 23 19

EDIBLEGIFTS000177

<https://www.facebook.com/EdibleGiftsPlusFan>   <http://pinterest.com/ediblegiftsplus>   <https://twitter.com/ediblegiftsplus>
<https://www.linkedin.com/pub/dino-dizdarevic/20/251/b74>   <https://instagram.com/ediblegiftsplus>

Wishing You Continued Good Fortune,

Alex Emeira
Corporate Sales
Lady Fortunes Inc
Corporate Headquarters
21609 Parthenia Street
Canoga Park, CA 91304

 http://www.LadyFortunes.com

 www.FaceBook.com/LadyFortunesinc

 www.Instagram.com/ladyfortunesinc

www.Twitter.com/ladyfortunesinc

EDIBLEGIFTS000178

EXHIBIT "H"



**LADY FORTUNES®, INC.
STANDARD RESELLER AGREEMENT**

This **LADY FORTUNES®, INC. STANDARD RESELLER AGREEMENT**
(the "Agreement") is entered into on _____, 20___ ("Effective Date"), by and between Lady
Fortunes® Inc., located at 21609 Parthenia Street, Canoga Park, CA 91304 ("Lady Fortunes")
and _____,
located at _____
("Reseller").

### RECITALS

**WHEREAS**, Reseller is in the business of maintaining a web site and/or mail order catalog
which offers potential customers information related to consumer products and an opportunity to
purchase those products by placing orders through Reseller's web site, telephone or returning an
order form via fax, mail or email.

**WHEREAS**, Lady Fortunes® is in the business of selling gourmet gifts, party favors and other
edibles to Reseller and directly shipping such products to customers of Reseller that place orders
for Lady Fortunes' products.

### AGREEMENT

**NOW, THEREFORE**, in consideration of the mutual promises herein, and other good and
valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as
follows:

1.    DEFINITIONS.  For purposes of this Agreement, the following terms shall have the
following meanings:

1.1    Authorized Products mean the gourmet gifts, party favors and other edibles, gifts and
other chocolate products authorized, supplied and made available by Lady Fortunes® from time to
time for purchase by Reseller's customers. Authorized Products are limited to those products set
forth on Exhibit A, as may be amended from time to time by Lady Fortunes®. Authorized
Products must be sold at no less than the prices shown on Exhibit A- or as agreed to in writing.

1.2    Content means the textual and any pictorial or graphic content related to the Authorized
Products and provided to Reseller by Lady Fortunes.

1.3    Custom Content means the textual, pictorial and/or graphic content created by or on
behalf of Reseller representing, describing or referring to the Authorized Products and
authorized by Lady Fortunes.

1.4    Customer means any purchaser who orders Authorized Products through Reseller.

1.5    Intellectual Property Rights means copyright rights, trademark rights, patent rights, trade
secrets, moral rights, right of publicity, authors' rights, contract and licensing rights, goodwill
and all other intellectual property rights as may exist now and/or hereafter come into existence

EGP-000038

and all renewals and extensions thereof, regardless of whether such rights arise under the law of the United States or any other state, country or jurisdiction.

1.6     Lady Fortunes® Area means any page or location on Reseller's website where Authorized Products are displayed.

1.7     Web Site(s) means the Reseller World Wide Web site(s) at the universal resource locator(s) ("URL") as set forth on Exhibit A, as may be amended from time to time by mutual written agreement of the parties.

## 2.     LICENSE GRANTS

2.1     Content.  Lady Fortunes® grants to Reseller a worldwide license to (i)reproduce, distribute, publicly perform and publicly display the Content, and (ii) offer for sale and sell the Authorized Products, solely on the Web Site(s) and/or Reseller's catalog.

2.2     Custom Content.

(a)     License to Reseller.  Subject to Reseller's obligations set forth in Exhibit B ("Lady Fortunes® Content Formatting"), Lady Fortunes grants to Reseller a non-exclusive, royalty-free, national license to (i) create Custom Content utilizing the Authorized Products, and (ii) reproduce, distribute, publicly perform and publicly display such Custom Content solely on Reseller's Web Site(s) and/or in Reseller's catalog solely for the purpose of offering the Authorized Products for sale under the terms of this Agreement, including without limitation Section 2.3 ("Attribution") below.  The display, publication or use of Custom Content shall be subject to Lady Fortunes®' prior written approval in accordance with the approval process set forth in Section 8.2 below.  The right and license to utilize the Authorized Products, Lady Fortunes Marks, or Content as incorporated into the Custom Content shall terminate upon the termination or expiration of this Agreement.  RESELLER MAY NOT SELL THE AUTHORIZED PRODUCTS FOR LESS THAN THE PRICES SHOWN ON EXHIBIT A without written consent by Lady Fortunes® Inc.
Reseller agrees not to use the Custom Content of other Lady Fortunes Resellers without the written approval of Lady Fortunes and that Reseller.

(b)     License to Lady Fortunes.  Reseller shall, and hereby does, grant to Lady Fortunes a worldwide, perpetual, royalty-free, non-exclusive license to use, reproduce, modify, publish, transmit, distribute, publicly display and publicly perform, in whole or in part, the Custom Content solely for its own promotional and advertising purposes in any medium now known or later developed.  Reseller agrees to provide Lady Fortunes® with copies of the Custom Content in a mutually agreeable electronic format for its use pursuant to this Section 2.2(a).

2.3     ATTRIBUTION.  AT NO TIME SHALL RESELLER DISPLAY OR ADVERTISE IN ANY MANNER OR MEDIUM LADY FORTUNES' AUTHORIZED PRODUCTS WITHOUT IDENTIFYING THEM AS SUCH without previous written permission/agreement.

2.4     No Sublicensing.  Other than subcontractors of Reseller performing services related to printing or distributing Reseller's catalog, if any, or operation of the Web Site(s), Reseller shall not sublicense its right to reproduce the Content or Custom Content to any third party, including

EGP-000039

affiliate partners or other business partners, without Lady Fortunes®' prior written consent to the sublicense, which consent shall be granted or denied in Lady Fortunes®' sole discretion.

2.5     Exclusivity.

(a)     Reseller acknowledges and agrees that Lady Fortunes® shall be Reseller's exclusive provider of Fortune Cookies (any size), Logo Oreos®, Logo Grahams, Logo Rice Krispies, Logo Sugar Cookies, Logo Cake Pops, Logo Biscotti, Logo Cupcakes, and any other products unique to Lady Fortunes® Inc- including packaging designs offered on the Reseller's Web Site(s), in Reseller's catalog or via any other marketing channels utilized by Reseller. Reseller further agrees that it will not allow or authorize any other person or entity whose business is the sale of items listed above to link their website to Reseller's Web Site(s) in connection with the sale of such products. This provision shall remain in effect for ninety (90) days following termination of the agreement.

(b)     Reseller acknowledges and agrees that nothing in this Agreement shall be deemed or construed to prohibit Lady Fortunes® from entering into similar agreements or from providing the Content or Authorized Products to any third party.

2.6     Reservation of Rights. Lady Fortunes® reserves all rights not expressly granted hereunder.

3.      PRODUCT OBLIGATIONS

3.1     Fulfillment of Open Orders. Upon receipt of an order for Authorized Products from Customers, Reseller shall promptly transmit such orders to Lady Fortunes as agreed between the parties for fulfillment. In each case, an open order will include all information necessary to process the order. Lady Fortunes® will use commercially reasonable efforts to send electronic confirmation to Reseller of (a) receipt of the order and (b) shipment of the order.

3.2     Shipment. Lady Fortunes will drop-ship orders directly to Customers at either Reseller's expense (via UPS or FedEx 3rd Party Billing OR at Lady Fortunes® published "flat rates").

3.3     Partial Orders. Reseller agrees that Lady Fortunes® may drop-ship partial orders in the event that all Authorized Products ordered by any Customer are not available for shipping at the same time.

3.4     Availability of Authorized Products. Lady Fortunes® will use commercially reasonable efforts to keep an adequate inventory of Authorized Products in stock at all times and will notify Reseller in the event that any individual Authorized Product becomes temporarily or permanently unavailable. Lady Fortunes® shall promptly submit revised Content reflecting such changes in Authorized Product availability.

3.5     Sale of Authorized Products/Customer Support. Reseller shall be solely responsible for all Customer services, including without limitation, billing and collection. Reseller will handle all Customer inquiries regarding the Authorized Products. Lady Fortunes® will provide Reseller with relevant information requested regarding the manufacture and shipping of Authorized Products ordered pursuant to this Agreement.

EGP-000040

4.    CONTENT OBLIGATIONS

4.1    Format for Lady Fortunes® Area Lady Fortunes® shall provide Reseller with the Content; provided, however, Reseller shall be primarily responsible for the design and development of the Lady Fortunes® Area formatting, which shall be performed in accordance with the requirements of Exhibit B ("Reseller's Placement Obligation"). Reseller agrees to provide the format to Lady Fortunes® for review and consultation prior to using such format. Reseller shall use commercially reasonable efforts to incorporate any modification to the format design proposed by Lady Fortunes®.

In no circumstances will Reseller claim to be the "official" website of Lady Fortunes®, nor will Reseller design its website so similar to Lady Fortunes® in appearance so as to create confusion.

Should Reseller create a section or category on their website entitled "Lady Fortunes®", Reseller agrees to display and offer for sale only the Authorized Products.

4.2    Costs and Expense.   Reseller alone shall bear the costs and expenses incurred in connection with reproducing and distributing the Content.

5.    OWNERSHIP.

5.1    Lady Fortunes® As between Lady Fortunes® and Reseller, Reseller acknowledges and agrees Lady Fortunes® owns all right, title and interest in and to the Authorized Products, Content, and Lady Fortunes® Marks (as defined in Section 7.1) and all Intellectual Property Rights embodied therein.

5.2    Reseller.   As between Reseller and Lady Fortunes®, Lady Fortunes® acknowledges and agrees Reseller owns all right, title and interest in and to the Web Site(s), Reseller catalog (if any), Custom Content (other than any Content incorporated therein which shall be subject to Section 2 ("License Grants")) and Customer Information (as defined in Section 3.5 ("Customer Information")).

6.    PAYMENT.

6.1    Pricing.   Reseller shall pay to Lady Fortunes® an amount equal to the published retail price, less the discount set forth hereto in Exhibit A, which amount shall not be reduced for any Taxes (as defined below) for all Authorized Products ordered. Lady Fortunes®' price list is subject to change or modification from time to time upon written notice to Reseller.

6.2    Payments.Lady Fortunes® shall invoice Reseller* weekly for orders shipped the previous week; payment by check, money order, cashiers check or wire transfer is due within the terms granted and appearing on the Lady Fortunes® invoice. Any individual or cumulative invoice balance in excess of $2,500 will require a deposit of 50%, or as agreed to in writing by Lady Fortunes® Inc. Lady Fortunes reserves the right to refuse to fulfill orders until such balances are paid. Reseller shall pay interest on late payments at the greater of: (i) one and one-half percent (1½%) per month, or (ii) the highest rate permitted by law. Payment by credit card requires approval in advance from Lady Fortunes® and will only be granted if settlement is done at the order level on a regular basis.

*Upon Approved Credit

EGP-000041

6.3     Taxes and Assessments.  In addition to any payments due under this Agreement, Reseller agrees to pay, indemnify and hold Lady Fortunes® harmless from any sales, use, excise, import or export, value-added or similar tax or duty, and any other tax not based on Lady Fortunes®'net income, including any penalties and interest, and all government permit or license fees and all customs and similar fees, which Lady Fortunes® may incur in respect of this Agreement, and any costs associated with the collection or withholding of any of the foregoing items (the "Taxes"). Notwithstanding the foregoing, Reseller and Lady Fortunes® are each responsible for payment of its respective corporate income taxes for any revenues associated with this Agreement.

7.      REPRESENTATIONS AND WARRANTIES.

7.1     Each party hereto warrants and represents that: it possesses full power and authority to enter into this Agreement and to fulfill its obligations hereunder; and the performance of the terms of this Agreement and of its obligations hereunder shall not breach any separate agreement by which it is bound.

7.2     Reseller warrants and represents that it will not materially modify the Content as displayed on the Web Site(s) or in Reseller's catalog, if any.

7.3     Warranty Disclaimer.   THE CONTENT AND AUTHORIZED PRODUCTS ARE PROVIDED 'AS-IS' AND WITHOUT WARRANTY OF ANY TYPE OR KIND.  EXCEPT AS EXPRESSLY SET FORTH IN SECTION 3.5 ("CUSTOMER INFORMATION") AND SECTION 7 ("REPRESENTATIONS AND WARRANTIES"), EACH PARTY HEREBY DISCLAIMS ALL ADDITIONAL WARRANTIES, WHETHER STATUTORY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

8.      LADY FORTUNES® TRADEMARKS

8.1     License.  Subject to the terms and conditions of this Agreement, Lady Fortunes® grants to Reseller a non-exclusive, worldwide and non-transferable license to use Lady Fortunes®' trademarks, logos, services marks, and slogans "Lady Fortunes® Marks" on the Web Site(s) and/or Reseller's catalog solely in connection with the promotion of the Authorized Products as contemplated hereunder.  This license does not include the right to sublicense the use of the Lady Fortunes® Marks.  Reseller's use of the Lady Fortunes® Marks shall be in compliance with the Lady Fortunes® Trademark Usage Guidelines, as amended from time to time, as provided to Reseller in electronic or photographic form, following the execution of this Agreement.

8.2     Approval.  The nature and quality of any materials or services supplied by Reseller bearing the Lady Fortunes® Marks, including without limitation the Custom Content, shall be of high quality in the Internet and catalog sales industry.  Lady Fortunes® shall have the right to approve Reseller's use of the Lady Fortunes® Marks and/or Custom Content.  Prior to Reseller's using the Lady Fortunes® Marks and/or Custom Content, Reseller shall provide Lady Fortunes® with samples in an electronic format and submit a written request for approval of such use to Lady Fortunes®.  Lady Fortunes® shall not unreasonably withhold its consent to any use by Reseller. If Lady Fortunes® does not object in writing specifying the reasons for objection, within ten (10) business days of receipt of such request, Lady Fortunes® shall be deemed to have

EGP-000042

approved the request. Reseller may submit revised requests for approval of any use to which Lady Fortunes® objected. Lady Fortunes® may withdraw its approval at any time without cause.

8.3    Ownership of Lady Fortunes® Marks Lady Fortunes® is the sole and exclusive owner of the Lady Fortunes® Marks. Except as prohibited by law, Reseller shall do nothing inconsistent with such ownership, either during the term of this Agreement or afterwards. Reseller's use of the Lady Fortunes® Marks shall inure to the benefit of and be on behalf of Lady Fortunes®. Reseller's utilization of the Lady Fortunes® Marks will not create any right, title or interest in such Lady Fortunes® Marks in Reseller. Reseller shall use the Lady Fortunes® Marks so that each Lady Fortunes® Mark creates a separate and distinct impression from any other trademark that may be used or affixed to materials bearing the Lady Fortunes® Marks or used in connection with services provided under the Lady Fortunes® Marks.

## 9.    CONFIDENTIALITY.

9.1    Confidential Information means all nonpublic information, whether in oral, written or other tangible form that the party disclosing the information (the "Discloser") designates as being confidential or which, under the circumstances surrounding disclosure, the receiving party (the "Recipient") knows or has reason to know should be treated as confidential, including without limitation, price lists, customer lists, business plans, and the terms and conditions of this Agreement.

9.2    Obligation of Confidentiality. During the term of this Agreement, the Discloser may provide Confidential Information to the Recipient. Recipient shall hold the Confidential Information in strict confidence, provided that the Confidential Information may be disclosed to such of Recipient's employees, contractors and professional advisors who have a need to know for the purpose of fulfilling Recipient's obligations under this Agreement. Without Discloser's prior written consent, Recipient shall not, and shall direct such individuals not to, disclose the Confidential Information in whole or in part, except to the extent compelled by law. Recipient shall employ all reasonable steps to protect the Confidential Information from unauthorized or inadvertent disclosure or use, including, without limitation, all steps that it takes to protect its own information that it considers a trade secret. It is further understood and agreed that money damages would not be a sufficient remedy for any breach of Recipient's obligations under Section 9 ("Confidentiality") by Recipient, or any employees, contractors or advisors under Recipient's supervision and that Discloser shall be entitled to specific injunctive relief as a remedy for any such breach. Such remedy shall not be deemed to be the exclusive remedy for the breach of obligations under Section 9 ("Confidentiality") but shall be in addition to all other available legal or equitable remedies.

## 10.    TERM AND TERMINATION.

10.1    Term. The initial term of this Agreement shall commence upon the Effective Date and shall continue for an initial period of one (1) year, unless terminated in accordance with the terms hereof. Thereafter, this Agreement shall automatically renew for successive one (1) year terms unless either party gives written notice of its intention not to renew this Agreement at least thirty (30) days prior to the expiration of the then-current term.

10.2    Termination. In the event of a material breach, of the terms and conditions of this Agreement, other than a breach of Section 2 LICENSE GRANTS and Section 8, LADY

EGP-000043

FORTUNES® TRADEMARKS, the non-breaching party may terminate this Agreement by providing written notice to the other party of the nature of the breach and intent to terminate. Such Termination will be effective thirty (30) days after receipt of such notice unless the breach has been corrected by that time.

In the event of a breach of Section 2 LICENSE GRANTS and Section 8, LADY FORTUNES® TRADEMARKS, Lady Fortunes® may terminate this Agreement by providing written notice to Reseller of the nature of the breach and intent to terminate. Such Termination will be effective five (5) days after receipt of such notice unless the breach has been corrected by that time.

Either party may terminate this Agreement without cause, and such termination shall be effective thirty (30) days after providing written notice of such decision to terminate to the other party.

10.3    Return of Property. Within fifteen (15) business days after any termination or expiration of this Agreement each party shall immediately deliver to the other party all copies of Confidential Information or other materials then in its possession owned by such other party. In addition, upon termination, Reseller shall immediately remove all of the Content from the Web Site(s) and destroy or return all copies of the Content to Lady Fortunes®.

11.    NO PARTNERSHIP OR JOINT VENTURE. Lady Fortunes® and Reseller are independent contractors and neither party is the legal representative, agent, joint venture, partner, or employee of the other party for any purpose whatsoever. Neither party has any right or authority to assume or create any obligations of any kind or to make any representation or warranty on behalf of the other party, whether express or implied, or to bind the other party in any respect whatsoever.

12.    CONSEQUENTIAL DAMAGES WAIVER.    IN NO EVENT SHALL LADY FORTUNES® BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, OR INCIDENTAL DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, HOWEVER CAUSED, ON ANY THEORY OF LIABILITY AND WHETHER OR NOT LADY FORTUNES HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES.

13.    LIMITATION OF LIABILITY. IN NO EVENT SHALL LADY FORTUNES® BE LIABLE TO RESELLER UNDER THIS AGREEMENT FOR AMOUNTS IN EXCESS OF THE MONIES PAID BY RESELLER TO LADY FORTUNES® FOR THE ORDER(S) GIVING RISE TO THE LIABILITY HEREUNDER.

14.    FAILURE OF ESSENTIAL PURPOSE. THE LIMITATIONS SET FORTH IN SECTIONS 12 ("CONSEQUENTIAL DAMAGES WAIVER") AND 14 ("LIMITATION OF LIABILITY") SHALL APPLY NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

15.    DISPUTE RESOLUTION.

15.1    Arbitration. Any controversy, claim or dispute arising out of or in connection with or relating to this Agreement, or the breach or alleged breach thereof, shall be resolved by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration

EGP-000044

Association ("AAA") in effect as of the day arbitration having commenced, and the procedures set forth below. In the event of any inconsistency between the Rules of AAA and the procedures set forth below, the procedures set forth below shall control. Judgment upon the award rendered by the arbitrator may be enforced in any court having jurisdiction thereof. Notwithstanding the above, each party shall have the right to seek injunctive relief including preliminary injunctions and permanent injunctions in a court of competent jurisdiction to protect its intellectual property rights. The location of the arbitration shall be in the City of Los Angeles, California. The arbitration shall be conducted by one arbitrator who is independent and disinterested with respect to the parties, this Agreement, and the outcome of the arbitration.

15.2    Discovery. The parties shall have discovery as provided under the Federal Rules of Civil Procedure in existence at that time as applied in the local federal district court. The parties shall have discovery as provided in Sections 1283.05 and 1283.1 of the Code of Civil Procedure of California. The arbitrator shall decide any disputes and shall control the process concerning these pre-hearing discovery matters. Pursuant to the rules of AAA, the parties may subpoena witnesses and documents for presentation at the hearing.

15.3    Case Management. Prompt resolution of any dispute is important to both parties; and the parties agree that the arbitration of any dispute shall be conducted expeditiously. The arbitrator is instructed and directed to assume case management initiative and control over the arbitration process (including scheduling of events, pre-hearing discovery and activities, and the conduct of the hearing), in order to complete the arbitration as expeditiously as is reasonably practical for obtaining a just resolution of the dispute.

15.4    Remedies. The arbitrator shall follow and apply the applicable law. The arbitrator shall grant such legal or equitable remedies and relief in compliance with applicable law that the arbitrator deems just and equitable, but only to the extent that such remedies or relief could be granted by a California state or federal court. No punitive damages may be awarded by the arbitrator. No court action may be maintained seeking punitive damages.

15.5    Expenses. The expenses of the arbitration, including the arbitrator's fees, expert witness fees, and attorney's fees, shall be awarded to the prevailing party.

16.     SURVIVAL. Upon any termination of this Agreement, the following Sections shall remain in full force and effect: Section 1 ("Definitions"), Section 5 ("Ownership"), Section 6.3 ("Taxes and Assessments"), Section 7.3 ("Warranty Disclaimer"), Section 8.3 ("Ownership of Lady Fortunes Marks"), Section 9 ("Confidentiality"), Section 10.3 ("Return of Property"), and Section 12 ("Consequential Damage Waiver") through Section 17 ("General").

17.     GENERAL.

17.1    This Agreement shall be governed in all respects by the laws of the United States of America and the State of California as such laws are applied to agreements entered into and to be performed entirely within California between California residents. Except as provided in Section 3.1 ("Fulfillment or Open Orders"), all notices or requests shall be in writing and shall be sent by facsimile, or recognized commercial overnight courier. Notices shall be deemed received upon receipt of written confirmation of transmission when sent by facsimile, or signing

EGP-000045

for receipt of delivery if sent by overnight courier. Notices shall be sent to the parties at the address set forth in the first paragraph of this agreement. Nothing contained herein shall be construed as creating any agency, partnership, or other form of joint enterprise between the parties. Neither party shall be liable hereunder by reason of any failure or delay in the performance of its obligations hereunder (except for the payment of money) on account of (i) any provision of any present or future law or regulation of the United State or any applicable law that applies to the subject hereof, and (ii) strikes, shortages, riots, insurrection, fires, flood, weather, crop failure, transportation problems, explosions, acts of God, war, governmental action, labor conditions, earthquakes, or any other cause which is beyond the reasonable control of such party. The failure of either party to require performance by the other party of any provision hereof shall not affect the full right to require such performance at any time thereafter; nor shall the waiver by either party of a breach of any provision hereof be taken or held to be a waiver of the provision itself. In the event that any provision of this Agreement shall be unenforceable or invalid under any applicable law or be so held by applicable court decision, such unenforceability or invalidity shall not render this Agreement unenforceable or invalid as a whole, and, in such event, such provisions shall be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or applicable court decisions. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement and the Exhibits hereto, constitute the entire Agreement between the parties with respect to the subject matter hereof. This Agreement supersedes, and the terms of this Agreement govern, any prior or collateral agreements with respect to the subject matter hereof with the exception of any prior confidentiality agreements between the parties. This Agreement may only be changed by mutual agreement of authorized representatives of the parties in writing.

17.2   The terms and conditions of this Agreement shall apply to all quotations and offers made and purchase orders accepted by Lady Fortunes unless expressly modified by Lady Fortunes and Reseller in a written agreement signed by both parties and making specific reference to this clause.   IN THE EVENT RESELLER'S PURCHASE ORDER (OR OTHER COMMUNICATIONS OF ANY KIND) CONTAIN ANY ADDITIONAL TERMS OR CONFLICT WITH ANY TERMS AND CONDITIONS CONTAINED HEREIN, THIS AGREEMENT SHALL GOVERN AND ACCEPTANCE OF RESELLER'S ORDER IS EXPRESSLY CONDITIONED UPON RESELLER'S ACCEPTANCE OF THE TERMS AND CONDITIONS HEREIN. Lady Fortunes®' failure to object to provisions contained in any communication from Reseller shall not be deemed a waiver of the provisions herein. No modifications of these terms and conditions is authorized and no modification shall be binding on Lady Fortunes®, unless in writing and signed by an authorized officer of Lady Fortunes®.

EGP-000046

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed.

Lady Fortunes®:                          Reseller:

Lady Fortunes® Inc.                      Reseller name: _____

By: _____             By: _____

Title: _____            Title: _____

Date: _____             Date: _____

EGP-000047

## EXHIBIT A

### A.1   AUTHORIZED PRODUCTS & RELATED RETAIL PRICES & SHIPPING FEES:

SUPER GIANT FORTUNE COOKIES, GIANT FORTUNE COOKIES, BABY GIANT FORTUNE
COOKIES, "CLASSIC SIZE " FORTUNE COOKIES, LOGO EDIBLES [OREOS®, RICE KRISPIES,
GRAHAMS, SUGAR COOKIES, MARSHMALLOWS, CAKE POPS, BROWNIES, CUPCAKES,
BISCOTTI, NILLAS®, NUTTER BUTTERS®, FORTUNE COOKIES ( ALL SIZES), LOGO
LOLLIPOPS, CHOCOLATE COINS, APPLES AND PRETZELS (TWISTS AND WANDS)]
ALL DIPPED & DECORATED ITEMS (OREOS®, GRAHAMS, BISCOTTI, RICE KRISPIES
TREATS, MARSHMALLOWS, PRETZELS (TWISTS AND WANDS)]

### A.2   RESELLER DISCOUNT LEVEL

_____

### A.2   PARTY CONTACTS

If for Lady Fortunes:  Alex Emeira
                       Alex@LadyFortunes.com
                       Phone  818-993-1277 x145
                       Fax 818-993-1278

If for Reseller:       Name _____
                       Email _____
                       Phone _____
                       Fax _____

Billing address: _____
                 _____
                 _____

### A.3   WEB SITE (S)

www._____.com
www._____.com
www._____.com

### A.4   RESELLER CERTIFICATE #

Certificate #: _____

**Must return copy of reseller certificate with agreement**

EGP-000048

## EXHIBIT B

### Reseller's Placement Obligations

<u>Reseller's Obligation</u>

Reseller agrees to provide Lady Fortunes® with the following features:

- Prominent listing on Reseller' Web Site(s), in Reseller's catalog, if any, and Store Directory
- Only display and sell products listed on the approved Product and Price List.
- Inclusion in any online retail catalog of products
- Secured online retail ordering capability
- In-store retail ordering (if applicable)
- Resolution of customer service issues
- All products must be identified as "Lady Fortunes®" products UNLESS agreed to in writing to Private Label or omit Lady Fortunes® name.

Reseller agrees to sell Lady Fortunes® items sold as such on Reseller's Web Site(s), and in Reseller's catalog, if any, and will NOT:

- Outsource a Lady Fortunes® item with another vendor's product
- Refer an order intended for Lady Fortunes® Inc to another factory or manufacturer
- Offer a competing line in lieu of a Lady Fortunes® product as listed on Exhibit A

<u>Holiday Placement</u>

- In consideration of the discount set forth on Exhibit A, Reseller agrees to the following holiday placement of the Content or Custom Content on the Reseller Web Site(s) and/or in any special holiday catalog or mailing: (i) Front web page placement on all major holidays of at least one of the Authorized Products, including, but not limited to, Christmas, Valentine's Day, Mother's Day and Halloween (ii) placement in at least two other categories (e.g. Weddings, Birthday). **The discount provided to Reseller shall decrease a minimum of 10 percentage points if these conditions are not met.**

**I have read and understand the above statements.**

Print Name:_____

Signature:_____

EGP-000049

EXHIBIT "I"













EXHIBIT "J"





