EXHIBIT "A"

Page 1

Condensed
Transcript

1              UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEW JERSEY
3          CIVIL ACTION NO.: 3-15-cv-07904-AET-DEA
4
5
6      EDIBLE GIFTS PLUS, LLC and     :
7      MELANIE OLLIVETT DIZDAREVIC,  :
8                        Plaintiffs, : DEPOSITION OF:
9          v.                        : MARGO RAPPEL
10     MARGO RAPPEL and XYZ COMPANY,:
11              Defendants/Third   :
12              Party Plaintiffs. :
13          v.                      :
14     MELANIE DIZDAREVIC, DINO      :
15     DIZDAREVIC & DARREN J. KADY, :
16          Third Party Defendants,:
17
18          TRANSCRIPT of testimony as taken by and
       before CATHERINE GOLEMBESKI, Certified Court
19     Reporter, Registered Professional Reporter and
       Notary Public in and for the State of New Jersey,
20     at the law offices of BYRNES O'HERN & HEUGLE, LLC.,
       28 Leroy Place, Red Bank, New Jersey 07701, on
21     Tuesday, August 30, 2016, commencing at 9:30 a.m..
22
23
24
25     Job No. NJ2374054

Page 2

```
 1 APPEARANCES:
 2
      GOLUB, ISABEL & CERVINO, P.C.
 3    BY: ALAN S. GOLUB, ESQ.
      160 Littleton Road, Suite 300
 4    Parsippany, New Jersey 07054
      (973) 968-3377
 5    Representing the Plaintiffs,
      Third Party Defendants
 6
 7
 8    BYRNES O'HERN & HEUGLE, LLC.
      BY: SEAN F. BYRNES, ESQ.
 9    28 Leroy Place
      Red Bank, New Jersey 07701
10    (732) 219-7711
      Representing the Defendant, Margo Rappel
11
12
13
14    ALSO PRESENT:
15    Melanie Dizdarevic
16    Darren Kady
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          - - -
            I N D E X
 2          - - -
 3 Testimony of: MARGO RAPPEL
 4    By: MR. GOLUB            4
 5
 6
 7
            - - -
 8    E X H I B I T S
            - - -
 9
     NO.      DESCRIPTION          PAGE
10
11 P-1  Contract for Sale of Assets    88
12 P-2  Contract              123
13 P-3  Bill of Sale            149
14 P-4  E-mail               155
15 P-5  Affidavit of Margo Rappel     174
16 P-6  Letter 4/26/16          191
17 P-7  Letter 2/16/16          200
18 P-8  Binder of Material        230
19 P-9  E-mail 9/23/15          257
20
21
22
23
24
25
```

Page 4

```
 1       MARGO RAPPEL, 119 Borden Road, Middletown,
 2 New Jersey, after having been duly sworn, was
 3 examined and testified as follows:
 4 EXAMINATION BY MR. GOLUB:
 5    Q.  Good morning, Miss Rappel.
 6    A.  Good morning.
 7    Q.  My name is Alan Golub. As you know, I
 8 represent the Plaintiffs in this case. And we're
 9 here to take your deposition.
10       Before we get started, I wanted to just
11 run through some basics of how the deposition will
12 proceed and make sure you understand what we're
13 doing here. So, you understand that the court
14 reporter has sworn you in.
15    A.  Yes.
16    Q.  Okay. You understand that this is the
17 equivalent of a court proceeding. You're obligated
18 to tell the truth.
19    A.  Yes.
20    Q.  All right. Sitting here today, is
21 there any reason that you know of that would
22 inhibit your ability to give truthful answers to my
23 questions?
24    A.  No.
25    Q.  Have you ever been deposed before?
```

Page 5

```
 1    A.  Yes.
 2    Q.  How many times?
 3    A.  Once.
 4    Q.  Do you know when?
 5    A.  During a pre-divorce proceeding.
 6    Q.  What year was that?
 7    A.  2006, maybe.
 8    Q.  Okay. Is that the only time you've
 9 ever been deposed?
10    A.  Yes.
11    Q.  All right. You understand that I will
12 be asking you the questions and you'll be providing
13 answers?
14    A.  Yes.
15    Q.  Okay. And it's all being taken down,
16 everything we say, is being taken down by the court
17 reporter. You understand that?
18    A.  Yes.
19    Q.  Okay. If, at any time, I ask you a
20 question that you don't understand or you want me
21 to clarify, please say so. I'm happy to try to
22 accommodate you. Okay?
23    A.  Okay.
24    Q.  When you give an answer, it's best if
25 you say yes or no, if that's appropriate, rather
```

2 (Pages 2 - 5)

Page 30

1    Q.  Do you have anything scheduled for 2016
2  in terms of party planning?
3    A.  No.
4    Q.  In 2014, who did you do party planning
5  for?
6    A.  Micro Strategies.
7    Q.  And what's that?
8    A.  What's what?
9    Q.  What's Micro Strategies?
10    A.  Micro Strategies is a corporation.
11    Q.  What do they do?
12    A.  Something with computer technology.
13  I'm not really sure.
14    Q.  And were there any other party planning
15  -- did you do any other party planning in 2014?
16    A.  I don't believe so.
17    Q.  So just for Micro Strategies?
18    A.  Correct.
19    Q.  How many parties did you plan for Micro
20  Strategies?
21    A.  I believe one.
22    Q.  And what was the nature of the party?
23    A.  It was an anniversary party.
24    Q.  A company anniversary?
25    A.  Yes.

Page 31

1    Q.  And what did you do for that event as
2  the party planner?
3    A.  I oversaw helping them set up tents,
4  florist, helping them with table setups, flower
5  centerpieces, menus, invitations, party favors,
6  things for the bathroom basket, anything that they
7  asked me to do.
8    Q.  What kind of party favors?
9    A.  I believe they had some scarves and key
10  chains.  She wanted some fortune cookies and some
11  cake pops.  She had a sand theme, so I think we did
12  seashells.
13    Q.  Real seashells?
14    A.  Say that again?
15    Q.  Real seashells?
16    A.  Uh-huh.
17    Q.  Okay.  Aside from fortune cookies and
18  cake pops, were there any other edible aspects of
19  your party planning for Micro Strategies?
20    A.  I think there might have been some
21  Oreos.
22    Q.  How many people attended this?
23    A.  Several hundred.
24    Q.  Where was it?
25    A.  At McCloone's in Long Branch.

Page 32

1    Q.  And what's McCloone's?
2    A.  A restaurant.
3    Q.  Did you attend the event?
4    A.  Yes.
5    Q.  How did you get the job to be the party
6  planner for that event?
7    A.  The contact there asked me to help them
8  coordinate the event.
9    Q.  And who was that?
10    A.  Letty Dempsey.
11    Q.  And Letty is L-e-t-t-y?
12    A.  Correct.
13    Q.  Is that short for anything or is her
14  name actually Letty?
15    A.  I think her name is actually Letty.
16    Q.  And how long do you know Letty Dempsey?
17    A.  Probably about five years maybe.
18    Q.  And how did you meet her?
19    A.  Through business.
20    Q.  Exactly, how did you meet her?
21    A.  She called Edible Gifts Plus to order
22  product for something she was doing.
23    Q.  Did she call on behalf of herself or on
24  behalf of Micro Strategies?
25    A.  On behalf of Micro Strategies.

Page 33

1    Q.  Did Micro Strategies become a client of
2  Edible Gifts Plus while you owned the company?
3    A.  Yes.
4    Q.  So you say you met her about five years
5  ago when she called you for the first time.  So
6  that would put that around 2011 is the first time
7  you did business with Micro Strategies?
8    A.  Maybe longer.  I don't know.  I really
9  don't remember.
10    Q.  Okay.  So it could be before 2011?
11    A.  Could be.
12    Q.  Is Micro Strategies a big client of
13  Edible Gifts Plus?
14    A.  They are a consistent client.
15    Q.  What do you mean by that?
16    A.  I developed a very good relationship
17  with her and she called whenever she needed
18  something.
19    Q.  Do you have a sense of the annual
20  volume of sales you did with Micro Strategies?
21    A.  No.
22    Q.  Were they in the top 10 in terms of
23  volume of all of your customers?
24    A.  I don't know if they were in top 10.
25  They were -- I don't know, top 20.

9 (Pages 30 - 33)

Page 34

1     Q.  How many customers did you have while
2 you owned Edible Gifts Plus?
3     A.  I don't recall, but if I remember
4 Melanie's testimony yesterday, about 20,000 she
5 said, around, the database.
6     Q.  Do you have any reason to disagree with
7 that?
8     A.  No.
9     Q.  Do you think it could have been 20,000
10 while you were still owning it?
11     A.  I think it would have been somewhat
12 less.  I don't remember what the number was.
13     Q.  So 2014 you say you only did one party
14 planning event and that was for Micro Strategies.
15 You can't think of any others?
16     A.  Any other parties that I planned?
17     Q.  Any other party planning that you did.
18     A.  No.  I think that was all I did.
19     Q.  Let's talk about 2015.  Did you do
20 party planning in 2015?  I think you said you did.
21         MR. BYRNES:  Object to the form.
22         You can answer.
23     Q.  Did you do any party planning in 2015?
24     A.  I don't recall.
25     Q.  Did you do any party planning in 2016?

Page 35

1     A.  No.
2     Q.  So since 2014, is it only one party
3 planning event that you've done?
4     A.  Yes.
5     Q.  What about prior to 2014, did you do
6 any party planning as the owner of Edible Gifts
7 Plus?
8     A.  No.
9     Q.  Did you do any party planning as the
10 owner of Candy Wrappers Plus?
11     A.  No.
12     Q.  Once you started Candy Wrappers Plus,
13 were you doing any party planning at that point?
14     A.  Only for me personally.
15     Q.  Micro Strategies pay you for the one
16 party that you planned for them?
17     A.  Yes.
18     Q.  How much did they pay?
19     A.  I don't remember what the total
20 business was.  They paid me for my time and the
21 products that were purchased.
22     Q.  You said Micro Strategies might have
23 been a top 20 client of Edible Gifts Plus while you
24 were the owner, right?
25     A.  Correct.

Page 36

1     Q.  I'd like you to do your best to tell me
2 who the other customers were who were in the top 20
3 when you owned the business?
4     A.  Mom365 probably, Great American
5 Financial Resources, DDF Labs, ADP, maybe,
6 Transwestern, Project Ezra.
7     Q.  With Micro Strategies that's seven
8 companies.  So that's pretty good.  Can you think
9 of any more who might be considered top 20?
10     A.  I just named a bunch for you.
11     Q.  I know.  I asked if there's any more
12 that you can think of.
13     A.  Not that I can think of.
14     Q.  Okay.  Of the six companies you just
15 named, in addition to Micro Strategies, did you
16 ever do any party planning for any of them?
17     A.  No.
18     Q.  Have you done any party planning for
19 any companies other than Micro Strategies?
20     A.  That's the only party I've done
21 recently.
22     Q.  Were there ones that you did -- when
23 you say "recently", what do you mean?
24     A.  Well, that I can think of in the past.
25 I haven't done anything in the past three years.

Page 37

1     Q.  Okay.  So we talked about when you
2 started Edible Gifts Plus it was, primarily, baked
3 goods; and, primarily, things along the nature of
4 treats, right?
5     A.  Uh-huh.
6     Q.  Over the years, as you continued to own
7 it, did you grow the business at all?
8     A.  Yes.
9     Q.  Okay.  And how did you grow the
10 business?
11     A.  We added different vendors and
12 products.  We marketed, we optimized the website
13 and built up a customer base.  I also purchased
14 another company.
15     Q.  And what company was that?
16     A.  Cookie HQ.
17     Q.  And this may be clear already, but for
18 Edible Gifts Plus, that wasn't a business, an
19 existing business you purchased, was it?
20     A.  Cookie HQ?
21     Q.  No, Edible Gifts Plus.  That's
22 something you formed yourself.
23     A.  Correct.
24     Q.  Okay.  What about Candy Wrappers Plus,
25 that's, again, also something you formed yourself?

Page 74

1  active with that.
2      Q.  Were you doing that when you still
3  owned Edible Gifts?
4      A.  I think that company was just started.
5      Q.  Okay.  And you say you haven't been
6  very active with that.  Do you mean lately?
7      A.  I really didn't do a whole lot with it.
8      Q.  Did you make any money doing it?
9      A.  No, I probably spent more on products
10 than the money I make.
11     Q.  Are you buying product for yourself?
12     A.  Yeah.
13     Q.  Is there -- do you have a website for
14 ID Life products?
15     A.  Not the ID Life one, I think I shut it
16 down.  For Stream, yes, I think I do.
17     Q.  Stream is the Ignite Stream?
18     A.  Yeah.
19     Q.  You have a website for that?
20     A.  Yes, just through the company.
21     Q.  Do you have a title for your role with
22 Ignite Stream?
23     A.  Associate.
24     Q.  Is it like sales associate?
25     A.  Yes.

Page 75

1      Q.  And you said you think you shut down ID
2  Life website?
3      A.  I definitely shut down my ID website.
4  I don't pay for that any more.
5      Q.  But you did have a website at one time?
6      A.  Yes.
7      Q.  Do you know when you had a website?
8      A.  Probably in 2014.
9      Q.  After the sale to Melanie?
10     A.  Yeah.
11     Q.  Did you have it before the sale to
12 Melanie?
13     A.  I don't think the company had started
14 yet.
15     Q.  Do you know when you shut the website
16 down?
17     A.  No, I don't remember.
18     Q.  Could it have been in 2016?
19     A.  No, I think I shut it down in 2014.
20     Q.  So you probably --
21     A.  I really didn't do much with it.
22     Q.  Okay.  Why did you shut it down?
23     A.  I just wasn't spending time promoting
24 the business.
25     Q.  Did you have to pay to be able to have

Page 76

1  that website?
2      A.  Yes.
3      Q.  Who did you pay, ID Life?
4      A.  Yes.
5      Q.  So when you sold the business to
6  Melanie, were you concerned at all about losing the
7  stream of revenue that Edible Gifts Plus provided
8  you?
9      A.  No.
10     Q.  How come?
11     A.  I have other sources of money.  My kids
12 get Social Security.
13     Q.  Why do your kids get Social Security?
14     A.  My ex-husband died.
15     Q.  All three of your kids get Social
16 Security benefits?
17     A.  Well, that just stopped, but they were,
18 yes.
19     Q.  Was that a monthly benefit?
20     A.  Yes.
21     Q.  And why did it stop?
22     A.  They all turned 18.
23     Q.  Okay.  Do you know how much the monthly
24 revenue was from Social Security benefits?
25     A.  About 4,500 a month.

Page 77

1      Q.  Did you have any other streams of
2  revenue at the time you sold the business?
3      A.  Savings.
4      Q.  Do you know how much you had in savings
5  at the time?
6          MR. BYRNES:  I'm just going to object
7  to the relevance of how much savings she has to the
8  issues in this case.
9          MR. GOLUB:  Okay.  Fine.
10     Q.  How much did you have in savings?
11         MR. BYRNES:  I'm going to instruct her
12 not to answer, unless you can proffer some
13 relevance to that.
14         MR. GOLUB:  I'm trying to find out how
15 she lived, financially, afterwards.  She said
16 savings.  I'm entitled to find out how much there
17 was.
18         MR. BYRNES:  Why?
19         MR. GOLUB:  Because she said she had
20 enough money.  I want to know all of the streams of
21 revenue she had when she identified the savings.
22         MR. BYRNES:  Savings are not a stream
23 of revenue.
24         MR. GOLUB:  That was her answer not
25 mine.

20 (Pages 74 - 77)

Page 78

1      MR. BYRNES:  From another source.
2      Q.  Did you live off your savings after you
3  sold the business?
4      A.  I lived off my savings after I sold the
5  business.
6      Q.  Okay.  What other streams of revenue do
7  you have besides savings and Social Security
8  benefits for your children?
9      A.  I was helping my mother.  I really did
10  not have any streams of revenue.
11      Q.  When you say you weren't concerned
12  because you had the streams of revenue, right; you
13  had the Social Security benefits, and you had your
14  savings and that was enough to tide you over?
15      A.  Yes.
16      Q.  Okay.  Did your savings include the
17  proceeds from the sale of the business to Melanie?
18      A.  Yes.
19      Q.  Okay.  Did you use any of that money
20  for anything immediately after the sale?
21      A.  Just for living expenses.
22      Q.  You didn't invest in anything?
23      A.  No.
24      Q.  You didn't acquire anything, buy
25  anything?

Page 79

1      A.  No.
2      Q.  Just day-to-day living expenses?
3      A.  Day-to-day living expenses.
4      Q.  All right.  If you didn't have your
5  savings, would your children's Social Security
6  benefits have been enough to provide for you and
7  your children?
8      A.  No.
9      Q.  Okay.  So did there come a time when
10  you had to generate some income in another way?
11      A.  Just recently I started working again.
12      Q.  Okay.  How recently?
13      A.  Earlier this year.
14      Q.  2016?
15      A.  Yes.
16      Q.  And did you start a new job somewhere?
17      A.  I started working for -- I started
18  managing the office for a mosquito and tick
19  company.
20      Q.  What's the name of the company?
21      A.  Last Bite Mosquito.
22      Q.  Okay.  So from the time you sold the
23  business to the time you started working at Last
24  Bite Mosquito, you didn't have any other full-time
25  employment?

Page 80

1      A.  No.
2      Q.  Did you generate revenue in any other
3  way?
4      A.  Not really.
5      Q.  So could you think of any other sources
6  of income between the closing of the sale and you
7  starting work at Last Bite Mosquito?
8      A.  I also have a personal assistant and
9  concierge business.  I dog walk and do senior care.
10      Q.  All right.  Is that three separate
11  things?
12      A.  No, it's all part of the same.
13      Q.  Concierge service?
14      A.  Yes.
15      Q.  What's the name of that?
16      A.  Alice At Your Service.
17      Q.  Okay.  When did you start that?
18      A.  Probably the end of last year maybe.
19      Q.  Last year being 2015?
20      A.  Correct.
21      Q.  And how do you -- is that Alice At Your
22  Service a website?
23      A.  There is no website.
24      Q.  Okay.  How do you -- do you have any
25  clients?

Page 81

1      A.  A few.
2      Q.  And what do you do for them?
3      A.  We dog walk and do senior care.
4      Q.  Okay.  You say "we dog walk", is there
5  anyone else involved in Alice At Your Service?
6      A.  A couple of my friends.
7      Q.  Okay.  Are you the sole owner?
8      A.  No.
9      Q.  Your friends are owners as well?
10      A.  Correct.
11      Q.  Is it -- did you actually form an
12  entity in New Jersey at the time?
13      A.  I believe so, yeah.
14      Q.  Okay.  Does Alice At Your Service have
15  a tax ID number?
16      A.  I would think so.  I don't handle the
17  financial of that.
18      Q.  How many friends of yours are involved
19  in Alice At Your Service?
20      A.  Two.
21      Q.  Aside from dog walk and senior
22  assistance, is there anything that Alice At Your
23  Service does?
24      A.  We grocery shop, run errands, that's
25  pretty much it.

21 (Pages 78 - 81)

Page 82

1      Q.  When you mentioned party planning
2  earlier, you did the one event for Micro
3  Strategies.  Was that in your capacity as a
4  representative of Alice At Your Service?
5      A.  Alice At Your Service wasn't in
6  business.
7      Q.  Okay.  Was that in your personal
8  capacity?
9      A.  Yes.
10     Q.  Once you decided to sell your business,
11  how did you go about trying to find a buyer?
12     A.  I advertised on bizbuysell.
13     Q.  And what's bizbuysell?
14     A.  It's a website to sell a business on
15  your own.
16     Q.  And how did you know about that
17  website?
18     A.  I don't remember.  One of my friends or
19  relative may have told me about it.
20     Q.  Your father past in September of 2013.
21  Do you know when you first posted your business at
22  bizbuysell?
23     A.  November or December.  I don't remember
24  the time, but somewhere around then.
25     Q.  Towards the end of 2013?

Page 83

1      A.  Correct.
2      Q.  Did you generate any interest?
3      A.  Yes.
4      Q.  How many people responded to your
5  listing?
6      A.  Quite a few.
7      Q.  More than 10?
8      A.  Yes.
9      Q.  Really?
10     A.  Yes.
11     Q.  What were you asking for in terms of
12  the business in price?
13     A.  I don't remember what I had it listed
14  as.  I think like 140, 150.
15     Q.  How did you arrive at that asking
16  price?
17     A.  Couple different people helped me come
18  up with that price.
19     Q.  Okay.  Which people?  Who are they?
20     A.  My uncle.  There was a company, I
21  believe I spoke to, who helped give me a valuation,
22  that was really it.
23     Q.  Do you know what the asking price was
24  based on?
25     A.  The valuation of, I think we did it on

Page 84

1  two times profits or my net profits.  I'm guessing.
2  It was somewhere between 140 and 150.
3      Q.  Why did you ask your uncle for help
4  with this?
5      A.  Because he has a lot of business
6  experience.
7      Q.  Okay.  Do you know what kind of
8  business he's in?
9      A.  He's retired.
10     Q.  What was he doing?  What did he used to
11  do before he retired?
12     A.  He owned an electrical supply company.
13     Q.  So when one someone is interested in
14  your business that they see it on the website, how
15  do they get in touch with you?
16     A.  They send me an e-mail.
17     Q.  And you say you had, possibly, as many
18  as 10 interested buyers?
19     A.  Way more than that.
20     Q.  More than that.  20?
21     A.  Probably more than that.
22     Q.  Really.  Okay.  And how long did it
23  take before you first started getting inquiries
24  from potential buyers?
25     A.  Within a day or two.

Page 85

1      Q.  Did you handle initial communications
2  with those potential buyers by yourself?
3      A.  Yes.
4      Q.  Did you have anybody giving you any
5  advice at the time with respect to offers that may
6  have come in?  Did any offers come in?
7      A.  Yes.
8      Q.  Did you speak to anyone or confer with
9  anyone in evaluating the offers?
10     A.  Yes.
11     Q.  Who?
12     A.  My uncle.
13     Q.  Okay.  Anyone else?
14     A.  He was probably the primary person I
15  spoke with.
16     Q.  Okay.  Did you get an offer from the
17  Plaintiff, Melanie?
18     A.  She was one of them, yes.
19     Q.  Okay.  And did you review that offer
20  with your uncle?
21     A.  Yes.
22     Q.  Were there any negotiations with
23  Melanie before you actually had a signed contract?
24     A.  Negotiations regarding what?
25     Q.  Her purchasing your business.

22 (Pages 82 - 85)

Page 86

1    A.  I believe I had some conversations with
2 her.
3    Q.  Did you talk about price?
4    A.  I would think we would have had to.
5    Q.  Did she have questions about the
6 business?
7    A.  Yes.
8    Q.  Did you do your best to answer them?
9    A.  Yes.
10   Q.  Did there come a time when you
11 consulted an attorney to help you with the
12 transaction?
13   A.  Yes.
14   Q.  And who was that attorney?
15   A.  Laurie Bini.
16   Q.  B-i-n-i?
17   A.  Correct.
18   Q.  How did you know her?
19   A.  She was somebody I knew through our
20 neighborhood and a friend of mine.
21   Q.  How long did you know Laurie before
22 this transaction?
23   A.  I don't know, seven, eight years.
24   Q.  Did you ever use her as an attorney
25 before?

Page 87

1    A.  No.
2    Q.  Do you know if she was experienced in
3 handling the purchase of a business or sale of a
4 business?
5    A.  Yes.
6    Q.  And was she?
7    A.  I believe so, yes.
8    Q.  Did you ever talk to her about her
9 experience?
10       MR. BYRNES:  Object.  Don't give any
11 answers regarding any discussions or even
12 indirectly related to any discussions with Miss
13 Bini.
14   Q.  Why do you believe that Miss Bini was
15 experienced in handling the sale of the business?
16       MR. BYRNES:  Again, same objection.
17       To the extent that would require you to
18 rely on any conversations you had with her to
19 answer that question, I don't want you testifying.
20   Q.  Can you answer the question?
21   A.  Sean has told me not to.
22   Q.  He told you, if it requires you to
23 reveal communications with Laurie.  Other than
24 communications with Laurie, was there any basis for
25 you believing that she had experience with handling

Page 88

1 the sale of a business?
2       MR. BYRNES:  Again, if any part of that
3 answer would require you to rely on a conversation
4 you had with her, I don't want you to answer.
5    A.  I can not answer.
6       MR. GOLUB:  The question said other
7 than.
8    Q.  Was there anything else?
9       MR. BYRNES:  I think what you could ask
10 her is whether she looked at materials, or looked
11 at a website or something.  But other than that, I
12 don't know what else would be the basis, other than
13 conversations with her.
14   Q.  Is there anything else?
15   A.  No.
16   Q.  Word of mouth?  Did you ever speak with
17 anyone who may have used her as an attorney?
18   A.  No.
19   Q.  Okay.  Did you look her up on the web?
20   A.  No.
21       MR. GOLUB:  Could I have this marked,
22 please, as Plaintiff's Exhibit-1.
23       (Exhibit P-1, Contract For Sale of
24       Assets, was marked for identification.)
25   Q.  Miss Rappel, the court reporter has

Page 89

1 handed you what's now been marked as P-1.  I ask
2 you to take a look at this document.  The top of it
3 it says Contract for Sale of Assets.  And the
4 parties identified at the top are Edible Gifts
5 Plus, LLC here and after referred to as seller.
6 And Melanie Ollivett, here and after referred to as
7 buyer.  Have you seen this before?
8    A.  Yes.
9    Q.  Is this a draft of what became the
10 contract for your sale of your business to Melanie?
11   A.  I'm assuming so.
12   Q.  Okay.  You see handwriting on several
13 pages?
14   A.  Yup.
15   Q.  Is that your handwriting?
16   A.  Yes.
17   Q.  Okay.  Take a look at each page.  Is
18 all of it your handwriting?
19   A.  Yes.
20   Q.  Okay.  I want you to take a look at
21 page three, Paragraph 9.  It's captioned Warranties
22 or Guarantees.  And it looks like there's a
23 handwritten note that says:  "Not selling computer,
24 fax printer."  Is that what it looks like it says
25 to you?

23 (Pages 86 - 89)

Page 90

1    A.  That's what it looks like.
2    Q.  Okay.  Is that your handwriting?
3    A.  I think so, yeah.
4    Q.  Okay.  And that's you indicating that
5  you wanted to make clear that those weren't
6  included in the sale?
7    A.  I'm sure those were just some of the
8  things that I was talking about.  Those are my
9  notes.
10    Q.  Okay.  Look at page four at the bottom,
11  Paragraph 15.  It says noncompete is the caption
12  for that paragraph?
13    A.  Uh-huh.
14    Q.  Left margin it says: "Read carefully."
15  Is that your note?
16    A.  Uh-huh.
17    Q.  Do you recall writing that?
18    A.  Yes.
19    Q.  Do you know why you wrote it?
20    A.  I'm sure because my attorney said to
21  read this.
22    Q.  Okay.  At the bottom it says: "As long
23  as buyer owns business for the 10-year period."  Is
24  that your handwriting?
25    A.  Yes.

Page 91

1    Q.  Okay.  Why did you write that?
2    A.  Because I think they wanted me to sign
3  a 10-year noncompete.
4    Q.  Okay.  And so what is the significance
5  of your note?
6    A.  I don't know that there is
7  significance.  It's probably part of a
8  conversation.
9    Q.  Okay.  Whose idea was it to include a
10  noncompete provision in this contract?
11    A.  I do not know.  I'm assuming Melanie.
12    Q.  Was the noncompete provision,
13  typically, to protect the buyer or the seller in
14  the sale of a business?
15       MR. BYRNES:  Objection to the form of
16  the question.  Calls for a legal conclusion.
17    Q.  Do you know?
18    A.  Repeat the question again.
19    Q.  Well, do you know what a noncompete
20  provision is?
21    A.  Yes.
22    Q.  Okay.  What is it?
23    A.  It's a provision about not competing.
24  That's about all I can tell you.
25    Q.  All right.  Do you know if there's a

Page 92

1  sale of a business between the seller and the
2  buyer, who has an interest in including a
3  noncompete provision in that contract, if you know?
4    A.  I would assume the buyer.
5    Q.  And why?
6    A.  So that their business can continue to
7  succeed.
8    Q.  Okay.  And that understanding forms
9  your assumption that it was probably Melanie that
10  requested that provision?
11    A.  That would be my understanding.
12    Q.  Did you resist the inclusion of the
13  noncompete provision?
14    A.  No.
15    Q.  Did you try to limit the noncompete
16  provision in any way?
17    A.  I was not part of the discussions with
18  the noncompete.  I believe that was between my
19  attorney and Melanie's father.
20    Q.  Okay.  Did you have any discussions
21  about the noncompete provision with Melanie at all?
22    A.  We had a couple of discussions about
23  contacting customers for different things.
24    Q.  Okay.  Were these phone conversations?
25    A.  Yes.

Page 93

1    Q.  Was this during the time you were
2  negotiating the contract?
3    A.  I believe so.
4    Q.  Okay.  So you said contacting customers
5  for different things.  I mean, what was the issue?
6  Did you want to contact customers?
7    A.  I think, originally, the language was
8  such that I couldn't speak with customers or
9  vendors.  Many of those were my family and friends.
10  I wasn't going to agree to that.
11    Q.  Okay.  Which of your customers, at the
12  time, were family members?
13    A.  My mom, my brother.  I couldn't tell
14  you.
15    Q.  Were any of your corporate clients
16  family members?
17    A.  My brother.  I probably did work with
18  his company at one time.  Other family members?
19  Springpoint.
20    Q.  Okay.  Who's your family member at
21  Springpoint?
22    A.  Gary Puma.
23    Q.  And how are you related?
24    A.  He's my cousin.
25    Q.  What's the name of your, at the time of

24 (Pages 90 - 93)

Page 94

1 these negotiations, what was the name of your
2 brother's company?
3      A. Cooper Rehab.
4      Q. What's your Brother's name?
5      A. Brad Cooper.
6      Q. Does your brother still work for Cooper
7 Rehab?
8      A. Yes.
9      Q. Any other family members that were
10 customers at the time you sold the business?
11      A. I can't really remember.
12      Q. Did you tell Melanie, during these
13 discussions, that Gary Puma of Springpoint was your
14 cousin?
15      A. We didn't really have many
16 conversations about customers at the time.
17      Q. Oh, okay. Did you have discussions
18 about the fact that your brother -- you may have
19 done some business with your brother's company,
20 Cooper Rehab?
21      A. No.
22          MR. BYRNES: Objection to the form.
23 What time are we talking about? Are we still in
24 the --
25          MR. GOLUB: In the negotiations, yeah.

Page 95

1      A. We didn't have discussions, really,
2 about customers.
3      Q. Okay.
4      A. About specific customers, anyway.
5      Q. But your concern was you wanted to be
6 able to still be in touch with customers. Did you
7 express that concern to Melanie?
8      A. Yes.
9      Q. Okay. Do you remember exactly what you
10 said?
11      A. No.
12      Q. Did you tell her that certain customers
13 were family members?
14      A. We didn't really get into customers.
15      Q. Okay. Did you say -- were there any
16 vendors who were family members?
17      A. No.
18      Q. Okay. What about you said friends and
19 family members. So did you have any customers who
20 were friends?
21      A. Say that again?
22      Q. Customers who were friends at this
23 time?
24      A. Yeah.
25      Q. Who?

Page 96

1      A. A lot of my friends ordered, I guess.
2 I couldn't tell you their names.
3      Q. Any corporate clients whose primary
4 contact was a friend of yours?
5      A. I had business -- I had customers who
6 had become friends over time.
7      Q. All right. With respect to the
8 corporate clients, which customers were those?
9      A. Tony Paul.
10      Q. So I'm going to ask you to tell me the
11 name of the individual and the name of the company.
12      A. Actually, she doesn't have a company,
13 so she just was a customer that became a friend.
14      Q. But she wasn't a corporate client in
15 any way?
16      A. No.
17      Q. Who did she work for, do you know?
18      A. She didn't work for anybody.
19      Q. She's unemployed?
20      A. Say that again?
21      Q. Was she unemployed?
22      A. Yeah, she didn't work.
23      Q. Okay.
24      A. Repeat your question again. Corporate
25 customer who were friends?

Page 97

1      Q. Yeah.
2      A. Who became friends?
3      Q. At this time you're negotiating this
4 noncompete provision. I want you to tell me which
5 corporate customers of Edible Gifts Plus had people
6 that you considered friends that you did business
7 with?
8      A. I considered all my customers to be
9 friends. I developed very strong relationships
10 with all my customers.
11      Q. Were any of these corporate business
12 friends closer to you than others?
13      A. Probably, Letty at Micro Strategies,
14 that might be it.
15      Q. All of the folks you've done business
16 with over the years in terms of corporate clients,
17 is Letty Dempsey the one person you're closest
18 with?
19      A. Yes.
20      Q. Is there anyone who you're about as
21 close with?
22      A. No.
23      Q. What about Susan Affert?
24      A. I know her quite well through business
25 and through business functions.

25 (Pages 94 - 97)

Page 98

1    Q.  Okay.  When did you meet her for the
2  first time?
3    A.  Six, seven years ago.
4    Q.  Do you know who she works for?
5    A.  Project Ezra.
6    Q.  And do you know how you came to meet
7  her?
8    A.  She found us on the web, on the
9  internet.
10    Q.  Find "us" meaning Edible Gifts?
11    A.  Correct.
12    Q.  So before she found you and your
13  website, you didn't know her at all?
14    A.  No.
15    Q.  Have you ever met her in person?
16    A.  Yes.
17    Q.  Can you think of any other corporate
18  clients at the time you're selling the business,
19  with the contact you consider a friend of yours?  I
20  know you said all.  I'm talking about your closest
21  friends?
22    A.  Not that I can recall.
23    Q.  What about vendors?  At the time you're
24  negotiating this language, I think you said you
25  were concerned that vendors had become family

Page 99

1  members and friends too.  Were there any vendors
2  who were family members?
3    MR. BYRNES:  Object to the form.
4    You can answer.
5    A.  Say your question again?
6    Q.  Were there any vendors who were family
7  members?
8    A.  No.
9    Q.  Okay.  Were there any vendors who were
10  friends?
11    A.  I had very good relationships with my
12  vendors.
13    Q.  Okay.  Who were you closest with among
14  all the vendors you had at the time?
15    A.  I spoke quite a bit with Fran at Sugar
16  Plumb, that was probably the person I spoke to the
17  most.
18    Q.  What's Fran's last name?
19    A.  Edley.
20    Q.  And how did you meet Fran Edley?
21    A.  She found me on the internet.
22    Q.  And what does Sugar Plumb do?
23    A.  They are another bakery of baked goods.
24    Q.  Okay.  How did she find you?
25    A.  She saw Edible Gifts Plus mentioned on

Page 100

1  the Rachael Ray Show.  And she wanted us to carry
2  her product.
3    Q.  Did you actually appear on the Rachel
4  Ray Show, you personally?
5    A.  No.
6    Q.  The website was mentioned on the show?
7    A.  Yeah, we gave out promotional gifts on
8  her show.
9    Q.  Okay.  And so why did she reach out to
10  you?
11    A.  She saw the clip with Edible Gifts Plus
12  on Rachael Ray and she approached us about becoming
13  a reseller.
14    Q.  And you said out of all the vendors,
15  she's the one you're probably closest with in terms
16  of friendship?
17    A.  Probably.
18    Q.  Who else in terms of vendors are you
19  friendly with?
20    A.  I had very good business relationships
21  with Veronica's Treats, with Lady Fortunes, with
22  Lollipop Creations.
23    Q.  Who's the individual at Veronica's
24  Treat's?
25    A.  Hillary Susa.

Page 101

1    Q.  And at Lady Fortune?
2    A.  Daria Artem.
3    Q.  And at Lollipop Creations?
4    A.  Laurie.  I don't know her last name.  I
5  also had good business relationship with Gift
6  Marketing Alliance.
7    Q.  And who's the individual there?
8    A.  Debbie Quintona.
9    Q.  What's Gift Marketing Alliance?
10    A.  A gift basket company.
11    Q.  What kind of gift baskets?  Do they
12  manufacture and sell gift baskets?
13    A.  Yes.
14    Q.  Okay.  You seemed puzzled.  Why is
15  that?
16    A.  Well, I'm trying to think if they
17  manufacture.  They're not really manufacturing
18  anything, but they're the ones putting the
19  components of the gift baskets together.
20    Q.  Okay.  Fair enough.  Are they edible
21  baskets -- not the baskets themselves, the items
22  inside the basket?
23    A.  No, I know.  Yes, but they -- yeah, I
24  think so.  They all seem to have edible components
25  in them.

26 (Pages 98 - 101)

Page 102

1  Q.  Okay.  Do they have any products that
2  don't include edible items?
3     A.  Probably.
4     Q.  You're not sure?
5     A.  I'm trying to think what I used to buy
6  from them.  They had wine, they sold flowers,
7  different product offerings.
8     Q.  Did you offer any of their wine gift
9  baskets for sale?
10    A.  Uh-huh.
11    Q.  Feature them on your website?
12    A.  Yes.
13    Q.  Flowers too?
14    A.  Yes, sir.
15    Q.  Edible gift basket?
16    A.  Products were edible, yes.
17    Q.  Yes?  Okay.  Who did Fran Edley work
18  for again?
19    A.  Sugar Plum.
20    Q.  How did you meet Hillary Susa?
21    A.  Found her on the internet.
22    Q.  You found her?
23    A.  Uh-huh.
24    Q.  Okay.  Were you looking for additional
25  vendors?  Is that how you found her?

Page 103

1     A.  Yes.
2     Q.  Do you know when?
3     A.  I don't remember.
4     Q.  Let me go back to Sugar Plum for a
5  moment.  Where are they located?
6     A.  Pennsylvania.
7     Q.  Do you know what town?
8     A.  I can't remember.
9     Q.  Have you ever met Fran Edley in person?
10    A.  I have.
11    Q.  How many times?
12    A.  Couple.
13    Q.  Did you go to Sugar Plum's location in
14  Pennsylvania?
15    A.  No.
16    Q.  Where did you meet her?  Where in
17  person did you meet her?
18    A.  Her daughter works at the same camp
19  where my daughter went.
20    Q.  So did you meet her at camp?
21    A.  Uh-huh.
22    Q.  What was the occasion for you to go to
23  camp?
24    A.  Visiting day.
25    Q.  Okay.  And Fran was visiting her

Page 104

1  daughter as well?
2     A.  Yes.
3     Q.  Okay.  Did you know each other at that
4  time?  You had already communicated with each
5  other?
6     A.  I was one of her resellers.
7     Q.  Okay.  And how long were you -- had you
8  been a reseller by the time you met for the first
9  time?
10    A.  Probably a year or two.
11    Q.  Do you know when that meeting at camp
12  took place?
13    A.  I have no idea.
14    Q.  Okay.  You said you met her a couple of
15  times.  What was the other time?
16    A.  Subsequent visiting days.
17    Q.  Did you only ever meet her at camp?
18    A.  I think so.
19    Q.  When you owned the Edible Gifts Plus
20  business; how often, once you started doing
21  business with Sugar Plum, how often would you speak
22  with Fran Edley?
23    A.  I really don't know.
24    Q.  Did you speak with her every week?
25    A.  Probably, yeah.

Page 105

1     Q.  Okay.  More than once a week?
2     A.  Could be, yeah.
3     Q.  On a relatively consistent basis
4  throughout your ownership of the company?
5     A.  Yeah.
6     Q.  What about after you sold the company?
7     A.  I still spoke to her all the time.
8     Q.  Yeah.  Why did you speak to her after
9  you sold the company?
10    A.  We spoke about our kids, her kids'
11  camp.
12    Q.  Okay.  Other than personal things, did
13  you talk about business at all with Fran after you
14  sold the business?
15    A.  Occasionally, yeah.
16    Q.  Okay.  What kind of things?
17    A.  I had been trying to help Melanie with
18  some projects for her.  She wanted to know what
19  happened to them, and why she hadn't heard from
20  Melanie.
21    Q.  What projects are we talking about?
22    A.  There were some big sale orders that I
23  was trying to secure for Melanie when I sold her
24  the business.
25    Q.  Did you say bake sale?  Bake sale?

27 (Pages 102 - 105)

Page 110

1    Q.  Why would she call you about it?
2    A.  Because when I sold the business, I
3  assured all my vendors that there would be a smooth
4  transition, and that I would be helping Melanie
5  transition the business.  And I don't think things
6  were going as smoothly as they would have liked.
7    Q.  Do you know how long after the sale of
8  the business this call took place?
9    A.  No, I don't.
10   Q.  Was it within the first year?
11   A.  Definitely within the first year.
12   Q.  Was it likely the same month as the
13  closing?
14   A.  No, I doubt that.
15   Q.  Well, aside from that conference
16  call.  Well, let me ask you this:  You had
17  mentioned Gafri, a finance company you thought that
18  had to do with Daria?
19   A.  Fortune Cookies I think we were working
20  on.
21   Q.  Who's "we"?
22   A.  Melanie and I.
23   Q.  Is this before the closing or after?
24   A.  I was working on it before.  And then I
25  was trying to help Melanie with it after.

Page 111

1    Q.  Okay.  And the conversation you had
2  with Daria, was Melanie on that call as well?
3    A.  Which call?  I don't know what call
4  you're referring to.
5    Q.  The call you discussed Gafri?
6    A.  Yes.
7    Q.  Was it only one phone call?
8    A.  I don't recall.
9    Q.  Was there ever a phone call with Daria
10  to discuss Gafri that Melanie was not on the call
11  for?
12   A.  Only if Melanie asked me to call them.
13   Q.  Only if Melanie asked you to call
14  Daria?
15   A.  Yes.
16   Q.  Did Melanie ever ask you to call Daria?
17   A.  Within the first two weeks that she
18  bought the business, I was making phone calls on
19  her behalf.
20   Q.  Specifically to Daria?
21   A.  Specifically to any baker involved in
22  any order I was helping her with.
23   Q.  Okay.  Including Daria?
24   A.  Yes.
25   Q.  Other than Gafri, were there any other

Page 112

1  orders you recall that Melanie asked you to speak
2  to the vendor on her behalf of?
3    A.  Not that I can remember.
4    Q.  How many calls like that do you recall,
5  calls to vendors on Melanie's behalf, after the
6  sale of the business?
7    A.  I really don't remember within the
8  first two weeks after the business, I was trying to
9  help her as much as possible.
10   Q.  Okay.  After those first two weeks, no
11  more calls from you on behalf of Melanie?
12   A.  She asked me not to.
13   Q.  She asked you not to call vendors?
14   A.  She asked me not to communicate with
15  her and not to help her, that she would contact me
16  if she wanted help from me.
17   Q.  Did she specifically ask you not to
18  call vendors?
19   A.  I don't recall what the e-mail said.
20   Q.  This was an e-mail you're recalling?
21   A.  Uh-huh.  I got an e-mail from Dino.
22   Q.  Okay.  Did they tell you they didn't
23  want your help?
24   A.  They said they only wanted me to
25  communicate via e-mail.  And they would let me know

Page 113

1  when they wanted my help.
2    Q.  Okay.  Did you take that to mean they
3  don't want you to help?
4    A.  I took it to mean they only wanted me
5  to communicate with them via e-mail.  I thought
6  that was a mistake.  And I told them so, but I said
7  I would honor their wishes.
8    Q.  After that you did not make any further
9  calls on their behalf to speak to vendors?
10   A.  No, no.
11   Q.  Did you still speak to vendors on your
12  own behalf?
13   A.  I spoke to vendors for personal things.
14  Nothing to do with them.
15   Q.  How many vendors did you speak to for
16  personal things after you sold the business?
17   A.  I, occasionally, spoke to Daria.  I
18  spoke to Hillary and Fran quite regularly.
19   Q.  All about personal orders that you were
20  making?
21   A.  Oh, just personal things, personal
22  conversation.
23   Q.  Not business related?
24   A.  No.
25   Q.  How often would you speak with Daria

29 (Pages 110 - 113)

Page 114

1 after the sale of the business?
2     A.  Daria, intermittently.  I really don't
3 recall.
4     Q.  Okay.  Was it at least once a month?
5     A.  I don't think so.
6     Q.  Okay.  What about Hillary?  Who did you
7 speak to the most out of Daria, Hillary and Fran
8 after the sale of the business?
9     A.  Probably Fran.
10     Q.  Was Fran at least once a month?
11     A.  Probably.
12     Q.  What about Hillary?
13     A.  I really don't know.
14     Q.  Okay.  Did you speak to Daria or
15 Hillary more after the sale of the business?  Who
16 do you consider closer to you?
17     A.  Probably Hillary.
18     Q.  Where's Hillary located?
19     A.  Massachusetts.
20     Q.  Did you ever meet her in person?
21     A.  No.
22     Q.  Do you still speak to Hillary?
23     A.  Yes.
24     Q.  How often?
25     A.  I really don't know.

Page 115

1     Q.  When was the last time you spoke to
2 her?
3     A.  Probably a few days ago.  She called to
4 ask how my kids got off to school.
5     Q.  Did you discuss anything else?
6     A.  No.
7     Q.  Did you discuss this lawsuit with her?
8     A.  She knows there's a lawsuit.  She's
9 discussed it with me before.
10     Q.  Last week when you spoke to her, did
11 you discuss this lawsuit?
12     A.  No.
13     Q.  Not even the fact that you were going
14 to be deposed?
15     A.  I don't think so.
16     Q.  How many conversations have you had
17 with Hillary about this lawsuit?
18     A.  I really don't recall.
19     Q.  More than one?
20     A.  I'm sure more than one.
21     Q.  What do you talk about when you discuss
22 the lawsuit?
23     A.  Basically, that I'm just very upset
24 about the lawsuit, pretty much it.
25     Q.  Do you ever ask for any help with the

Page 116

1 lawsuit?
2     A.  No.
3     Q.  What about Daria Artem?  Did you ever
4 ask her for any help with the lawsuit?
5     A.  No.
6     Q.  Did you ever discuss the lawsuit with
7 her?
8     A.  She discussed the lawsuit with me.
9     Q.  You didn't say anything in response?
10     A.  I said the same thing.  I'm very upset
11 about the lawsuit.
12     Q.  When was the last time you spoke with
13 Daria?
14     A.  About a month or two ago.
15     Q.  Did you discuss the lawsuit then?
16     A.  Yeah.  She called to say that she was
17 sending in information you requested.  I said okay.
18     Q.  Did she send you a copy?
19     A.  No.
20     Q.  Did she tell you what she was sending
21 me?
22     A.  No.
23     Q.  Why was she calling you to tell you
24 that?
25     A.  You'd have to ask her that.

Page 117

1     Q.  You didn't talk to her about it beyond
2 her telling you she's doing it?
3     A.  Yeah.
4     Q.  Did she ask you what she was sending
5 you?
6     A.  No.
7     Q.  Why not?
8     A.  I knew I'd get it from you.
9     Q.  You weren't curious when she got a
10 subpoena and she was sending me information?
11     A.  I knew she would -- whatever she sent,
12 she would send to you.
13     Q.  What about Fran?  Did you ever discuss
14 this lawsuit with Fran?
15     A.  Yes.  Fran discussed the lawsuit with
16 me.
17     Q.  Is that different than you discussing
18 it with her?
19         MR. BYRNES:  Object to the form.
20     A.  I'm sure we discussed it with each
21 other.
22     Q.  Okay.  What was the nature of your
23 discussion with Fran?
24     A.  Again, that I was very upset about the
25 lawsuit.

30 (Pages 114 - 117)

Page 122

1    A.  Yes.
2    Q.  Were you living off any sources of
3 revenue at that time?
4    A.  Not anything in addition to what I've
5 told you.
6    Q.  Okay.  Do you have any investments?
7    A.  I do.
8    Q.  Okay.  Do you have any interest income
9 from those investments?
10    A.  I do.
11    Q.  Okay.  Is it sufficient interest income
12 for you to live off of?
13    A.  No.
14    Q.  Can you give me an approximate estimate
15 of how much interest income you have every year?
16        MR. BYRNES:  Could I just ask what the
17 relevance of that is?
18        MR. GOLUB:  Yeah.  We want to figure
19 out the extent of her assets and net worth to see
20 what we're talking about here.
21        MR. BYRNES:  I don't think, typically,
22 in a civil litigation you don't get discovery, it's
23 more geared toward collection of a judgement than
24 relevant to any issues, actually, in dispute.  I
25 mean, if there's -- I'm trying to see what the

Page 123

1 connection of her interest income is to whether she
2 somehow violated the agreement with your client.
3        MR. GOLUB:  Let's go off the record for
4 a moment.
5        (Off-the-record conference.)
6        MR. GOLUB:  Back on the record, please.
7    Q.  So, Miss Rappel, when we took the break
8 I was asking you about your interest income.  And
9 you said, I believe you testified, that the
10 interest income is not enough -- it's not
11 significant?
12    A.  Correct.
13    Q.  Is that accurate?  Okay.  Is it enough
14 for you to live on?
15    A.  Absolutely not.
16        (Exhibit P-2, Contract, was marked for
17        identification.)
18        MR. GOLUB:  Let's move on to Exhibit
19 P-2.  This has been marked by the court reporter.
20 I'll hand it to Miss Rappel.  I have a copy for you
21 Sean.
22        Just so the record's clear, there's
23 handwriting on the bottom where it says MD-5,
24 that's just my handwriting.  This is my copy of
25 what was marked at your deposition yesterday.

Page 124

1    Q.  I'll ask you to take a look at what's
2 been marked as P-2.  Let me know when you're ready.
3 And my first question is:  Do you recognize this
4 document?
5    A.  Yes.
6    Q.  Okay.  And this is the contract that
7 you entered into with Melanie to sell your business
8 to her, correct?
9    A.  Correct.
10    Q.  Okay.  Who drafted this contract?
11    A.  I believe my attorney did.
12    Q.  And your attorney is Laurie Bini?
13    A.  Correct.
14    Q.  Okay.  So at the top of this contract
15 on page one it has the date, agreement made this
16 11th day of January, 2014, correct?
17    A.  Uh-huh.
18    Q.  And it identifies Edible Gifts Plus,
19 LLC as the seller, correct?
20    A.  Yes, correct.
21    Q.  Melanie Ollivett as the buyer, right?
22    A.  Yes.
23    Q.  Okay.  All right.  I'm going to ask you
24 to take a look at paragraph one, on page one which
25 is captioned:  "Sale of business".  And it says:

Page 125

1 "Seller agrees to sell and buyer agrees to purchase
2 free from all liabilities and encumbrances except
3 as otherwise specifically set forth herein.  The
4 assets now owned by seller."  And then it has your
5 address, right?
6    A.  Uh-huh, yes.
7    Q.  And then it goes on to say:  "Including
8 all of seller's rights under its contracts,
9 licenses, and agreements, including inventory and
10 property owned and used by seller in such business
11 as specified in Schedule A which includes the web
12 sites, e-mail addresses, phone numbers, customer
13 lists, vendor lists, and the goodwill of the
14 business as a going concern other than property
15 specifically excluded herein."  Did I read that
16 correctly?
17    A.  Yes.
18    Q.  Okay.  Is that consistent with your
19 understanding of what you're selling to Melanie?
20    A.  Yes.
21    Q.  I'd like to take a look at the Schedule
22 A that's referenced in that section I just read.
23    A.  Sure.
24    Q.  And if you see there are Bates numbers
25 on the bottom of these pages.  The Bates numbers

32 (Pages 122 - 125)

Page 126

1  Edible Gifts 734 is at the bottom of Schedule A.
2  Do you see that?
3      A.  Yes, I do.
4      Q.  Okay.  This document is captioned:
5  "Schedule A Assets and Property Being Sold and
6  Liabilities Being Assumed", right?
7      A.  Uh-huh, yes.
8      Q.  Okay.  Do you know who came up with
9  this Schedule A?  Where did these items come from?
10      A.  I do not recall.  I assume my attorney
11  came up with these.
12      Q.  Well, did your attorney know what the
13  assets of the business was?
14      Let me ask you this:  Did you have any
15  feedback into drafting this.
16      A.  We talked about it.
17      Q.  Okay.  Did you look at this Schedule A
18  before signing the contract?
19      A.  Yes.
20      Q.  Okay.  Did you understand this Schedule
21  A?
22      A.  I believe I did, yes.
23      Q.  Do you know whether there were any
24  changes to this version of Schedule A before you
25  signed the final version?

Page 127

1      A.  No.
2      Q.  Okay.  Let's talk about the items
3  listed here.  Okay?  So the first item on the list
4  it says:  "Inventory to be shipped to buyer at
5  buyer's sole cost and expense", right?
6      A.  Yes.
7      Q.  What was the inventory you're talking
8  about there?
9      A.  The candy wrappers and the Our Name is
10  Mud ceramic products.
11      Q.  Our Name is Mud?
12      A.  Yes.
13      Q.  What are those?
14      A.  Ceramic products.  There was a line of
15  ceramic products I sold.
16      Q.  What kind of products?  What are they,
17  ceramic ornaments?
18      A.  Picture frames.  It was an assortment
19  of different things.
20      Q.  Okay.  All made out of ceramic?
21      A.  Yes.
22      Q.  Those weren't for -- those weren't
23  edible items, right?
24      A.  No.
25      Q.  More decorative, artistic, functional?

Page 128

1      A.  Yes.
2      Q.  A mixture of that kind of thing?  Okay.
3  Did it include anything else?
4      A.  As far as in the inventory?
5      Q.  Yes.
6      A.  Not that I can recall.
7      Q.  Next it says:  "Use of names; Edible
8  Gifts Plus, Candy Wraps Plus, and Cookie HQ",
9  correct?
10      A.  Correct.
11      Q.  All right.  And is that -- is your
12  understanding -- what's your understanding of that
13  item?
14      A.  That those were the names of the -- the
15  names to use that went along with the website.
16      Q.  Okay.  And those are three companies
17  that we discussed this morning, right?
18      A.  Right.  There were three different web
19  sites.
20      Q.  Okay.  Next item is:  "Exclusive use,
21  rights and management of URLs currently under
22  license to seller."  What's your understanding of
23  that item?
24      A.  Those were the website domains.
25      Q.  Okay.  So is this item limited to the

Page 129

1  domain name for each of those companies?
2      A.  I thought so.
3      Q.  Okay.  Next is customer lists and
4  purchase history.  Did each of those things exist
5  at the time you sold the business?
6      A.  Yes, they were in the back end of the
7  website.
8      Q.  Okay.  And you delivered those to the
9  buyer at the closing of the sale?
10      A.  Yes.
11      Q.  So they were hers as soon as the sale
12  was finished, right?
13      A.  Yes.
14      Q.  Okay.  Next item is:  "Vendor contacts
15  and purchase history", were those part of the sale?
16      A.  Yes.
17      Q.  Okay.  Vendor contacts is just a list
18  of the contact information of all the vendors that
19  you used, correct?
20      A.  Correct.
21      Q.  Purchase history, was that related to
22  vendors or customers?
23      A.  It would probably be in the back end of
24  the website, that would have been both.
25      Q.  Well, actually, the previous items said

33 (Pages 126 - 129)

Page 130

1 customer lists and purchase history. Presumably,
2 that purchase history related to customers?
3     A. Right, vendor contacts and purchase
4 history related to vendors, yes.
5     Q. Okay. Very good. So the next item is
6 goodwill. What is your understanding?
7     A. I was just being honest and handing
8 everything over to her that pertained to my
9 website.
10    Q. Okay. That's what goodwill is to you?
11    A. I didn't really -- I don't -- you could
12 give me your definition of goodwill.
13    Q. Was that your definition of goodwill,
14 what you just said?
15    A. Yeah.
16    Q. Just being honest?
17    A. Yes.
18    Q. Okay. Trademarks? What's that?
19    A. I think that might have referred to, if
20 I trademarked any of my logos, but I don't know
21 that I ever did.
22    Q. But if you did, they would belong to
23 Melanie as result of the sale?
24    A. Correct.
25    Q. Do you recall ever filing a

Page 131

1 registration with the U.S. Patent and Trademark
2 Office for anything ever?
3     A. I don't think so.
4     Q. Okay. So you don't recall doing it
5 with respect to any of these company names?
6     A. I don't think so.
7     Q. What about the logos for the company?
8 Did you ever register a trademark for any of the
9 logos?
10    A. I don't think so.
11    Q. And I said any of the logos. Was there
12 more than one logo for the company that you sold to
13 Melanie?
14    A. I think there were different variations
15 of the files that I gave her all of that.
16    Q. Variations of the files. Were the
17 files -- was it an image of the logo, each file was
18 an example of the logo?
19    A. Yeah.
20    Q. When you say different variations, what
21 do you mean?
22    A. I think there might have been a logo
23 with the image in one corner, maybe with text
24 underneath. I don't really remember.
25    Q. Okay. But you recall there were

Page 132

1 different variations of the logo?
2     A. Yes.
3     Q. That were included in the sale?
4     A. Melanie acknowledged she got them
5 yesterday.
6     Q. You mean during her deposition?
7     A. Yes.
8     Q. How did you deliver the logos to
9 Melanie?
10    A. Electronically.
11    Q. Okay. Did you e-mail them to her?
12    A. I don't recall whether I e-mailed them
13 to her, if I sent them on a drive. I do not
14 remember.
15    Q. But what you delivered was a digital
16 file?
17    A. Uh-huh, yes, correct.
18    Q. Does trademarks include anything else?
19    A. I don't think so.
20    Q. Okay. Images and advertising files,
21 what is included in that?
22    A. That includes the logos, the banners,
23 the home pages, anything pertaining to the logo for
24 all three web sites and some of the different files
25 that were used for that.

Page 133

1     Q. Okay. You said the logos. I thought
2 the logos were included in the trademark items.
3     A. No, I think that means trademarks. If
4 anything is trademarked she got the trademark. I'm
5 not really...
6     Q. Okay. Anything else included in the
7 imaging and advertising files?
8     A. No.
9     Q. Telephone numbers. What's that?
10    A. The 800 number to the business.
11    Q. Okay. Well, it says telephone numbers,
12 plural.
13    A. Well, Melanie and I found out we
14 couldn't transfer the local number, so we took that
15 number off the website and put up her local number.
16    Q. Okay. But at the time you signed this
17 contract, you both contemplated transfer of more
18 than one number?
19    A. There was an 800 number, and then there
20 was another number. And the telephone company told
21 us we couldn't transfer it.
22    Q. Did you have a conversation with the
23 telephone company?
24    A. Yes, Melanie and I both did together.
25    Q. On a conference call?

34 (Pages 130 - 133)

Page 134

1   A.  Yes.
2   Q.  What was the name of the telephone
3 company?
4   A.  I don't remember.  I know we have an
5 e-mail that speaks to that.
6   Q.  Do you know when this was?
7   A.  When what was?
8   Q.  When the conference with the telephone
9 company was?
10   A.  It would have been in February or
11 March.
12   Q.  Of 2014?
13   A.  Yes.
14   Q.  Okay.  E-mail addresses.  Were e-mail
15 addresses part of the sale?
16   A.  There was info@EdibleGiftsPlus.  And I
17 think there was a Cookie HQ one, which was in a
18 dormant state.
19   Q.  So the e-mail address associated with
20 Cookie HQ was dormant like the website?
21   A.  Correct.  I'm pretty sure it is.
22   Q.  Okay.  Did you ever use the Cookie HQ
23 e-mail address?
24   A.  When I first bought the business I did,
25 because we were running almost two separate

Page 135

1 websites.
2   Q.  How long did you use it for?
3   A.  I don't recall.  I'm guessing about a
4 year or so.
5   Q.  Okay.  Once the HQ site, the Cookie HQ
6 site went dormant, did you ever use the e-mail
7 address again?
8   A.  I don't think we could.  I really don't
9 know.
10   Q.  Okay.  But did you?
11   A.  No.
12   Q.  All right.  Next item is signable
13 contracts of seller.  What's that?
14   A.  I believe those were any contracts that
15 I had.  And Melanie sent over transfer of ownership
16 that were different documents -- different things
17 for them.  I don't really remember what all of them
18 were.  I know they included transfer of the
19 ownership of Volusion, transfer of those things
20 from the website company, transfers of the merchant
21 accounts for credit cards.  I don't remember what
22 else was included in that, but Melanie took care of
23 that very quickly after closing.
24   Q.  Okay.  You said transfers of the things
25 from the website company.  I'm not sure what you

Page 136

1 mean?
2   A.  We had to transfer the ownership of the
3 website domain.
4   Q.  Domain, okay.
5   A.  To Melanie through Volusion.  There
6 were a number of things that needed to be done, all
7 of which were taken care of.
8   Q.  Okay.  Were there any contracts with
9 vendors?
10   A.  No.
11   Q.  Were there any contracts with
12 customers?
13   A.  No.
14   Q.  Did you ever have any contracts with
15 vendors during the time that you owned the
16 business?
17   A.  Not that I can recall.
18   Q.  Did you ever have any contracts with
19 customers?
20   A.  No.
21   Q.  Next item is a noncompete agreement.
22 We talked a little bit about that one, right?
23   A.  Yes.
24   Q.  Okay.  After that it says:  "No
25 liabilities are to be assumed", correct?

Page 137

1   A.  Correct.
2   Q.  Okay.  Did the company have any
3 liabilities at that time?
4   A.  No.
5   Q.  Going back to the noncompete agreement,
6 that was something that was actually part of this
7 contract and being provided from you, as the
8 seller, to Melanie as the buyer, correct?
9   A.  Correct.
10   Q.  Beneath that it says additional items.
11 And it says:  "All inventory so strictly in its
12 present as-is condition."  And you walked me
13 through the inventory before, correct?
14   A.  Correct.
15   Q.  Next page, Schedule B, page number
16 Edible Gifts 735 on the bottom.
17   A.  Okay.
18   Q.  "Assets and properties not included in
19 the sale."  So is your understanding that this is a
20 list of things that you are expressly stating are
21 not being sold to Melanie?
22   A.  Correct.
23   Q.  Okay.  "Cash on hand and in banks" is
24 the first item, right?
25   A.  Yes.

35 (Pages 134 - 137)

Page 138

1    Q.  "Accounts receivable including credit
2  card transactions pending at time of closing",
3  right?
4    A.  Yes.
5    Q.  "Office furniture located at offices of
6  seller", that's the next item, correct?
7    A.  Correct.
8    Q.  "Computers, printers, fax machines,
9  telephones and similar equipment located at the
10 offices of seller", right?
11   A.  Correct.
12   Q.  And "seller's vehicles".  Last item,
13 right?
14   A.  Correct.
15   Q.  Did you have a vehicle that belonged to
16 the company at the time you entered this
17 transaction?
18   A.  No.
19   Q.  Okay.  Were there any discussions or
20 negotiations about the exclusions from the sale?
21   A.  I don't believe so.
22   Q.  Next page 736 is the number at the
23 bottom.  Schedule C, it says:  "Purchase price
24 allocation."  Do you see that?
25   A.  Yes.

Page 139

1    Q.  Okay.  And then there's a number of
2  items that are part of a contract and a dollar
3  amount associated with each one, right?
4    A.  Yes.
5    Q.  Do you know how these numbers were
6  determined?
7    A.  No, I do not.
8    Q.  Do you know who did it?
9    A.  I would have to assume my attorney did
10 it, but...
11   Q.  Okay.  Let me ask you this.  So I have
12 been an attorney involved in asset purchase
13 agreements before.  And often times the allocation
14 of the purchase price is something that's done as a
15 tax consideration.  The seller would like it
16 allocated a certain way, in most cases in order to,
17 you know, to be favorable under the tax code for
18 him or her.
19   A.  Okay.
20   Q.  Do you know if that was any basis for
21 this allocation?
22      MR. BYRNES:  Just object to the form.
23      You can answer it.
24   A.  I don't know.  It might have been.
25   Q.  Do you remember whether -- did you

Page 140

1  consult with any accountant in the preparation of
2  this purchase price allocation?
3    A.  I don't remember.  We could have.  I
4  really don't remember.
5    Q.  The first item here is inventory.  Is
6  that consistent with the definition of inventory
7  you gave me before?
8    A.  Correct.
9    Q.  We're talking about candy wrappers and
10 the mud ceramic items, correct?
11   A.  Correct.
12   Q.  URLs and websites.  Is that the domain
13 name and everything on the websites that you had?
14   A.  Correct.
15   Q.  The business goodwill, what's that?
16   A.  I'm assuming that's me just being
17 honest that I'm passing everything along to her.
18 I'm representing everything as-is with the
19 business.
20   Q.  What does that mean, representing
21 everything as-is?
22   A.  Everything that Melanie and I
23 discussed.
24   Q.  I'm still not sure I follow.  I'm
25 representing everything as-is --

Page 141

1    A.  I really don't know how to define
2  business goodwill and personal goodwill to you.
3    Q.  Okay.  Well, that was my next question;
4  personal goodwill as well is here.  You don't know
5  what that is either?  What's your understanding of
6  what it is, your best understanding?
7    A.  My best understanding is I'm selling
8  the business to her in good faith and being honest
9  about all the representations I'm making to her.
10   Q.  Okay.  And there's $20,000 associated
11 with business goodwill, right?
12   A.  Correct.
13   Q.  And there's $20,000 associated with
14 personal goodwill, right?
15   A.  Uh-huh.
16   Q.  Okay.  Do you recall having any
17 discussions about how those numbers were
18 calculated?
19   A.  No.
20   Q.  Do you know what the difference between
21 business goodwill and personal goodwill is?
22   A.  No.
23   Q.  The next item, intellectual property
24 also $20,000.  Do you know what that is?
25   A.  I'm assuming that's my -- the URLs up

36 (Pages 138 - 141)

Page 142

1 above. I'm assuming the intellectual property is
2 my website. I don't know, specifically, what this
3 is referring to here.
4        MR. BYRNES: I'm just going to give her
5 an instruction. You might have given it at the
6 beginning, I'm not sure.
7        You can estimate and approximate, but I
8 don't want you to assume anything. If you know --
9 you have a basis for answering, that's fine. But
10 you said a few times, I'm going to assume.
11        THE WITNESS: I do not know.
12        MR. BYRNES: Counsel, will tell you
13 whether he wants you to assume or not. I don't
14 think so.
15     Q. Well, you said websites. Up above it
16 says URLs and websites in the second item?
17     A. I don't know what intellectual property
18 refers to.
19     Q. Okay. Next item is customer lists,
20 vendor lists, data, $20,000. Do you know what that
21 is?
22     A. The customer lists, the vendor lists.
23     Q. What's the data?
24     A. I'm not sure what that refers to.
25     Q. Okay. Covenant not to compete. Do you

Page 143

1 know what that is?
2     A. That's the noncompete clause.
3     Q. Right. Then assistance and training.
4 Do you know what that is?
5     A. Yes, that was my 90-day offer to help
6 Melanie to make a smooth transition for the
7 business.
8     Q. Okay. Were there any discussions at
9 the time you were negotiating this contract, and I
10 mean discussions between you and the buyer, as to
11 what would be included in the assistance and
12 training?
13     A. Yes. Melanie and I talked about
14 transitioning customers. We talked about sending
15 out an e-mail once the sale was complete. She
16 asked me not to tell anyone that I was selling the
17 business. We were going to make mutual
18 introductions together. And I was -- agreed with
19 that, and was very much on board with that. And
20 that I had told her that I was going to do
21 everything I can to make a smooth transition for
22 her, and the vendors, and her and the customers
23 over the 90-day period.
24     Q. Okay. So all of that is in, it's your
25 understanding, that all of that is included in the

Page 144

1 assistance and training item?
2     A. Yes.
3     Q. Yes, okay. Let me go back to Schedule
4 A a moment. This is the assets that you sold.
5     A. Okay.
6     Q. All right. Now, it says -- well, let
7 me, without referring to this. Can we agree that
8 you were selling Melanie the websites?
9     A. Yes.
10     Q. The URLs?
11     A. Yes.
12     Q. Were you selling everything related to
13 the website to Melanie?
14     A. Everything that was mine to sell, yes.
15     Q. Okay. This is a list of things that
16 were yours to sell, correct?
17     A. Correct.
18     Q. Okay. It says images, right?
19     A. Images and advertising files were on
20 the same line. They refer to the logo, the
21 banners, the home page images. I can't sell her
22 images that I do not own.
23     Q. Okay. I agree, you can't sell her
24 images you do not own. All right. Did you ever
25 tell Melanie or give her a list -- let me ask you

Page 145

1 this: Did you ever give Melanie a list of the
2 images that you actually own?
3     A. No.
4     Q. Did you ever discuss with her the
5 images that this covered in the list of assets
6 being sold?
7     A. I don't recall that. I showed her how
8 to add products and told her where those products
9 came from.
10     Q. When did you do that?
11     A. When she and I had the remote sessions
12 prior to her closing on the business.
13     Q. You had remote sessions with her prior
14 to closing?
15     A. Yes.
16     Q. Why would you do that?
17     A. Because she wasn't able to spend very
18 much time going through things when she was at my
19 house.
20     Q. And why was that?
21     A. She got sick.
22     Q. Okay. But your testimony is that
23 before you closed on this, you showed her how to
24 add images to a remote session on your computers?
25     A. Yes.

37 (Pages 142 - 145)

Page 146

1    Q.  Walk me through the process.  What
2  exactly did you show here?  Was it one remote
3  session?
4    A.  I think we had more than one remote
5  session.  I don't recall.
6    Q.  Do you recall at least one?
7    A.  I recall at least one.
8    Q.  And do you recall what you walked her
9  through?
10    A.  We talked about -- one of the things
11  was adding products.
12    Q.  Okay.
13    A.  I told her we put in a product
14  description, the product name.  I don't know that
15  we did any search engine optimization things.  I
16  showed her where the key words were, that really
17  wasn't my area of expertise.  I showed her where
18  you add the vendor.  We talked about different
19  categories of products.  And then I'm quite sure
20  that I added a product.  I don't remember what
21  product it was, but I would have taken her to that
22  website, and we would have grabbed the image from
23  that -- from the manufacturer's website.
24    Q.  Okay.  And you're saying before closing
25  you showed Melanie how to do this, including going

Page 147

1  to a manufacturer's website to download an image?
2    A.  If I was showing her how to add a
3  product, the only way I could get an image is to go
4  to that vendor's website and show her how to do
5  that.
6    Q.  Do you know what vendor it was?
7    A.  I do not recall.  I do not even recall
8  the image, the product, rather, that we added.  I
9  add products quite a bit.  So I'm sure I just
10  picked one that we were adding.
11    Q.  Did you do this more than once for
12  Melanie?
13    A.  I don't believe so.  I don't remember.
14  We might have.
15    Q.  Okay.  What makes you think that you
16  did it before closing?
17    A.  Because that was something that I knew
18  that I needed to show her how to do.  And we didn't
19  have time to do it when she was at my house.
20    Q.  Why would you need to show her that
21  before closing?
22    A.  She asked me if I could show her some
23  things from the back end of the website, so that
24  when she took over the business, she was ready to
25  go.  And I agreed to allow her to do that.

Page 148

1    Q.  Right.  Now, you heard Melanie's
2  testimony yesterday about this remote PC session,
3  right?
4    A.  Correct.  And she also said I showed
5  her how to add a product.
6    Q.  Okay.  Well, that's a product.  She did
7  say that.  She said that you didn't add an image
8  though?
9    A.  That's not my recollection.
10    Q.  But you don't remember what the image
11  was?
12    A.  I cannot tell you what the image -- the
13  product was that we were adding.
14    Q.  And you don't remember what vendor it
15  was?
16    A.  No, I do not.
17    Q.  Do you know if it was an edible product
18  that you added?
19    A.  I would imagine, because those are the
20  images that change most frequently.
21    Q.  Any other details that you can remember
22  to give us a clear sense of the fact that this
23  happened before closing?
24    A.  I really cannot remember.  There were
25  certain things Melanie wanted me to show her prior

Page 149

1  to closing.  And I was very happy to do that
2  because I was very excited about her taking over
3  the business.
4    Q.  I'm going to go to Schedule B.  We went
5  through this already.  And we discussed how this is
6  a list of things that are not being sold to the
7  buyer.  There's no mention of images here, right?
8    A.  There are no, excuse me.  There are no
9  mention of images, correct.
10    Q.  Okay.  By the way, I forgot during the
11  break, Exhibit P-1 went with you.  Do you still
12  have it?
13    A.  Oh, I'm sorry.
14    Q.  That's okay.  I just, if you could
15  leave the original exhibits here, because I've got
16  to be responsible for them.
17    A.  No.  No, problem.
18      (Exhibit P-3, Bill of Sale, was marked
19       for identification.)
20    Q.  Thank you.  Okay that's it for P-2 for
21  now.
22      I'm going to show you what's been
23  marked as P-3.  At the top it says Bill of Sale.
24  Do you see that?
25    A.  Yes.

Page 158

1    A.  Yes.
2    Q.  Okay.  And then a couple lines down the
3  question is:  "How many times a month does your
4  website go down?"  And your answer is:  "Hardly
5  ever."  We may, I'm sorry, I read the wrong
6  question.  Excuse me.
7    A.  Okay.
8    Q.  Below that one it says:  "What are your
9  costs for making changes to the website?"
10    A.  Okay.
11    Q.  "I.e., what would the company charge to
12  add or remove an additional product to your
13  website?"
14    A.  Yes.
15    Q.  And your answer is:  "We do much of
16  that ourselves.", right?
17    A.  Correct.
18    Q.  And this all happened before you signed
19  the contract for sale, right?
20    A.  Correct.
21    Q.  Would you call this part of the buyer's
22  due diligence in evaluating whether to buy your
23  company?
24    A.  Yes.
25    Q.  Okay.  We're going to go back to P-2,

Page 159

1  which should be --
2    A.  It's right here.
3    Q.  It's a copy of the contract?
4    A.  Right, sure.
5    Q.  Turn to page five, please?
6    A.  Okay.
7    Q.  All right.  Paragraph 15, that's the
8  noncompete provision, right?
9    A.  Yes.
10    Q.  And in the opening statement it says:
11  "For a period of 10 years following the closing or
12  for as long as buyer owns the business, whichever
13  period is lesser.", right?
14    A.  Yes.
15    Q.  Okay.  So that's the term of the
16  noncompete provision, correct?
17    A.  Yes.
18    Q.  All right.  It says:  "The seller will
19  not compete with either directly or indirectly an
20  online edible gift business or other online gift
21  business that markets and sells gifts for special
22  occasions, holidays, celebrations,
23  corporate/business events, gratuities, and/or
24  similar functions here and after referred to as a
25  'Gift Business.'" with initial caps, right?

Page 160

1    A.  Yes.
2    Q.  Do you know who drafted that language?
3    A.  I believe Laurie and Melanie's father.
4    Q.  Okay.  So when you entered into this
5  agreement, did you read this noncompete provision?
6    A.  I did.
7    Q.  Did you read and have an understanding
8  of this first sentence that we just went over?
9    A.  I believe I have an understanding of
10  the entire noncompete clause.
11    Q.  Why don't we just go to that.  What is
12  your understanding of the noncompete clause?
13    A.  My understanding, as explained to me by
14  my attorney, is that I was not able to operate an
15  online edible gifts business.  I could not teach
16  somebody to do the same.  And I could not solicit
17  or contact customers directly for the purpose of us
18  competing, that was my understanding.
19    Q.  Was there any application to vendors?
20    A.  I do not contact or solicit vendors or
21  customers for the purposes of competing, but I was
22  not precluded from speaking to customers or
23  vendors.
24    Q.  Okay.  Well, let's talk about
25  competing.  What's your understanding of competing?

Page 161

1  What would be competing?
2    A.  Opening up another online gift business
3  that competed with Melanie.
4    Q.  Okay.  Is that the only thing that
5  would be competing?
6    A.  That was my understanding.
7    Q.  And does your understanding come from
8  the language in this agreement?
9    A.  It comes from my conversations with my
10  attorney, explaining the language in this
11  agreement.
12    Q.  Okay.  Let's look at the next sentence
13  it says:  "For the purpose herein, the term
14  "compete" means to design, manufacture, market or
15  sell products that utilize the edible gifts concept
16  and applies equally to refraining from teaching any
17  other party, except for the buyer, how to operate a
18  gift business, consult, assist, direct, own or work
19  for a gift business."  Do you see that?
20    A.  Uh-huh.
21    Q.  Okay.  Well, this sentence, to me, it
22  includes the notion that the term "compete" means
23  to market or sell products that utilize the edible
24  gifts concept.  Do you see that?
25    MR. BYRNES:  Objection to the form.

41 (Pages 158 - 161)

Page 162

1     MR. GOLUB: Okay. You can object to
2 the form.
3     A. I see it.
4     Q. Okay. What does that mean to you?
5     A. I, again, will go back to the
6 conversations I had with my attorney as to how this
7 was explained to me.
8     Q. Were these conversations during the
9 negotiations for this agreement?
10     A. I would think they would have had to
11 have been.
12     Q. Did you read this paragraph and have an
13 understanding of your own, independent of your
14 attorney?
15     A. No, I did not. This is my
16 understanding based on conversations with my
17 attorney.
18     Q. All right. Well, the sentence that I
19 just read to you, it includes the words "compete"
20 for this provision, "compete means to market or
21 sell products that utilize the edible gifts
22 concept". It doesn't say anything about an online
23 business, does it?
24     MR. BYRNES: I'm going to object.
25 Calls for a legal conclusion. And in isolation,

Page 163

1 without referencing the prior sentence, which it
2 specifically designs and modifies.
3     MR. GOLUB: That's the legal
4 conclusion. The section I've read doesn't say
5 anything about an online business.
6     MR. BYRNES: Well, the compete
7 definition that it's giving there is given for the
8 purpose of interpreting the first sentence, at
9 least that's my reading of it. So in either way
10 the fact we're debating this because it's a legal
11 -- it's ultimately a legal issue to be decided and
12 she's not in a position to give legal opinions.
13     Q. You see the reference in this position
14 to the edible gift concept?
15     A. I see that, yes.
16     Q. What's the edible gifts concept?
17     A. An online edible gifts business.
18 That's online edible gifts, including the products
19 that are sold on the Edible Gifts Plus website.
20     Q. But the reference to edible gifts
21 concept here for you, it only means an online
22 business?
23     A. Like I said, that's how -- that is my
24 understanding.
25     Q. Did you ever consult anybody after the

Page 164

1 closing about an interpretation of this provision?
2     A. No, because I thought I understood it
3 correctly.
4     Q. Okay. That was based upon your
5 understanding at the time of the closing?
6     A. Correct.
7     Q. Were you involved at all in the
8 drafting of this provision?
9     A. No.
10     Q. You certainly had to review it and
11 approve it, right?
12     A. Yes, I discussed it with my attorney.
13     Q. Okay. The very last sentence says:
14 "The provisions of this paragraph shall survive the
15 close of this transaction." What's your
16 understanding of that?
17     A. I really don't. I can't explain that
18 sentence to you.
19     Q. Okay. Based upon the first portion of
20 this provision where it talked about 10 years or as
21 long as the buyer owns the business, you understood
22 that even after closing, that's when the period
23 starts, 10 years, right?
24     A. I understand that, yes.
25     Q. Under this noncompete provision, could

Page 165

1 you sell the same products as Edible Gifts Plus as
2 long as you didn't have an online business to do
3 it?
4     A. I really didn't give any thought to
5 that.
6     Q. You didn't?
7     A. No, I didn't. I never -- I didn't sit
8 and start extrapolating on what could, what if,
9 what if. This is my understanding of the
10 noncompete.
11     Q. Okay. And just so I make sure I
12 understand it. I'll ask the question again. If
13 you sell a product that Edible Gifts Plus sells,
14 but you're not operating an online website to do
15 it, is it a violation of this noncompete provision?
16     A. Based on my understanding it wouldn't
17 be.
18     Q. Okay. At the time that this agreement
19 was signed, did you have any plans to continue
20 selling products that were sold by Edible Gifts
21 Plus?
22     A. No. My plan was to help Melanie.
23     Q. Okay. Did you have any plan to sell to
24 the customers that belonged to Edible Gifts Plus?
25     A. No, my plan was to help Melanie.

42 (Pages 162 - 165)

Page 190

1 for Sun Trust?
2     A.  No, I did not.
3     Q.  In your entire time owning Edible Gifts
4 you never did?
5     A.  No.
6     Q.  And after the sale of the business you
7 never did?
8     A.  No.
9     Q.  In Paragraph 18, when you say that you
10 never did an order for chocolate bar for
11 Springpoint in 2015, you say that you have not
12 fulfilled this candy bar order, but you don't say
13 anything about any other candy bar order for
14 Springpoint.  Any reason?
15     A.  Not that I recall.
16     Q.  Okay.  But there was a 2014 order and
17 you must have known about that at the time, right?
18     A.  Yes.
19     Q.  Okay.  But just chose not to say
20 anything about it?
21     A.  This was written by my attorney.
22     Q.  Signed by you though?
23     A.  Correct.
24     Q.  Right?  Sworn statement by you,
25 submitted to the court for purposes of this

Page 191

1 lawsuit?
2     A.  That is correct.
3         (Exhibit P-6, Letter dated 4/26/16, was
4         marked for identification.)
5     Q.  All right.  What I've given you is
6 marked as P-6.  It's an April 26th, 2016 letter
7 from Mr. Byrnes, on your behalf, to Mr. Bluestone,
8 who's the former counsel for the Plaintiffs in this
9 case.  And he says: "Enclosed is a copy of Margo's
10 Certified Answers to Interrogatories in the above
11 matter."  Do you see that?
12     A.  Yes.
13     Q.  Okay.  Do you remember -- do you know
14 what an interrogatory is?
15     A.  Questions, I believe.
16     Q.  Okay.  It's written questions presented
17 to you and your attorneys and with a request for an
18 answer, right?  Do you remember sitting down to
19 answer these interrogatories and, actually, I
20 should say, the second document is a copy of the
21 interrogatories.  So Exhibit 6 is two documents;
22 it's your answers to the interrogatories, and
23 annexed thereto, is a copy of the actual
24 interrogatories.
25     A.  Yes, I remember signing this.

Page 192

1     Q.  Okay.  Let's go to -- I'm looking at
2 these side-by-side.  I have the interrogatory on
3 one side and your answers on the other side just so
4 you can see the question and your answer.
5     A.  Okay.  Wait.  Tell me what we're doing.
6     Q.  So that's your interrogatory
7 answers.
8     A.  Okay.
9     Q.  If you go to where your answers start,
10 it's a couple of pages in.  It says answers at the
11 top and a number one?
12     A.  Okay.
13     Q.  Okay.  And the other document, you got
14 to go several pages in, because there are
15 instructions at the beginning.  And then there's a
16 page that's numbered page one at the bottom and at
17 the top it says interrogatories, followed by a
18 numbered paragraph.
19     A.  Okay.
20     Q.  Okay.  Interrogatory 2 it asks you:
21 "Identify every business you have owned or operated
22 from 2010 to the present.  State the nature of each
23 business, and the role you had, and the dates you
24 owned the business."
25     A.  Okay.

Page 193

1     Q.  In response, you identified and you can
2 look at your answers now.  Paragraph 2, you
3 identified Edible Gifts Plus, LLC, and Alice At
4 Your Service, LLC.
5     A.  Correct.
6     Q.  Okay.  Any other businesses you can
7 think of that you owned during that time frame?
8     A.  No.
9     Q.  Okay.  Was Cookie HQ a separate
10 business?
11     A.  Cookie HQ and Candy Wraps Plus were
12 under Edible Gifts Plus.
13     Q.  Okay.  So you viewed all of those under
14 the Edible Gifts Plus banner?
15     A.  Correct.
16     Q.  Okay.  What's MLR Designs?
17     A.  That is just a name of when we were
18 selling some things for my mom on eBay.  I had to
19 give something on a PayPal account.  So we just
20 called it MLR Designs.  That is not a business of
21 any kind.
22     Q.  Okay.  What does MLR stand for?
23     A.  My initials.
24     Q.  What's your middle name?
25     A.  Glen.

49 (Pages 190 - 193)

Page 194

1    Q.   Who came up with MLR Designs?
2    A.   I think me and my son.  We were just
3  trying to figure out what to sell some stuff on, on
4  eBay.
5    Q.   Did MLR Designs, other than do anything
6  other than sell items of personal property on eBay?
7    A.   It was on my PayPal account, that was
8  just the name of the PayPal account.
9    Q.   Was it ever a formal business
10  registered with the State of New Jersey?
11    A.   No.
12    Q.   Forgive me.  Going back to what you're
13  actually selling on eBay under that name, what were
14  you selling?
15    A.   We were trying to sell some things for
16  my mom.  And my son had sold some things on eBay as
17  well.
18    Q.   All personal property?
19    A.   Correct.
20    Q.   Never any product that you
21  manufactured?
22    A.   No.
23    Q.   Never anything that you were selling as
24  a reseller from somebody else?
25    A.   No.

Page 195

1    Q.   Okay.  Did you ever offer any services
2  under the name MLR Designs?
3    A.   I believe for one of the orders that I
4  did with CR Wealth, they paid through PayPal, but
5  that would have come up as MLR Designs.
6    Q.   When you say one of the orders from CR
7  Wealth, do you know what the order was for?
8    A.   It was for holiday gifts they asked me
9  to do.
10    Q.   Edible gifts?
11    A.   Yes.  You have a copy of that order.
12    Q.   Do you know when it was?
13    A.   Say that again?
14    Q.   Do you know when that was?
15    A.   December of 2014.
16    Q.   So after the closing and the sale to
17  Melanie?
18    A.   Yes.
19    Q.   How did that order come about?
20    A.   They called me in a panic, that they
21  hadn't heard from anybody.  And could I please help
22  them.  And I said, let me refer you to Melanie.
23  And he said absolutely not.
24    Q.   Who's "he"?
25    A.   I don't remember his name, Alex

Page 196

1  something.  And he asked if I could please help him
2  figure out a way to get their order done.  It was
3  like a week or two before Christmas.
4    Q.   So they were under a deadline because
5  the holiday was coming?
6    A.   Correct.
7    Q.   And you agreed to help him?
8    A.   I told him I would help them, yes.
9    Q.   Did you consider, at the time, whether
10  that might be an issue in terms of violating the
11  noncompete agreement?
12    A.   I, again, keep telling you my
13  understanding of the noncompete.
14    Q.   So no, it wasn't an issue?
15    A.   I did not see that as a violation.
16    Q.   Did you ever call Melanie to ask her
17  about CR Wealth?
18    A.   I asked him if I could call and talk to
19  her about it or if he would contact her directly.
20  He said absolutely not.
21    Q.   Did he give a reason?
22    A.   Because he had never heard from her.
23    Q.   Okay.  So he never heard from Melanie.
24  So he's not going to order his candy bar order.
25  Was it a candy bar order?

Page 197

1    A.   No.
2    Q.   I'm sorry?
3    A.   I forget what they did.
4    Q.   But he wasn't going to order his
5  holiday order through Melanie because he had never
6  heard from her?
7    A.   Because he had never been contacted by
8  her, that's exactly what he told me.
9    Q.   Did you ever tell Melanie to contact CR
10  Wealth when you sold her the business?
11    A.   I never really had a chance to talk to
12  her about all the customers that we -- she and I
13  would transition together, because she said she
14  would communicate with me through e-mail when she
15  needed something from me.
16    Q.   Okay.  Did you ever send her an e-mail
17  with a list of customers that was important for her
18  to reach out to?
19    A.   No, it was in the database.  She knew
20  that I wanted to show her how to transition
21  customers, and that we were going to do it
22  together.  And as I keep telling you, she did not
23  want to hear from me.
24    Q.   When you say you wanted to show her how
25  to transition customers?

50 (Pages 194 - 197)

Page 234

1 charged me.
2    Q. Yes. You said there was a discount.
3 I'm just asking, how do you know?
4    A. Well, I don't know. I don't know.
5 This is what I paid for these gifts from Sugar
6 Plum.
7    Q. Okay. That's fine. Was this a gift
8 for somebody in particular?
9    A. They were probably holiday gifts. I'm
10 looking. It's Christmastime. I probably brought
11 them over to people's houses for the holidays.
12    Q. Let's move on to Tab 2. All right.
13 This is an order to Lady Fortunes, right?
14    A. Uh-huh.
15    Q. That's Daria Artem?
16    A. Yup.
17    Q. All right. Order date is 8/16/2014 on
18 the top right?
19    A. Correct.
20    Q. And it's after the closing on the sale,
21 right?
22    A. Correct.
23    Q. Okay. Shipped to you again, right?
24    A. Correct.
25    Q. All right. And here we have an edible

Page 235

1 item, caramel toffee giant fortune cookie, right?
2    A. Correct.
3    Q. So now, the price says here is 29.99.
4 Below that there is a discount on this item. It
5 says ASI discount minus $15. Do you see that?
6    A. I do.
7    Q. What's that discount? Do you know?
8    A. The bakers gave me a courtesy account
9 to order products for myself.
10    Q. Okay. What's ASI?
11    A. I guess -- I don't even know what that
12 is. I guess that's just her discount. I don't
13 know.
14    Q. You never heard of that before? ASI
15 discount?
16    A. I think ASI is a trade vendor discount.
17 I don't know what that is. She gave me her
18 wholesale discount.
19    Q. Okay. Why would she do that?
20    A. Like I said, she gave me a courtesy
21 account.
22    Q. Why though?
23    A. Because I was a long time vendor of
24 hers.
25    Q. But you weren't any more. It's just

Page 236

1 extending the benefit?
2    A. She gave me a courtesy account to
3 continue ordering products.
4    Q. Was it because she was your friend?
5    A. No, it was a courtesy account for all
6 the years of business I did with her.
7    Q. Okay. In the items description it
8 says: Fort. And I assume that's the fortune that
9 comes inside the cookie. Is that right?
10    A. Correct.
11    Q. And it says at the end, love Rebecca.
12 Who's Rebecca?
13    A. My daughter.
14    Q. It's safe to assume that's a gift for
15 Rebecca?
16    A. That would be safe to assume.
17    Q. Let's go to Tab 3. Another voice from
18 the Lady Fortunes. This was going to John Page in
19 Palo Alto, California?
20    A. That's friend of mine for his birthday.
21    Q. Okay. How do you know John Page?
22    A. He's a friend of mine. He's a friend
23 of mine.
24    Q. Okay. How long have you known him?
25    A. About 18 years.

Page 237

1    Q. And it's $349.60 gift, right? The
2 quantity of 40, picture Triple Oreo pops, right?
3    A. Correct.
4    Q. That was a birthday gift from you to
5 him?
6    A. Correct. For his 50th birthday, I
7 believe.
8    Q. Okay. Looking at the discount applied
9 here, we have the ASI discount we saw before. This
10 time it's $159.80, right?
11    A. Like I said, she gave me a courtesy
12 account. So the discount would always be applied
13 any time I placed an order.
14    Q. So that discount is associated with
15 your account with Lady Fortunes, right?
16    A. Correct.
17    Q. And then there's another discount, it
18 says wholesaler's discount. That's different from
19 ASI discount. Do you know what that is?
20    A. I have no idea. My guess is, let's
21 say, 350. The total price at the bottom is 175.
22 So it's just a different way, I guess, of splitting
23 the discount.
24    Q. Okay. So you got some wholesaler
25 discount and some ASI discount?

60 (Pages 234 - 237)

Page 238

1    A.  I don't know how that works.
2    Q.  Is it your understanding that all this
3  is part of the courtesy extended to you by Lady
4  Fortune?
5    A.  Correct.
6    Q.  Another personal order, right?
7    A.  Correct.
8    Q.  In your view, just to be clear,
9  personal orders from any of the Edible Gifts
10  vendors after the closing are not a violation of
11  the noncompete provision?
12    A.  That is correct.
13    Q.  Let's go to Tab 4, another order from
14  Lady Fortunes.  This is being shipped to Donald
15  Beck in Boonton, New Jersey?
16    A.  Uh-huh.
17    Q.  Who's that?
18    A.  That is a friend of the family's.
19    Q.  Okay.  Do you know what the occasion of
20  this gift was?
21    A.  I believe it was his birthday.
22    Q.  Okay.  Just a personal gift from your
23  family to Mr. Beck?
24    A.  Right.  And it's actually signed wrong.
25    Q.  Signed wrong?

Page 239

1    A.  I'm looking at it.  It says, love Judy.
2  It should have said love Judy and Marco.
3    Q.  Okay.  Who's Judy?
4    A.  My mom.
5    Q.  What's your mom's last name?
6    A.  Cooper.
7    Q.  Is this the ASI discount applied to
8  this order?  Do you see that?
9    A.  Yes, I do.
10    Q.  But there's no wholesale discount on
11  this one.  Any idea why?
12    A.  No idea why.
13    Q.  Did you ever have any discussions with
14  Daria Artem about the discount she's applied?
15    A.  No.
16    Q.  Did you ever thank her for it?
17    A.  Yes, of course, I said thank you.
18    Q.  Okay.  Did you ever ask her for the
19  discount?
20    A.  I don't recall the conversation.  She
21  told me shortly after I sold the business that she
22  would give me a courtesy account for any orders I
23  wanted to place.
24    Q.  Okay.  Did she specify personal orders?
25    A.  We didn't specify anything.

Page 240

1    Q.  So this applies to any orders you
2  placed with Lady Fortunes even after you sold the
3  business?
4    A.  I didn't have a conversation with her
5  about anything.
6    Q.  Okay.  Is it your understanding that
7  this discount would apply to any order placed with
8  Lady Fortunes by you?
9    A.  That would be my understanding.
10    Q.  Okay.  It's not reserved for personal
11  orders, correct?
12    A.  I didn't have that conversation with
13  her.
14    Q.  Okay.  Let's look at Tab 5, another
15  Lady Fortunes order.  This one is shipped to Micro
16  Strategies, Letty Dempsey.  Do you see that?
17    A.  Yes.
18    Q.  Okay.  And Micro Strategies was a
19  client of Edible Gifts Plus, right?
20    A.  I sent that to her as a gift when her
21  dog died.
22    Q.  Okay.  So this was not a business gift,
23  it was a personal gift?
24    A.  Correct.
25    Q.  Letty is your friend?

Page 241

1    A.  Correct.
2    Q.  Tab 6, Lady Fortunes, a gift to
3  Danielle Cooper at Syracuse University.  Who's
4  Danielle Cooper?
5    A.  My niece.
6    Q.  Okay.  And this one, actually, the
7  signature says love Grandma Judy, but it's on your
8  account.  Does your mom have access to your
9  account?
10    A.  No.
11    Q.  Did you place the order for your
12  mother?
13    A.  Probably.
14    Q.  And I'm assuming Judy and Grandma Judy
15  is Judy Cooper, your mother?
16    A.  Yes, it is.  I think we sent her up
17  with a few different things.
18    Q.  Another personal order, right?
19    A.  Correct.
20    Q.  February 5th, I'm sorry, we're at Tab
21  7.  This is a gift.  It says ship to URI Union
22  Express.  What's that?
23    A.  University of Rhode Island.
24    Q.  I see to Rebecca Rappel.  Who is that?
25    A.  My daughter.

61 (Pages 238 - 241)

Page 242

1    Q.  And here's another one that says love
2  Grandma.  Is that from Judy Cooper?
3    A.  That would be from my mom, correct.
4    Q.  All right.  Let me go back to Tab 7 for
5  a moment.
6    A.  Sure.
7    Q.  It says, in the payment method, there's
8  the billing address clearly shows you at your home
9  address, and the payment method is a Visa card with
10  the last four digits 8983?
11    A.  Uh-huh.
12    Q.  Okay.  If you go back to Tab 6, it's
13  the same Visa card?
14    A.  Okay.
15    Q.  And Tab 5, it's a different Visa card.
16  This one says 4084.
17    A.  I had a couple different Visa cards.
18    Q.  Okay.  So the 8983 Visa card, was that
19  a card that you had when you ran Edible Gifts Plus?
20  Do you know?
21    A.  I do not recall.
22    Q.  Okay.  What about the 4084 card?
23    A.  I do not recall.
24    Q.  And you can go to Tab 4, again.  It's
25  8983 card.  Tab 3 is 8983.  Tab 2 is 4084.  And I

Page 243

1  have one, we can't tell, there's no Visa.  But so
2  far, it looks like two Visa cards that you've used
3  for these personal orders, right?
4    A.  Okay.  Yes.
5    Q.  Tab 8?
6    A.  Yes.
7    Q.  Another Lady Fortunes order.  This one
8  is shipped to you.  And can you tell what this is
9  for based upon the item description?
10    A.  I'm not sure who it's for.  It's from
11  Margo, Stew and Judy.
12    Q.  And Stew is S-t-e-w?
13    A.  Correct.
14    Q.  Who is Stew?
15    A.  My boyfriend.
16    Q.  What's his last name?
17    A.  Kaufman.
18    Q.  Stewart Kaufman?
19    A.  Correct.
20    Q.  Okay.  When did you meet Stewart?  I'm
21  sorry, Mr. Kaufman?
22    A.  Seven years ago.
23    Q.  So you knew him while you were running
24  Edible Gifts Plus?
25    A.  Yes.

Page 244

1    Q.  Okay.  And the Visa card here is the
2  8983.  So it's still two Visa cards, right?
3    A.  Okay.  Yes.
4    Q.  Tab 9, this is an order with the ship
5  to address, again, University of Rhode Island,
6  Rebecca Rappel.  You already said that was your
7  daughter, right?
8    A.  Yes.
9    Q.  This time you're ordering from a
10  different vendor, it's Veronica's Treats, right?
11    A.  Yes.
12    Q.  And that's Hillary Susa?
13    A.  Correct.
14    Q.  Trying to see, I don't see any discount
15  here like Lady Fortunes continued to give you.  Do
16  you see anything?
17    A.  No, I don't see anything.  I think they
18  did give me a discount, but she must do it
19  different.
20    Q.  It's just not shown on this invoice?
21    A.  That's what it looks like.
22    Q.  What makes you think she gave you a
23  discount?
24    A.  Because she told me she was giving me
25  discounts on the orders I placed as a courtesy.

Page 245

1    Q.  Okay.  After you sold the business, it
2  was a similar conversation to the one you had with
3  Daria, Lady Fortunes?
4    A.  Correct.
5    Q.  Continued courtesy because you had been
6  a long time reseller?
7    A.  Correct.
8    Q.  Because you were friends?
9    A.  Because I had been a long time
10  reseller.
11    Q.  Okay.  And I see Visa information,
12  that's your credit card 4084 which we see, right?
13    A.  I believe so, yeah.
14    Q.  Next one is Tab 10.  Ship to Megan
15  Andrew in Red Bank.  Who is that?
16    A.  A friend of mine who had surgery.
17    Q.  Okay.  So it's another personal order,
18  a gift?
19    A.  Correct.
20    Q.  Placed with Veronica's Treats, right?
21    A.  Yes.
22    Q.  In this, at Tab 10, the gift to Megan
23  Andrews, there's an e-mail address at the bottom of
24  the bill to address.  It says, Judiann, Judiann,
25  1962@gmail.com.  Whose e-mail address is that?

62 (Pages 242 - 245)

Page 270

1    Q.  Tab 20, all right.  This is an invoice
2  dated May 8th, 2014.  Do you see that?
3    A.  Yes.
4    Q.  All right.  And it's, again, from --
5  it's an order for Letty Dempsey at Micro
6  Strategies?
7    A.  Yes.
8    Q.  And it says for baby shower - Linda,
9  right?
10   A.  Yup.
11   Q.  Okay.  May 8th, 2014, that's about
12 three months after closing on the transaction?
13   A.  Yes.
14   Q.  Okay.  How did this order come your
15 way?
16   A.  I think I already explained it to you.
17   Q.  Did we talk about this order before?
18   A.  On this particular order, Letty called
19 and asked me if I could get these for her, for --
20 she said she needed something for a shower.
21   Q.  Okay.  And when she called and asked
22 you to do this for her, it's only three months
23 after the closing.  Did you have any thoughts about
24 the noncompete provision at all?
25   A.  We already talked about this.

Page 271

1    Q.  I'm asking you when this call came in,
2  it was an order three months after the closing?
3    A.  I had a general conversation with Letty
4  about Edible Gifts Plus.  And she was annoyed.  And
5  did not want me calling.  And said she wasn't going
6  to work with Melanie, and asked if I could help
7  her.
8    Q.  Okay.  Letty was your friend at that
9  time, right?
10   A.  Yes.
11   Q.  How did you know Alex from CR Wealth
12 Management?  I realize I'm shifting gears.  I just
13 want to go back to that for a moment.  Did you know
14 him at all?
15   A.  I only knew him through business.
16   Q.  How did CR Wealth ever find Edible
17 Gifts and become a customer?
18   A.  On the internet.
19   Q.  Did you ever meet Alex in person?
20   A.  No.
21   Q.  What about Chuck Russell?
22   A.  No, never even spoke to Chuck.
23   Q.  Okay.  Would you consider Chuck or Alex
24 a friend in any way?
25   A.  No.

Page 272

1    Q.  Purely business?
2    A.  Purely business.
3    Q.  All right.  Back to Tab 20.
4    A.  Okay.
5    Q.  There's a lot of handwriting on this
6  invoice.
7    A.  I have no idea what these things are.
8    Q.  Is it your handwriting?
9    A.  It's my handwriting.  I have no idea
10 what it is.
11   Q.  Okay.  Well, let's look at look the
12 order underneath all the handwriting for just a
13 moment.  All right?  It's the baby show for Linda?
14   A.  Uh-huh.
15   Q.  Products ordered are chocolate cake
16 pops, gift basket of 18, correct?
17   A.  Correct.
18   Q.  And a cookie gift basket, right?
19   A.  Uh-huh.
20   Q.  Okay.  Are those items that Edible
21 Gifts Plus sold while you owned the business?
22   A.  Yes.
23   Q.  Is it something that it continued to
24 sell after you sold the business?
25   A.  Yes.

Page 273

1    Q.  Is it something that Melanie could have
2  fulfilled if this order came to her?
3    A.  If Letty had agreed to place it with
4  her, yes.
5    Q.  On the handwriting, let's start at the
6  bottom.  There's number one on the lower right-hand
7  portion of the page.  It says: Ron's gift.  It says
8  a dash and it's a gift note.  Do you see that?
9    A.  Uh-huh.
10   Q.  And near Ron's it looks like an arrow
11 pointing to happy birthday we miss you love, Letty.
12 Do you see that?
13   A.  Uh-huh.
14   Q.  Okay.  Does any of those details -- do
15 any of those details refresh your recollection
16 about what Ron's gift might be?
17   A.  No.
18   Q.  Do you know who Ron is?
19   A.  No.
20   Q.  Do you know if -- does Letty have a
21 husband?
22   A.  Yes.
23   Q.  Is his name Ron?
24   A.  No, I don't believe so.
25   Q.  Okay.  Did you ever meet Letty's

69 (Pages 270 - 273)

Page 274

1  husband?
2      A. I did. I don't remember what his name
3  is. I really don't remember what his name is.
4      Q. Item number two underneath that it says
5  Letty, September 13th, centerpieces smore boxes,
6  300 people. What's that?
7      A. That might have been for the
8  anniversary party she was asking me to help her
9  with.
10     Q. Okay.
11     A. And I don't recall the date of that.
12     Q. Okay. Item four, it says lunch date,
13  and there's an arrow and it says: Schedule for
14  week of 6/16 at the end. Do you see that?
15     A. Yeah. Those are probably just my
16  personal notes on here.
17     Q. Okay. If you go over to the left side
18  of the page, there's a number three. And under
19  that it says send to girl in hospital, kidney
20  cancer, crispy treats. I think it says three-years
21  old. Do you see that?
22     A. I don't know what that is. Yeah. I
23  have no idea what that is. And it says Micro
24  Strategies. So I don't know if it was something
25  Letty was talking to me about.

Page 275

1      Q. Okay. Do you ever remember fulfilling
2  an order for girl in hospital?
3      A. No, I do not.
4      Q. Never?
5      A. No.
6      Q. Okay. Was crispy treats something that
7  Edible Gifts could provide?
8      A. Yes.
9      Q. And that's before and after the sale?
10     A. Correct.
11     Q. Under that there's a number four. It
12  says; cake pops. Looks like it says, Sue Angelo.
13  Do you have any idea what that is?
14     A. No.
15     Q. The next page, it looks like, perhaps,
16  part of the copy of a check that indicates from
17  Micro Strategies is paid and the date of the check?
18     A. Correct.
19     Q. All right. Okay. So you were paid for
20  all the items on the invoice we just looked at?
21     A. I believe so, yes.
22     Q. All right. Two pages in, there's an
23  invoice from Veronica's Treats to you, right?
24     A. Yes.
25     Q. Okay. And it's shipped to Letty at

Page 276

1  Micro Strategies. And the date is 5/8/2014, right?
2      A. Correct.
3      Q. And this looks like it is the invoice
4  from the vendor to you for the items we purchased
5  for Micro Strategies, right?
6      A. Yes, that's what it looks like.
7      Q. Okay. So let's go a few pages past the
8  Veronica's Treats invoice. There's a series of
9  pages with e-mails between you and Letty, right?
10     A. Okay. Yes.
11     Q. Okay. And the next to the last page
12  before Tab 21?
13     A. Uh-huh.
14     Q. At the bottom, there's an original
15  message it says, dated May 8th, 2014. And it's
16  from Letty to you. It says: "The shower is
17  Wednesday. So I guess you were right, I need
18  everything by Tuesday.", right?
19     A. Uh-huh.
20     Q. Okay. So is this about the baby shower
21  that we just looked at?
22     A. I believe so, yes.
23     Q. Okay. And it says: "You were right."
24  Were there any other e-mail communications about
25  this order before this e-mail that you recall?

Page 277

1      A. Everything I have is here.
2      Q. Okay. All right. And on the preceding
3  page, the next to last e-mail is dated Friday, May
4  9th from you to Letty. You say: "Just want to
5  confirm that you received this." And then you say:
6  "Enjoy the weekend. And when can we get together?"
7  Did you have plans to get together with Letty
8  around that time?
9      A. Possibly. I don't remember.
10     Q. Okay. This is, again, three months
11  after the closing of the transaction. This is the
12  first order from Micro Strategies that you placed
13  after the closing?
14     A. I believe so, yes.
15     Q. Why would you get together with Letty
16  at that point?
17     A. I already told you that she was a
18  friend of mine.
19     Q. Above that she writes back: "Oh, Happy
20  Mother's Day, my friend." Above that you write:
21  "Happy Mother's Day to you. Sending you love and
22  hugs."
23     A. That's correct.
24     Q. Sounds like a good friend, right?
25     A. She's a good friend.

70 (Pages 274 - 277)

Page 278

1    Q.  All right, Tab 21?
2    A.  Okay.
3    Q.  This is for Letty at Micro Strategies,
4 again, dated June 17, 2014, right?
5    A.  Correct.
6    Q.  All right.  And it says for assorted
7 gifts, Kim Bier and Sue Angela, right?
8    A.  Okay.
9    Q.  Is this an order you placed or you
10 fulfilled for Micro Strategies?
11    A.  Yes.
12    Q.  It says, the description, it's
13 chocolate cake pop assortment.  Is that something
14 that Edible Gifts Plus sold when you owned the
15 business?
16    A.  Yes.
17    Q.  Is it possible that Edible Gifts Plus
18 sold after you sold the business?
19    A.  Yes.
20    Q.  Okay.  Other than the fact that the
21 order came to you, is there any reason why Melanie
22 couldn't have fulfilled this order?
23    A.  No.
24    Q.  Okay.  This is about four months after
25 the closing.  It's now June 2014.  And it's the

Page 279

1 second order we've seen from Micro Strategies,
2 right?
3    A.  Yes.
4    Q.  A few pages in on this order, there's
5 another series of e-mail exchanges between you and
6 Letty?
7    A.  Okay.
8    Q.  And I'm looking at one that's right
9 after the Veronica's Treats invoice.  It's the
10 first page of e-mails after that.
11    A.  Okay.
12    Q.  All right.  Do you see the e-mails?
13    A.  Uh-huh.
14    Q.  All right.  And the second one up from
15 the bottom, it is a message from Margo to Letty.
16 And it says, the second line: "Funny, I was just
17 setting up Ron's gift, that will ship tomorrow."
18 Do you have any idea what that is?  We saw Ron's
19 name on the previous invoice with handwriting all
20 over it.
21    A.  I feel like I saw that somewhere.
22    Q.  All right.  If you go back to Tab 20,
23 that's the invoice with all the handwriting.  Item
24 number one on the bottom right was Ron's gift?
25    A.  Yup.  I see that.

Page 280

1    Q.  Okay.  So seeing the e-mail exchange
2 later on on June 3rd, does that refresh your
3 recollection at all about what the Ron gift was?
4    A.  Yup.  I feel like I saw it.
5    Q.  You say you feel like you saw it?
6    A.  I feel like I saw it in this notebook,
7 that we past it.
8    Q.  All right.  Past it already?
9    A.  I think so.  I saw something for Ron.
10 I do not know.  I don't know.
11    Q.  So let's go to the very last page of
12 Tab 18.  Can we?
13    A.  Where is that?
14    Q.  Right before Tab 19.
15    A.  Okay.  Go ahead.
16    Q.  Okay.  This says, it's an invoice from
17 Lady Fortunes with a ship to address of Ron Nagus
18 in Encino, California, right?
19    A.  Yup.
20    Q.  Okay.  Could this be the gift we're
21 talking about for Ron?
22    A.  Could be.
23    Q.  The billing address is your address,
24 right?
25    A.  No.

Page 281

1    Q.  Look.
2    A.  Oh, wait.  Oh, yeah.  Yes, it is.
3    Q.  The billing address at the bottom is
4 yours?
5    A.  Correct.
6    Q.  Okay.  So go back to the back of Tab
7 18, which is not what we were looking at.  Is there
8 any way for you to know if this is the gift for Ron
9 that you were talking to Letty about?
10    A.  I do not know, but that is the Ron.
11    Q.  You're sure it's the Ron you were
12 talking about with Letty?
13    A.  I would think so.
14    Q.  Okay.
15    A.  I didn't organize this binder.
16    Q.  No.  So let me ask you this:  Looking
17 at the Summary of Transactions prepared by Mr.
18 Byrnes, there is a Section D, Micro Strategies?
19    A.  Uh-huh.
20    Q.  All right.  And if you go through those
21 List of Transactions for Micro Strategies, I don't
22 see any way to tell from this list whether the Ron
23 Nagus invoice that we found, which is dated
24 12/16/2014, actually, that's the invoice from Lady
25 Fortunes to you.  But based on the date, and based

Page 282

1 on the vendor, and based on the price, I don't see
2 this Ron Nagus order reflected anywhere in the
3 Summary of Transactions, do you?
4     A. No, I don't. I'd have to go back and
5 try to figure it out for you.
6     Q. You see what was sent to Ron Nagus. It
7 says: "Sugar shortbread cookie rectangle, white
8 with Christmas trees. And given the day, it's
9 December 16th, 2014?
10    A. Yup.
11    Q. Sounds like a Christmas gift?
12    A. Yup. I'm guessing it probably was
13 included in one of these other things.
14    Q. Okay. Well, if you go --
15    A. I don't know.
16    Q. Going down the list of Micro Strategies
17 transactions that we see here, I don't see any
18 Christmas 2014 order with Lady Fortunes. Do you?
19    A. Nope, but it could have been bulked in
20 with one of these other bigger transactions, so I
21 don't know.
22    Q. Well, the date wouldn't make sense,
23 though, it's December 2014. And there is no
24 December 2014 here except for Sugar Plum.
25    A. Right. So maybe that included this one

Page 283

1 too from Lady Fortunes.
2     Q. All right. So you say it's lumped in.
3 I mean --
4     A. Right. Yeah, that's what I'm saying.
5 It could be lumped in. I really don't know.
6     Q. Was the Lady Fortunes invoice and the
7 list says Sugar Plum, so it doesn't sound like --
8 if you're calculating who it says from Sugar
9 Plum you wouldn't include Lady Fortunes, would you?
10 Unless you did it by mistake?
11    A. I could have done it by mistake. And I
12 can't sit here and tell you that for sure.
13    Q. Okay. Let's look at Tab 22, all right.
14 This is an invoice dated November 19th, 2015 from
15 you to Letty Dempsey at Micro Strategies, right?
16    A. Uh-huh.
17    Q. It says: "For anniversary celebration
18 McCloone's"?
19    A. Correct.
20    Q. By the way, all the invoices that we've
21 seen before this one for Micro strategies from you,
22 were any of those party planning?
23    A. I wouldn't categorize them as the same
24 way that McCloone's was, no.
25    Q. So they're not party planning, are

Page 284

1 they?
2     A. No.
3     Q. Okay. Are you -- is that another way
4 of saying -- are you saying that this McCloone's
5 invoice is for party planning?
6     A. This McCloone's party, this is for
7 party planning. This was the party planning we
8 talked about.
9     Q. Let's take a look at the description of
10 the items included on your invoice. Okay? The
11 first thing it says: Beach pail favors. And then
12 it says beach pails/beach theme with two cake pops,
13 flip flop Oreo in a bed of sand with shells wrapped
14 and tied with ribbon. That's the first item?
15    A. Yes.
16    Q. Okay. It's a party favor?
17    A. Yes. Those are the favors they gave
18 out.
19    Q. Okay. Those are cake pops and Oreos
20 included in the favor?
21    A. Correct.
22    Q. Is that something that you could have
23 done as Edible Gifts Plus when you owned the
24 company?
25    A. The cake pops and the Oreos, yes.

Page 285

1     Q. Well, the party favors, that whole
2 item?
3     A. I don't know if that would have been
4 possible to do for her.
5     Q. Why not? You were able to do it a few
6 months later when, oh, I'm sorry, in November of
7 2015. But you wouldn't have been able to do it
8 when you owned Edible Gifts Plus?
9     A. I guess it would have been possible to
10 do those favors.
11    Q. Okay. Well, did Edible Gifts plus,
12 during your ownership, did you do custom gifts
13 requested by customers?
14    A. Sometimes, not like that.
15    Q. Okay. But you would do it, right? You
16 get requests, customer requests?
17    A. If I could do it, I would try to do it.
18    Q. Okay. Any reason to think that Melanie
19 couldn't have provided those items?
20    A. No.
21    Q. Okay. Next item it says: "Tray for
22 Anthony's room. Fortune cookies with custom
23 message. Message to read, celebrating 30 years of
24 good fortune with you." Is the tray for Anthony's
25 room separate from the fortune cookies? Is it a

72 (Pages 282 - 285)

Page 286

1 tray of fortune cookies?
2     A. No. I believe that she had me pick up
3 something locally to put in Anthony's room. I
4 don't remember what that was.
5     Q. A tray of food?
6     A. I think so. I don't recall what it
7 was.
8     Q. Okay. And fortune cookies, however, is
9 a separate item?
10     A. Yes.
11     Q. Okay. Fortune cookies, that's
12 something that Edible Gifts sold, right?
13     A. Yes.
14     Q. During your time?
15     A. Yes.
16     Q. And after your time?
17     A. Yes.
18     Q. Then it says: "Anniversary gifts, Joann
19 and Adam, Chris and Kelly Avetta." Do you know
20 what those are?
21     A. I don't recall what those are. She had
22 me pick up something locally, I believe.
23     Q. Do you know if it was food?
24     A. I don't remember what it was.
25     Q. And the next thing it says: "Gourmet

Page 287

1 treats for smore cart." Do you see that?
2     A. Uh-huh.
3     Q. What's that?
4     A. I don't remember. We had a smore cart
5 on the beach with marshmallows and graham crackers.
6 I don't recall what we did.
7     Q. But if you're providing gourmet treats
8 for a smore cart, it sounds like you were providing
9 something having to do with smores or these treats,
10 right?
11     A. Correct.
12     Q. Is that something you would have done
13 with Edible Gifts Plus when you owned it?
14     A. I don't recall what we put on that
15 smore cart. So I couldn't tell.
16     Q. Okay. What about smores, is that
17 something you could have done?
18     A. Marshmallows and graham crackers? That
19 wouldn't have been anything Edible Gifts Plus sold,
20 that's something you pick up at the grocery store,
21 I would think.
22     Q. Could you have done it if a customer
23 wanted some smore treats?
24     A. I'm sure I could have done it.
25     Q. Okay. What about grahams and biscotti?

Page 288

1     A. Yes.
2     Q. Okay. That's something that was part
3 of this order?
4     A. Correct.
5     Q. Is that something that you could have
6 done as Edible Gifts Plus?
7     A. Yes.
8     Q. And any reason to think Melanie
9 wouldn't have done the same when she owned the
10 company?
11     A. No.
12     Q. Customized purse holders, is the last
13 item on this invoice, right?
14     A. Yes.
15     Q. Do you remember what those were?
16     A. Letty had me order something to --
17 hooks to hang for purses. So you hang from the
18 table and put your purse on.
19     Q. Okay. Is that something that you could
20 have done as Edible Gifts Plus?
21     A. I have no idea. She told me where she
22 wanted me to get these from and we bought them.
23     Q. Okay. Still within the same tab, if
24 you turn the page, you'll see a Lady Fortunes
25 invoice to you dated October 14th, 2015. And you

Page 289

1 can see there are several of the items that we saw
2 on the invoice that you sent to Micro Strategies,
3 right?
4     A. That was the whole invoice, correct.
5     Q. A few pages in there's an e-mail from
6 you to, it says, gdesshill@AOL.com. Do you know
7 who that is?
8     A. I believe that's Hillary.
9     Q. Hillary Susa?
10     A. Yes.
11     Q. From Veronica's Treats?
12     A. Correct.
13     Q. Okay. And attached to your e-mail
14 there are a bunch of images. And you can see them
15 over the next several pages. And you say to
16 Hillary, I'm going to call you. Right?
17     A. Yup.
18     Q. Okay. All these images, what was the
19 point of sending them over to Hillary Susa at
20 Veronica's Treats?
21     A. I was trying to figure out what I was
22 going to do for Letty with what she was asking me
23 to do.
24     Q. Okay. So some sort of customized treat
25 with the beach theme?

73 (Pages 286 - 289)

Page 290

1    A.  It was a beach party, yes.
2    Q.  Okay.  But you were ordering customized
3  edible treats with a beach theme, right?
4    A.  Correct.
5    Q.  Okay.  Let's go to there's -- after the
6  e-mails with photos of beach themes, there is an
7  e-mail from Letty to you dated July 3rd, 2014.  Do
8  you see that?
9    A.  July when?
10    Q.  July 3rd.
11    A.  I don't know where you're looking.
12    Q.  Okay.  Keep going.  It looks like this
13  with handwriting on the bottom.
14    A.  Okay.
15    Q.  You see it?  Okay.  So in the middle of
16  the text there's a paragraph that starts anyway.
17  Do you see that?
18    A.  Uh-huh.
19    Q.  Okay.  It says: "This is what I was
20  think about last night.  Anthony loves cookie,
21  candy, sweets."  Do you know who Anthony is?
22    A.  The owner of the company.
23    Q.  What company?
24    A.  Micro Strategies.
25    Q.  Oh, I see.  Okay.  And just to be

Page 291

1  clear, this is an e-mail from Letty to you.  And
2  Letty works at Micro Strategies, right?
3    A.  Correct.
4    Q.  Does Letty work for Anthony?
5    A.  Yes.
6    Q.  Her e-mail continues: "Would you be
7  able to make a plate of something nice for him that
8  I can put in his room with a note?"  So it sounds
9  like the tray that was referenced in the invoice,
10  this is what we're talking about, right?
11    A.  Correct.
12    Q.  A tray of cookie, candy and sweets?
13    A.  Yes.
14    Q.  Okay.  Is that something you could have
15  done as Edible Gifts when you owned it?
16    A.  I suppose so.  She asked me to pick it
17  up from a bakery for her in the area.
18    Q.  I don't see that in this e-mail.  Do
19  you see that in this e-mail?
20    A.  No, it's not in the e-mail, but that's
21  what she asked me to get.
22    Q.  Okay.  But if it was just the general
23  tray of cookie, candy and sweets, is that something
24  that Melanie could have done as Edible Gifts Plus
25  when she took over the business?

Page 292

1    A.  Yes.
2    Q.  Okay.
3    MR. GOLUB:  Why don't we take a five
4  minute break.
5    (A recess transpired.)
6    Q.  Okay.  Back in the binder.  We're
7  looking at Tab 23.  You have it in front of you?
8    A.  Yes.
9    Q.  Okay.  This is an invoice dated
10  September 18, 2014 from you to Letty Dempsey for
11  golf outing, right?
12    A.  Yeah.
13    Q.  Okay.  Invoice is for $1,025.  And the
14  description says:  Golf favors.  It's a trio of
15  gourmet Oreos, wrapped and tied with ribbon and a
16  gift card.  And it also includes gourmet biscotti,
17  right?
18    A.  Yes, sir.
19    Q.  Those kinds of gifts that you could
20  have fulfilled if this order came into Edible Gifts
21  Plus if you owned it?
22    A.  Yes.
23    Q.  And could it have been fulfilled by
24  Melanie after she owned the business?
25    A.  Yes.

Page 293

1    Q.  Okay.  Next Tab is 24.  It's an invoice
2  dated November 12th, 2014, to Letty Dempsey at
3  Micro Strategies.  It says for meeting slash tricky
4  tray.  And it's for cake pops and truffles, right?
5    A.  Yes.
6    Q.  Those are items that you could have
7  fulfilled when you owned Edible Gifts Plus?
8    A.  Yes.
9    Q.  What about when Melanie took over the
10  business?  Is there any reason she couldn't have
11  fulfilled this order?
12    A.  No.
13    Q.  Tab 25, it says -- one moment.  I'm
14  sorry.  Before I begin any questions on Tab 25,
15  back to Tab 22, please.
16    A.  Okay.
17    Q.  This is the anniversary celebration
18  from McCloone's, right?
19    A.  Correct.
20    Q.  Everything on this invoice, as far as I
21  can tell, with the possible exception of the
22  customized purse holders, and we don't know what
23  the anniversary gifts were for Joann and Adam and
24  Chris and Kelly.
25    A.  Uh-huh.

Page 294

1    Q.  Every one of those items, other than
2  those, appear to be things that Edible Gifts Plus
3  either could have fulfilled by either you or
4  Melanie, depending on who owned the business at
5  that time, right?
6    A.  Say that again?
7    Q.  Could you have fulfilled the order for
8  everything else when you owned Edible Gifts Plus?
9    A.  I don't think the purse holders.
10    Q.  Well, I'm saying everything except the
11  purse holders and you don't know what the
12  anniversary gifts were?
13    A.  I don't remember what those were.  And
14  not all the party planning time that I put into
15  that, but for the products, yes.
16    Q.  So for the cake pops?  Yes?
17    A.  Yes.
18    Q.  For the flip flop Oreo?  Yes?
19    A.  Yes.
20    Q.  For the fortune cookies?
21    A.  Yes.
22    Q.  For the tray for Anthony's room?
23    A.  I suppose so, yes.
24    Q.  Okay.  For the gourmet treats for the
25  smores cart?

Page 295

1    A.  Yes, sir.
2    Q.  The grahams and biscotti?
3    A.  Yes.
4    Q.  Okay.  Do you have any idea the
5  breakdown of these items and what they cost?  Do
6  you know there's attachments here?  Could you piece
7  together what was -- what you were charging Letty
8  for with respect to the anniversary gifts or the
9  purse holders?
10    A.  She was getting charged what the
11  products cost plus my time for the party planning
12  services.
13    Q.  Okay.  Did your time include dealing
14  with Hillary Susa for Veronica's Treats to get the
15  details of the party favors, correct?
16    A.  My time, primarily, included the things
17  that I told you before; helping set up the tables,
18  the tents, the overseeing the florists, things like
19  that, that was where the bulk of my time was spent.
20    Q.  Did it include the time spent getting
21  the products from the vendors that were Edible
22  Gifts?
23    A.  It would have had to have included
24  that.  I didn't charge her for -- I only charged
25  her for these product costs.  I don't have a

Page 296

1  breakdown of how my time was allocated.
2    Q.  Are you saying you charged her your
3  cost for these products or did you make profits on
4  them?
5    A.  There's no profit on the product
6  because I was spending a great deal of time
7  planning the party.
8    Q.  So I don't see any entry here for time
9  spent, do you?
10    A.  She just -- this is how she asked me to
11  bill her, so this is how I billed her.
12    Q.  Okay.  Was there any documentation of
13  the time you spent on this party planning?
14    A.  I'd have to go back and look to see if
15  I have any records.  I don't believe I do, because
16  they would be here.  This is how she told me to
17  send her an invoice.
18    Q.  Did she tell you not to put any entry
19  for time?
20    A.  She just said just put anniversary
21  celebration, just list the different things we
22  bought and give her a total for everything.
23    Q.  Okay.  Do you have any documentation
24  anywhere that would tell you what the anniversary
25  gifts were for Joann and Adam and Chris and Kelly?

Page 297

1    A.  I don't believe so.
2    Q.  You would have produced it if you did?
3    A.  If I had it, I would have given it to
4  you.
5    Q.  Could it be some of the Edible Gifts
6  that are attached to the backup for this invoice?
7    A.  I don't think so.  I don't know.
8  Whatever is here.
9    Q.  Why don't you take a look.  Let me know
10  if you find anything that could be the anniversary
11  gifts that we're talking about.
12    A.  I don't see anything here, so no.
13    Q.  Do you know where you got the
14  anniversary gifts from?
15    A.  I don't recall.
16    Q.  Do you know where you got the
17  customized purse holders from?
18    A.  No, I don't remember that at all.
19    Q.  How did you find the customized purse
20  holders?
21    A.  I think Letty might have told me where
22  to order them from.
23    Q.  Okay.  So there was no time on your
24  card involved in finding them?
25    A.  No.

75 (Pages 294 - 297)

Page 298

1    Q.  Why didn't Letty just order them
2 herself?
3    A.  She was trying to have me do a lot of
4 stuff for her.
5    Q.  Okay.
6    A.  I don't see it here.
7    Q.  Do you know who Joann and Adam are?
8    A.  No.
9    Q.  Do you know Chris and Kelly Avetta are?
10    A.  No.
11    Q.  Did you meet them at this event?
12    A.  Not that I recall.
13    Q.  Did you have conversations with Letty
14 about those anniversary gifts?
15    A.  I would imagine I must have.  I don't
16 remember what we did.
17    Q.  Okay.  You don't recall any specific
18 conversation where you discussed what she wanted to
19 provide to those couples as anniversary gifts?
20    A.  No, I do not.
21    Q.  Do you distinctly recall that they were
22 not edible gifts?
23    A.  I don't recall one way or the other.
24    Q.  Okay.  I think we were up to Tab 25.
25 Go back to Tab 24 for a moment.  I know we talked

Page 299

1 about the meeting, tricky tray?
2    A.  Yup.
3    Q.  What I don't recall is, if I asked,
4 this order was cake pops and truffles.  Did I ask
5 you whether this order could have been fulfilled by
6 you when you owned Edible Gifts Plus?
7    A.  I don't recall if you asked that, but
8 the answer would be yes.
9    Q.  And could it be filled by Melanie today
10 as the owner of Edible Gifts Plus?
11    A.  I would imagine so, yeah.
12    Q.  Tab 25, another Micro Strategies order,
13 right?
14    A.  Yes.
15    Q.  This one's holiday gifts and cocktail
16 party 2014?
17    A.  Yes.
18    Q.  Okay.  The items here you have the cake
19 pop arrangement, we have medium holiday tray.  I
20 should say, a medium holiday tray.  It looks like
21 there were four, if you look at the quantity.  Two
22 large holiday trays, 10 marshmallow trees, and then
23 shipping and handling charge.  These are all Edible
24 Gifts items, right?
25    A.  Yes.

Page 300

1    Q.  These items that you could have
2 fulfilled when you owned Edible Gifts Plus?
3    A.  Yes.
4    Q.  And items that Melanie could have
5 fulfilled as owner of Edible Gifts Plus?
6    A.  Not with the trays.  They were from
7 Sugar Plum's.
8    Q.  So what does that mean?
9    A.  Melanie terminated her relationship
10 with Sugar Plum.
11    Q.  This invoice doesn't say anything about
12 Sugar Plum, does it?
13    A.  No, it doesn't, but you see the
14 attached invoice is for Sugar Plum.
15    Q.  Okay.  Could Melanie have ordered trays
16 from another vendor?
17    A.  Well, no, because these were the ones
18 that Letty specifically wanted.
19    Q.  Okay.  I don't see any e-mail
20 communications with Letty where she makes that
21 clear.
22    A.  I'm sure she would have had a
23 conversation with me about it.
24    Q.  Okay.  Why do you say Melanie couldn't
25 fulfill an order from Sugar Plum at this time?

Page 301

1    A.  Melanie ended her relationship with
2 Sugar Plum.
3    Q.  Do you know when that was?
4    A.  I believe it was in March or April.  I
5 do not recall.
6    Q.  Of?
7    A.  2014.
8    Q.  You said March or April of 2014?
9    A.  I believe so.  You have to look at
10 Fran's certification.
11    Q.  That's Fran Edley?
12    A.  Correct.
13    Q.  There's two other vendors I think we
14 talked about today wherein relationship terminated
15 between Edible Gifts and the vendor.  One was Sugar
16 Plum.  Do you know if the relationship with
17 Veronica's Treats terminated with Edible Gifts
18 Plus?
19    A.  Through Melanie, that you talked about
20 that yesterday.
21    Q.  Well, I didn't talk about it.
22    A.  Melanie talked about that yesterday.
23    Q.  During her deposition?
24    A.  Correct.
25    Q.  Okay.  Before that, did you know

76 (Pages 298 - 301)

Page 302

1 whether Melanie still had a working relationship
2 with Veronica's Treats?
3     A.  Yes, I knew from Hillary that she did
4 not.
5     Q.  Do you know when that relationship
6 terminated?
7     A.  No, I do not.
8     Q.  How did you find out from Hillary?
9     A.  I think she told me.  Then when I think
10 when she sent her response to subpoena, I think all
11 that information was in there.
12    Q.  Okay.  She told you by phone?
13    A.  I believe so, yes.
14    Q.  Do you know when?
15    A.  No.
16    Q.  And Lady Fortune's relationship with
17 Edible Gifts Plus terminated when Melanie owned the
18 business, right?
19    A.  Yes.
20    Q.  Okay.  When was the first time you
21 found out about that?
22    A.  Probably last summer sometime.
23    Q.  And how did you find out?
24    A.  Daria called me at one point very angry
25 about what was going on.  I didn't really

Page 303

1 understand it.  And then Melanie sent me an e-mail
2 at one point saying she wasn't working with Lady
3 Fortunes.
4     Q.  She sent you an e-mail?
5     A.  In response to my question as to when
6 she was going to send her next payment.
7     Q.  Melanie sent you an e-mail saying she
8 is not going to work with Lady Fortunes anymore?
9     A.  She said something along the lines of
10 Lady Fortunes.
11    Q.  Did she say why?
12    A.  No.
13    Q.  Did she say it was her decision?
14    A.  She didn't say.
15    Q.  Was it prospective, like, I'm not going
16 to work with them; or was it, I'm not working with
17 them anymore?
18    A.  I don't recall.
19    Q.  Do you know of any other vendors that
20 Edible Gifts Plus did business with when you owned
21 the business, that stopped doing business with the
22 company once Melanie took over besides those three?
23    A.  Well, I know Melanie discontinued her
24 relationship with Candy Wraps Plus and Charmyn
25 Group.

Page 304

1     Q.  Well, that's the same thing, right?
2     A.  Yeah, yeah, yeah.  Yes, I agree.
3     Q.  Okay.  Anyone else?
4     A.  I know Melanie discontinued her
5 relationship with Gift Marketing Alliance.  I don't
6 know of anybody else.
7     Q.  Okay.  Do you know that's GMA?  People
8 refer to it as GMA?
9     A.  Yes.
10    Q.  Do you know why that relationship
11 ended?
12    A.  Yeah.  I had e-mails from Melanie said
13 she was not going to use them anymore.
14    Q.  Okay.  Did you have any conversations
15 with Melanie about that?
16    A.  No.
17    Q.  Melanie told you in an e-mail that she
18 was wasn't going to use them?
19    A.  Yes, I believe so.
20    Q.  Do you know when that was?
21    A.  March of 2014 maybe.
22    Q.  So a month after the business sold?
23    A.  Yes.
24    Q.  Who's the owner of GMA?
25    A.  I'm pretty sure it's Alex and Debbie

Page 305

1 Quintona.
2     Q.  Okay.  We mentioned Debbie Quintona
3 before.  Are you friends with her?
4     A.  Business associates.
5     Q.  Purely business?
6     A.  Yes.
7     Q.  Okay.  You don't engage in any social
8 activities with her, other than professional
9 conversations or communications?
10    A.  Correct.  She lives in California.
11    Q.  Well, so does Daria Artem, right?
12    A.  Well Daria's been here for trade shows.
13    Q.  Okay.  But you consider Daria more of a
14 friend?
15    A.  Correct.
16    Q.  And who is the owner of Charmyn Group?
17    A.  I don't remember her last name.
18    Q.  Don't know her last name, probably not
19 a close friend?
20    A.  No.
21    Q.  Ever met her?
22    A.  No.
23    Q.  Do you know where she's based?
24    A.  Florida.
25    Q.  So we did talk about the extent of your

77 (Pages 302 - 305)

Page 306

1 relationship with some of your vendors;
2 specifically, Fran Edley, Sugar Plum. You said you
3 considered her a friend, right?
4    A. Correct.
5    Q. Hillary Susa at Veronica's Treats is
6 considered a friend?
7    A. She's a business associate friend, yes.
8 Never met her.
9    Q. Okay. And Daria Artem a friend and a
10 business acquaintance, but more of a friend, right?
11   A. More of a business acquaintance.
12   Q. Really?
13   A. Really.
14   Q. You said earlier she's your friend.
15   A. You have to define friend. I have
16 socialized with her through business. I don't
17 socialize with her any other time.
18   Q. Okay. All vendors that you worked with
19 when you owned Edible Gifts Plus, right?
20   A. Yes.
21   Q. And all of them, for one reason or
22 another one, almost very soon after the closing,
23 are not doing business with Edible Gifts Plus any
24 more, right?
25   A. Say that again?

Page 307

1    Q. All of them were vendors of Edible
2 Gifts Plus when you owned the business, right?
3    A. Yes.
4    Q. Okay. Sitting here today, to your
5 knowledge, none of them are vendors for Edible
6 Gifts Plus, right?
7    A. That would have been Melanie's
8 decision, correct.
9    Q. Well, that's what you're saying, but
10 that wasn't my question. My question was: They're
11 not vendors for Edible Gifts Plus, right?
12   A. No, they're not.
13   Q. Did you have anything to do with the
14 termination of any of those relationships?
15   A. Absolutely not.
16   Q. Never discussed that with any of the
17 owners or those vendors?
18   A. Absolutely not.
19   Q. They're friends slash business
20 acquaintances of yours. Never came up?
21       MR. BYRNES: Asked and answered.
22   Q. I'm just probing and seeing if I can
23 jog some memories here, because these are friends
24 and people you did business with a long time.
25       MR. BYRNES: Is that a question?

Page 308

1       MR. GOLUB: Yup.
2    A. I've answered your question already.
3    Q. Okay. You say no, right?
4    A. I had nothing to do with the decision
5 for Melanie and these vendors to cease working
6 together.
7    Q. You continued to do business with all
8 three of them after the closing, didn't you?
9    A. They gave me courtesy accounts to do
10 business with them.
11   Q. Well, you sold products that you sold
12 when you were running Edible Gifts Plus and used
13 these vendors to do it, didn't you?
14       MR. BYRNES: Which vendors are you
15 talking about?
16       MR. GOLUB: The three we're talking
17 about.
18       MR. BYRNES: Well, does that include
19 Market Alliance?
20   Q. Do you know what three vendors we're
21 talking about?
22   A. You should probably repeat them again
23 for my benefit and Sean's.
24   Q. Yeah, boy. Okay. Sugar Plum?
25       MR. BYRNES: I'm only asking the last

Page 309

1 one you talked about was Gift Market Alliance.
2       MR. GOLUB: I'm going to give you the
3 benefit of the doubt.
4    Q. Talking about Sugar Plum.
5    A. Okay.
6    Q. We're talking about Veronica's Treats,
7 and we're talking about Lady Fortune. Those are
8 the three I was talking about. And I asked you,
9 specifically, if you had anything to do with the
10 termination of the business relationship.
11   A. And I said an emphatic no.
12   Q. Okay. But that's the context in which
13 my questions came. So we know who we're talking
14 about.
15   A. Correct.
16   Q. And you do business with all three of
17 them. You did business with all three of them
18 after the closing, didn't you?
19   A. Correct.
20   Q. Okay. And they gave you -- did all
21 three of them give you courtesy discount accounts?
22   A. Yes, I'm sure they would have.
23   Q. Okay. So they wanted to keep doing
24 business with you, right?
25   A. They wanted to give me the courtesy of

78 (Pages 306 - 309)

Page 310

1 their discount as a result of my long standing
2 relationship with them.
3        Q.   Okay.  But there's still a benefit for
4 them because you are still ordering from them to
5 fill orders for customers of yours, right?
6        A.   I suppose if that's how you want to
7 look at it.
8        Q.   Well, is that inaccurate?
9        A.   That's your definition, yes.
10       Q.   I asked you if there's any benefits to
11 these vendors of you ordering from them.  Is there?
12       A.   I think it's more a courtesy than
13 anything else, but that would be for them to
14 respond to.
15       Q.   Okay.  You don't see any benefit.  It's
16 mostly a courtesy because you're friends?
17       A.   Courtesy because I've been a long
18 standing vendor of theirs.
19            MR. GOLUB:  All right.  Before we leave
20 the record.  So we have an issue and that is
21 something that Mr. Byrnes and I tried to work out,
22 but I'm told that 30 minutes ago by Mr. Byrnes that
23 he has a hard stop time of 5:45 today, and the
24 witness has a hard stop time of 6:00 p.m..  I'm not
25 done.  And I have to take a look to see how much

Page 311

1 more time I have.  But, clearly, I'm not even going
2 to finish by 6 o'clock when Miss Rappel has to
3 leave anyway.
4        For the record, my client's sat for a
5 deposition that ended right around 6 o'clock
6 yesterday.  It was a full day.  Mr. Byrnes said he
7 was finished.  I started today with every intention
8 of finishing and I ran out of time.  We have more
9 depositions scheduled tomorrow, back-to-back, at my
10 office.  And I have asked for Miss Rappel to be
11 available to continue her deposition.  And I'm told
12 that that's not possible.  Mr. Byrnes and I will
13 discuss tomorrow and figure out how we're going to
14 finish these depositions.
15       Miss Rappel, I will continue with your
16 deposition.  So that's all I have to say.  Have a
17 good evening and we'll hope to schedule as soon as
18 possible.
19            MR. BYRNES:  I just want to put
20 something on the record.  It is now almost 5:50.  I
21 think our dep started about -- the deposition
22 started about 9:35.  I did finish my deposition
23 yesterday.  I made sure I finished my deposition
24 yesterday.  And even though I certainly could have
25 gone longer than the time we were there, but it was

Page 312

1 approximately 5:45 or so when we finished
2 yesterday.  And given that the discovery order
3 presently covering this case has discovery ending
4 on August 31st, I just wanted to make sure I got
5 through as much as I could, as rapidly as I could
6 by the end of that day, not knowing what's going to
7 happen with that discovery end date.  We do have
8 depositions scheduled tomorrow.  I have no idea if
9 my client's available, but I am not optimistic that
10 we would be able to squeeze her in when I have
11 depositions of two individuals tomorrow up in
12 Parsippany.  So I make no statements or
13 representations about what happens after this or
14 what we may work out.
15       I always proceed in good faith.  So,
16 you know, we'll see what we can work out.  But I
17 think, for the record, we've had equivalent time
18 with the two witnesses today -- yesterday and
19 today.  So that's all I have.
20            MR. GOLUB:  All right.  I hope to work
21 it out with you.  If we can't, I will have to ask
22 the judge for the ability to continue this
23 deposition beyond the close of discovery which is
24 tomorrow.
25       (Deposition was concluded at 5:50 p.m.)

Page 313

1            C E R T I F I C A T E
2
3        I, CATHERINE GOLEMBESKI, a Certified Court
4 Reporter and Notary Public of the State of New
5 Jersey and a Registered Professional Reporter do
6 hereby certify that prior to the commencement of
7 the examination the witness was sworn by me to
8 testify the truth, the whole truth and nothing but
9 the truth.
10       I DO FURTHER CERTIFY that the foregoing is a
11 true and accurate transcript of the testimony as
12 taken stenographically by and before me at the
13 time, place, and on the date hereinbefore set
14 forth.
15       I DO FURTHER CERTIFY that I am neither a
16 relative nor employee nor attorney nor counsel of
17 any party in this action and that I am neither a
18 relative nor employee of such attorney or counsel,
19 and that I am not financially interested in the
20 event nor outcome of this action.
21
22       *Catherine Golembeski*
23       Notary Public of the State of New Jersey
         Certificate No. XI01288
24
25

79 (Pages 310 - 313)